## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DEKALB COUNTY, FULTON COUNTY, and COBB COUNTY, GEORGIA, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:_____ |
| | ) | |
| HSBC NORTH AMERICA HOLDINGS INC., HSBC INVESTMENTS NORTH AMERICA INC., HSBC FINANCE CORPORATION, HSBC MORTGAGE CORPORATION, HSBC MORTGAGE SERVICES INC.,  HSBC MORTGAGE SERVICES WAREHOUSE LENDING INC., HSBC USA INC., HSBC BANK USA, NATIONAL ASSOCIATION, DECISION ONE MORTGAGE COMPANY, LLC, HSBC MARKETS (USA) INC., HSBC SECURITIES and HSBC CORPS 1-50, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.      Plaintiffs DeKalb County, Fulton County, and Cobb County,

Georgia, bring this action pursuant to the Fair Housing Act, 42 U.S.C. § 3601 et

seq. ("FHA"), which protects communities (and the individuals residing in them)

from discriminatory acts, policies and/or practices that make housing unavailable

or establish terms and conditions in real-estate related transactions, including real estate financing activities, that discriminate on the basis of race or ethnicity.

2.     Plaintiffs seek injunctive relief to remedy, and monetary damages for, Defendants' predatory and discriminatory residential mortgage lending and servicing activities that have resulted in - and will continue to cause - unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies in Plaintiffs' communities and neighborhoods, particularly those communities with high percentages of FHA protected minority residents.

3.     The foreclosure crisis is the foreseeable and inevitable result of Defendants' (and other industry participants') aggressive, targeted marketing and making of predatory high cost, subprime, ALT-A and certain other conforming first and second lien home mortgage loans that enabled Defendants to capitalize on a relatively short term opportunity to earn enormous fee income before the housing bubble burst.  This crisis has caused tremendous tangible and intangible damage to Plaintiffs including the erosion of Plaintiffs' tax base; the loss of property tax revenue; out-of-pocket costs relating to abandoned or vacant properties; the loss of certain intangible property recording fee income; and many other injuries to the fabric of Plaintiffs' communities and residents arising from the resulting urban blight.

4.     Plaintiffs, who are the embodiment of all the communities, neighborhoods and residents they collectively represent, seek to hold Defendants financially accountable under the FHA for that portion of Plaintiffs' injuries that Defendants' own actions *already have caused* to Plaintiffs' communities and neighborhoods (as distinct from the individual borrowers who also have been harmed).  As contemplated by the FHA Plaintiffs also seek to hold Defendants financially accountable for that portion of Plaintiffs' injuries that Defendants' own actions *are about to cause* through additional mortgage delinquencies, defaults, home vacancies and/or foreclosures.  Collectively, Plaintiffs' financial injury caused by these Defendants is in the *hundreds of millions of dollars*.

5.     Predatory lending is hallmarked by unfair lending practices that place the financial interests of the lender above the best interests of the borrower. Predatory mortgage lending practices, which ultimately generate mortgage loans that are not sustainable by the borrower and are destined to fail, include:

- targeted marketing of  mortgage loans on unfavorable terms to vulnerable borrowers who are unsophisticated or without access to traditional credit sources;

- steering credit worthy borrowers to more costly loans;

- incorporating into mortgage loans unreasonable terms, excessive fees, pre-payment penalties, and/or yield spread premiums  to the loan broker (i.e. kick-backs);

- basing loan values on inflated or fraudulent appraisals,

- repeated refinancing of loans that does not benefit the borrower and often jeopardizes the property (loan flipping);

- lending based on the value of the real estate asset collateralizing the loan, not the borrowers' ability to repay ("equity-stripping"); and

- inclusion of other loan terms and conditions that make it difficult or impossible for a borrower to reduce their indebtedness.

6.      As evidenced by the percentage of borrowers who were steered to and received subprime loans even though they would have qualified for a prime loan, predatory lending practices were rampant in the subprime mortgage lending industry during the boom years of 2003 through 2007.  As reported in a study commissioned by the *Wall Street Journal*, in 2005 approximately 55% of subprime borrowers would have qualified for a prime rate loan and in 2006 that number jumped to 61% of subprime borrowers. "*Subprime Debacle Traps Even Very Creditworthy*," *Wall Street Journal*, December 3, 2007.  Indeed, in 2004 when a FICO credit score of 620 would qualify a borrower for a prime interest loan, then-Federal Reserve Governor Edward Gramlich noted that half of all subprime borrowers had credit scores of 620 or higher.  "*Subprime Loan Market Grows Despite Troubles*," USA Today, December 14, 2004.

7.      Gramlich had warned in early 2001 "that a fast-growing new breed of lenders was luring many people into risky mortgages they could not afford."   "*Fed Shrugged as Subprime Crisis Spread*," *Wall Street Journal*, December 3, 2007.   As reported by the Government Accountability Office ("GAO") the "[m]ortgages originated from 2004 through 2007 accounted for the majority of troubled loans" and the percentage of mortgages completing the foreclosure process increased for each successive year.   Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, "*HOME MORTGAGES Recent Performance of Nonprime Loans Highlights the Potential for Additional Foreclosures,*" GAO-09-922T (July 28, 2009).   Based on a recent survey of large national lenders, the Office of the Comptroller of the Currency reported that as of June 30, 2011, nationwide 28.1% of subprime loans are seriously delinquent or in foreclosure as compared to only 5.5% of prime loans. Thus, subprime loans are more than 5 times more likely to be seriously delinquent or in foreclosure than prime loans.

8.      Mortgage lending deregulation in the 1980s set the stage for a boom in predatory, subprime mortgage lending in minority communities which, historically, were in need of credit.   Traditional regulated bank lenders, such as federally insured savings banks, had limited capital to make loans and were not

financially incentivized to lend in minority communities because lenders of traditional, conforming mortgage loan products were paid based on a percentage of the total amount of the mortgage loan they made.  This encouraged mortgage lenders to avoid lower value real estate markets, such as those typical of urban minority communities, and instead focus their efforts on higher value real estate markets where they could make more income, i.e., predominately non-minority communities.

9.      Unlike traditional mortgage lenders, Defendants (among other industry participants) had mortgage lending operations that were not subject to federal banking regulations and regulatory oversight, and developed and sold riskier mortgage loan products with predatory features that generated more income through higher interest rates and substantial fees. And, unlike traditional mortgage lenders that held the mortgage loans they made, Defendants utilized very little of their own capital, instead obtaining capital from investors by packaging and selling mortgage loans into securitizations.

10.      Importantly, the securitization process allowed Defendants to pass the risk of loss of the underlying mortgages onto the investors in the securitizations, while simultaneously obtaining capital from those investors to make many, many, more mortgage loans and thereby earn far greater income from both interest and fees on loans and the fees on the securitizations.  Defendants

made even more fees by servicing and/or foreclosing on the loans they had originated or had generated through their wholesale lending channel. Thus, Defendants' business model and goal was to make as many mortgage loans as possible, at the highest interest rates possible, and for the largest loan amounts possible, irrespective of whether such loans actually could be repaid.

11.    To quickly ramp up this business model, in early 2003 HSBC plc (Defendants' U.K. based parent) purchased Household Finance Company (now, Defendant HSBC Finance Corporation), a well-known predatory and discriminatory mortgage lender and servicer that, at the time, recently had settled several legal actions relating to Household's predatory and discriminatory mortgage lending practices.[1]  Utilizing Household's operations and niche subprime consumer lending and marketing techniques that inherently focused on FHA protected minority borrowers, Defendants then added the remaining ingredients

---

[1] These included Household's payment of $484 million in late 2002 to settle claims with all 50 States Attorneys General (and the District of Columbia) for violations of federal and state consumer protection, consumer finance and banking laws relating to Household's predatory and discriminatory mortgage lending practices; and an agreement by Household in 2003 to settle a somewhat related nationwide class action brought by the Association of Community Organizations ("ACORN"), providing relief to Household's borrowers who were at risk of losing their homes through, among other things, mortgage loan interest rate reductions, waiver of unpaid late fees and principal reductions.

necessary to fuel massive growth in its subprime mortgage lending operations including:

- employing a two-step strategy in targeting FHA protected minorities, use of "state of the art algorithms" that incorporated credit data and a sophisticated predictive behavior modeling techniques designed by HSBC that relied on data obtained from data mining companies that were used to identify the consumers best suited to receive and likely to respond to marketing material;

- employing a two-step "up-sell" strategy in targeting FHA protected minorities by first targeting them for unsecured credit products such as credit cards prior to targeting them for conversion to equity stripping mortgage products which HSBC considered "more profitable";

- distributing mortgage applications and loans between Defendants' unregulated subprime mortgage lending operations and regulated banking entities;

- providing greater access to capital markets for securitizations;

- making available massive amounts of capital for subprime loan originations by Defendants' own entities and Defendants' wholesale channel of brokers and correspondent lenders; and

- financially incentivizing Defendants' management, employees and wholesale lending channel to make as many mortgage loans as possible based on the value of the borrowers' home, at the highest interest rates and with the highest amount of fees borrowers would accept including prepayment penalties, irrespective of the borrowers' ability to repay the loan.

    12.    The net effect of Defendants' actions enabled and incentivized

every participant in the process to follow the path of least resistance to make as

many high cost, subprime mortgage loans as quickly as possible.  To obtain willing borrowers, Defendants focused their direct and wholesale lending activities on communities and neighborhoods, including Plaintiffs', with high concentrations of FHA protected minority homeowners (particularly African-American and Hispanic homeowners), targeting both those geographic areas and the minority homeowners who live there, as the quickest and easiest way to make such loans.  Communities with high concentrations of such potential borrowers, and the potential borrowers themselves, were targeted because of the traditional lack of access to competitive credit choices in these communities and the resulting willingness of FHA protected minority borrowers' to accept credit on uncompetitive rates.

13.     As a result, Plaintiffs' communities and neighborhoods with relatively higher concentrations of FHA protected minority homeowners have disproportionately and disparately received more of such high cost, subprime loans, and have been disproportionately and disparately impacted by the increased delinquencies, defaults, foreclosures and home vacancies resulting from such loans.  Indeed, both the relative percentage share of such loans -- and the resulting increased levels of loan delinquencies and defaults, loan foreclosures, and home vacancies -- increase in direct relationship to increases in the percentage concentrations of FHA protected minorities in Plaintiffs' communities and neighborhoods.

14.     From the outset Defendants knew the risks involved in their "equity stripping" subprime mortgage lending activities that were intended to – and did - drive Defendants' massive growth, and Defendants took numerous steps to obfuscate, segment or pass to third parties the liability for such activities.  For example, among other things Defendants:

- created a centrally coordinated and controlled organizational structure enabling a one-way referral scheme designed to direct high cost or subprime mortgage loans to Defendants' unregulated subprime lending entities to avoid regulatory oversight in their bank regulated entities, particularly with respect bank safety and soundness;

- extended new credit to delinquent unsecured credit card clients and by extending new credit to delinquent mortgage loan clients by "rewriting" the mortgage loan using inflated appraisals, thus masking the amount of delinquent loans that they owned and serviced;

- required subprime mortgage loans originated by Defendants directly or by Defendants' massive network of brokers and correspondent lenders to be closed in the name of the Mortgage Electronic Registrations Systems (MERS), thereby hiding the identity of the loan originator, obfuscating Defendants' involvement in the lending process and facilitating the assignment and transfer of subprime mortgage loans between Defendants' entities and third parties to whom such loans were packaged, sold and assigned as part of the securitization process including special purpose entities (SPEs) that keep Defendants' activities "off balance sheet" and outside of regulatory oversight;

- failed to report minority status on almost all of the loans they purchased for the years 2004 through 2007 which was 47% of all loans originated or purchased; and

- mislead investors regarding their underwriting standards, thereby shifting the risk of anticipated losses on such mortgage loan assets to third parties through securitizations, the sale of mortgage backed securities, the SPEs and primary mortgage insurers (a/k/a monoline insurers).

15.     Defendants' scheme to maximize profits from this business model -- and particularly to maximize the compensation of Defendants' executive management -- was clearly successful.   Indeed, HSBC plc entered the U.S. subprime mortgage market in 2003 with the acquisition of Household and by 2006 had become *the largest subprime lender and the second largest subprime loan servicer in the United States,* expatriating approximately $5 billion in dividends between 2005 through 2007.   During the period 2003 through 2007 the top six officers in Defendants' finance operations (Defendant HSCB Finance Corporation) collectively were paid base and bonus compensation of approximately $214 million (averaging approximately $7.13 million per year) and the two top officers in Defendants' regulated bank operations (e.g., Defendant HSBC USA, Inc.) collectively were paid approximately $53.5 million (averaging approximately $5.3 million per year).

16.     As further alleged herein, Defendants recently have been sued by federal regulators, including the Federal Reserve Board, the Office of the Controller of the Currency, the Federal Housing Finance Agency, various State

Attorney Generals, and FHA protected minority borrower class action plaintiffs, among others, for virtually all of Defendants' actions alleged in this complaint. By virtue of Defendants' numerous cash settlements, and entry into consent orders to change their policies and business practices, Defendants have effectively conceded their liability for the matters alleged herein.

17.     Moreover, the predatory subprime lending, securitization strategy and obfuscation tactics employed by Defendants and certain other key industry participants were the primary cause of the illiquidity waves in the U.S. commencing in August 2007, the numerous asset write-downs in early 2008 by financial institutions relating to subprime losses, and the full blown liquidity crisis in the fall of 2008 because of concerns over financial institutions' exposure to both counterparty credit risk and their own lending risk with respect to both their securitizations and the subprime mortgage loans underlying them. In short, it was Defendants' actions (and the actions of certain other subprime mortgage industry participants) that instigated the U.S. financial crisis, precipitating the economic decline and higher unemployment rates that in turn further exacerbated the foreclosure crisis initially caused by the predatory subprime lending itself.

18.     Incredibly, despite deteriorating regulatory capital levels in Defendants' regulated banking entities due to skyrocketing losses in their subprime lending operations, in 2007 Defendants still expatriated $1.8 billion in dividends to

HSBC plc stripping all of Defendants' historical retained earnings plus an additional $650 million out of the U.S.  As a result, Defendants' regulated banking entities were then so thinly capitalized that Defendants *were forced to borrow approximately $7 billion from the U.S government* (in 16 individual transactions between September 26, 2008 and July 2, 2009) in order to maintain adequate liquidity - adding insult to the injury caused by Defendants' predatory and discriminatory lending actions.

19.    In response to the foreclosure crisis the U.S. Department of Housing and Urban Development ("HUD") established the Neighborhood Stabilization Program ("NSP") to manage the disbursement of the federal funds appropriated to be disbursed to state and local governments to purchase, renovate, and resell foreclosed properties.  In doing so HUD developed data ("HUD Data") at a census tract level to assist state and local governments in identifying the areas of greatest need for NSP funds.  This data includes a foreclosure risk score and an estimate of foreclosure rates.

20.    While historical annual foreclosure rates averaged below approximately 1% in the Atlanta Metropolitan Statistical Area ("MSA") prior to the beginning of the boom in subprime lending in 2003, HUD estimated foreclosure rates for each Plaintiff now exceed 9% on average and in Plaintiffs'

communities with the highest percentages of minority borrowers those rates are ***as high as 18%.***

21.     Invariably, home mortgage delinquencies, defaults and foreclosures have led to home vacancies.  And increases in vacancy rates are indicative of an increase in the numbers of loans moving into the foreclosure process, foreclosed properties that have not been sold, and properties that simply have been abandoned.

22.     Vacancy rates determined from HUD Data and the U.S. Census Bureau reflect huge increases in the vacancy rates in Plaintiffs communities. Plaintiff Cobb County's vacancy rate increased from 4.2% in 2000 to 10.6% in 2010, an increase of 152%.  The calculated vacancy rates for DeKalb County for 2000 and 2010 are 4.6% and 10.9%, respectively, reflecting an increase of 137%. Similarly Fulton County has experienced a major increase in its vacancy rates from 7.9% in 2000 to almost 14% in 2010, an increase of 76%.

23.     Defendants' policies, practices and actions individually, and/or in combination with each other, are a primary cause of the disparately high number of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies in Plaintiffs' communities and neighborhoods with higher percentages of minority borrower homeowners, which have bled into Plaintiffs' surrounding communities and neighborhoods and exacerbated the spiraling level of mortgage loan defaults,

14

foreclosures and home vacancies as home prices fall from increased foreclosures and the deteriorating economy.

24.     This has greatly injured Plaintiffs, and will increasingly injure Plaintiffs, through the continued deterioration in Plaintiffs' neighborhoods and communities as Defendants' equity stripping continues unabated through each new foreclosure and/or home vacancy of FHA protected minority borrowers caused by Defendants' predatory and discriminatory mortgage lending and servicing practices.

25.     Because of the deliberate, egregious and widespread nature of Defendants' predatory and discriminatory mortgage lending and servicing schemes, efforts to obfuscate their liability, and their callous disregard for the impact of such actions on Plaintiffs' communities, neighborhoods and residents, Plaintiffs also seek imposition of punitive and/or exemplary damages.

**JURISDICTION & VENUE**

26.     This is an action for violation of 42 U.S.C. § 3601 et seq. (Fair Housing Act).  This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

27.     Venue is proper in this district under 28 U.S.C. § 1391 because each Defendant is a corporation subject to personal jurisdiction in this district, has

transacted business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## PARTIES

28.     Plaintiff, the County of DeKalb, Georgia, including its affiliated departments and authorities (e.g., the DeKalb County Housing Authority), is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution.  DeKalb County is Georgia's third largest county with more than 700,000 residents. DeKalb County consists of various communities, neighborhoods and cities such as Avondale Estates, Chamblee, Clarkston, Decatur, Doraville, Dunwoody, Lithonia, Pine Lake, Stone Mountain and Tucker, several unincorporated areas, and a portion of the City of Atlanta lies within it.  DeKalb County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

29.     Plaintiff, the County of Fulton, Georgia, including its affiliated departments and authorities (e.g., the Fulton County Housing Authority), is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution.  Fulton County is Georgia's most populated county with more than 920,000 residents. Fulton County consists of various communities, neighborhoods and cities such as Alpharetta, Chattahoochee Hills, College Park, East Point, Fairburn, Hapeville, Johns Creek, Milton, Mountain Park, Palmetto, Roswell, Sandy Springs, and Union City, several unincorporated areas, and a portion of the

16

City of Atlanta lies within it.  Fulton County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

30.     Plaintiff, the County of Cobb, Georgia, including its affiliated departments and authorities (e.g., the Housing Authority of Cobb County), is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution.  Cobb County consists of various communities, neighborhoods and cities such as Acworth, Austell, Kennesaw, Marietta, Powder Springs and Smyrna. Cobb County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

31.     Defendant HSBC North America Holdings Inc. (HNAH) is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York, and has transacted business in this district.  It is one of the nation's ten largest bank holding companies by assets and is a wholly owned subsidiary of HSBC Holdings plc (hereafter "HSBC plc"), one of the world's largest banking groups by assets.

32.     Defendant HSBC Investments (North America) Inc. is a corporation organized under the laws of Delaware with a principle place of business in New York, New York, and has transacted business in this district. Defendant is wholly owned subsidiary of Defendant HNAH.

33.     Defendant HSBC Finance Corporation (f/k/a Household Finance Corporation) ("HFC") is a corporation organized under the laws of

Delaware with its principle place of business in Mettawa, Illinois, and has transacted business in this district.  Defendant HSBC Finance is a wholly owned subsidiary of HNAH.

34.     Defendant HSBC Mortgage Corporation (USA) ("HSBC Mortgage") is a corporation organized under the laws of Delaware and has transacted business in this district.  Defendant HSBC Mortgage is wholly owned subsidiary of Defendant HUSA.

35.     Defendant HSBC Mortgage Services Inc. (f/k/a Household Financial Services, Inc.) ("HMSI") is a corporation organized under the laws of Delaware, with a principle place of business at Prospect heights, Illinois, and has transacted business in this district.   Defendant HMSI is wholly owned subsidiary of Defendant HFC.

36.     Defendant HSBC Mortgage Services Warehouse Lending Inc. (f/k/a HFC Funding Corp) is a corporation organized under the laws of Delaware with a principle place of business in Mettawa, Illinois, and has transacted business in this district. Defendant HSBC Mortgage Services is a subsidiary of Defendant HFC.

37.     Defendant HSBC USA Inc. (HUSA) is a corporation organized under the laws of Maryland, with a principle place of business in New York, New York, and has transacted business in this district.  It is a wholly owned subsidiary

of Defendant HNAH.  HUSA's principal subsidiary is Defendant HSBC Bank USA, National Association.

38.     Defendant HSBC Bank USA, National Association ("HBNA"), a national banking association, is a New York corporation with principle places of business in New York, New York, and McLean, Virginia, and has transacted business in this district.  HSBC Bank is the principal subsidiary of HUSA and was the sponsor for many of the mortgage loan securitizations alleged herein.

39.     Defendant Decision One Mortgage Company, LLC ("Decision One") is a corporation organized under the laws of North Carolina and has transacted business in this district.  Decision One is a wholly owned subsidiary of Defendant HFC.  In terms of the percentage of foreclosures relating to loan originations it made, Decision One ranked in the top 10 of the worst subprime mortgage lenders in the country.

40.     Defendant HSBC Markets (USA) Inc. is a Delaware corporation with its principal place of business in New York, New York, and has transacted business in this district. It is a wholly owned subsidiary of HUNA and the direct parent of HSBC Securities.

41.     Defendant HSBC Securities is a Delaware corporation with its principal place of business in New York, New York.  HSBC Securities is a wholly owned subsidiary of Defendant HSBC Markets, is an SEC-registered

broker/dealer, and was the lead underwriter for many of the Defendants' mortgage loan securitization transactions referred to herein.

42.     Defendants HSBC Corps. 1-50 are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein.  Defendant HUNA established and/or maintained hundreds of subsidiary and affiliate entities throughout the United States, as well as foreign affiliates.  Such parties are named in "John Doe" capacity pending discovery in this case.

43.     Defendants have operated as a common enterprise while engaging in the unlawful acts and practices alleged below.  Because Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged.  Moreover, as the corporate parent of various HSBC subsidiary defendants named herein, Defendant HNAH had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of centralized functions, coordinated practices, and centralized policy and price setting mechanisms.

## FACTS

A.     **Defendants Intended To Engage In Predatory & Discriminatory Lending To Drive Growth**

44.     Headquartered in London, HSBC plc is one of the largest banking and financial services organizations in the world.  It entered the North

American subprime mortgage lending and securitization segment in earnest in March 2003 when it purchased Household International, Inc., including its subsidiary Household Finance Corporation (collectively "Household Finance"), to try to cash in on the subprime mortgage lending and securitization market just as other large Wall Street and international financial institutions did.

45.     In its 2003 Form 20-F filed with the SEC, HSBC plc touted the acquisition of Household Finance as Defendants' "sustainable growth channel" for subprime mortgage lending and the targeted subprime lending methodology it would employ to achieve that growth:

> Household's consumer lending business is one of the largest sub-prime home equity originators in the US, marketed under the HFC and Beneficial brand names through a network of over 1,300 branches in 45 states, direct mail, telemarketing, strategic alliances and the internet. 'Sub-prime' is a US categorization [sic] which describes customers who have limited credit histories, modest incomes, high debt-to-income ratios, high loan-to-value ratios (for real estate secured products) or have experienced credit problems caused by occasional delinquencies, prior charge-offs, bankruptcy or other credit related actions. Consumer lending products include secured and unsecured loans such as first and second lien closed-end mortgages, open-ended home equity loans, personal loans and retail finance contracts.
>
> Household's mortgage services business purchases first and second lien residential mortgage loans from a network of over 200 unaffiliated third party lenders ('correspondents') in the US. Purchases are either of pools of loans ('bulk acquisitions') or individual loan portfolios ('flow acquisitions') made under predetermined underwriting guidelines. Forward commitments are offered to selected correspondents to strengthen relationships and create a sustainable growth channel for this business. Household,

21

through its subsidiary Decision One, also offers mortgage loans referred by mortgage brokers.

46.     Following its acquisition of Household Finance, HSBC plc created a North American organizational structure encompassing its subprime and conforming mortgage lending, securitization and mortgage servicing activities by establishing Defendant HSBC North America Holdings Inc. (HNAH) and its various subsidiaries, including the other Defendants here.

47.     As further alleged below, Defendants targeted minorities and high minority areas for subprime lending through reverse redlining. This was accomplished through Defendants' loan officers, authorized mortgage brokers and a network of correspondent lenders, including correspondent lenders such as Accredited Home Lenders Inc. and New Century Mortgage Corporation (to which certain Defendants provided funding as a warehouse lender), as well as Defendant Decision One, a wholly owned subsidiary of Defendant HFC, all of which were financially incentivized to make as many high cost, subprime and/or ALT-A loans as quickly as possible and at the highest possible loan amounts, irrespective of borrower ability to repay.

48.     Through a rapid escalation of its subprime mortgage lending and securitization activities by leveraging Household Finance's consumer lending operations, know-how, presence, and marketing, Defendant HNAH became one of

the 10 largest U.S. bank holding companies ranked by assets by the end of 2007. And, prior to the curtailment of their subprime mortgage loan origination operations by September 2007, Defendants collectively operated as one of the leading mortgage lenders and servicers in the United States, particularly in the subprime market.  Indeed, in 2006 Defendants were the largest subprime lender in the United States, with HFC responsible for nearly $53 billion in subprime mortgage loans, and operated as the second largest subprime mortgage loan servicer.  As of April 2011 Defendants remained the twelfth largest servicer of all residential mortgages in the United States with a servicing portfolio of approximately 900,000 mortgage loans.

49.     Collectively, through Defendants' common business enterprise, Defendants have originated, purchased, repackaged, sold, and/or serviced millions of first lien home mortgage loans and hundreds of thousands of home equity and second lien mortgage loans in the United States valued in the tens of billions of dollars.  Defendants also were one of the largest originators, purchasers, repackagers, securitizers and/or servicers of subprime mortgages within Plaintiffs' communities and neighborhoods.

**B.**   **The Federal Government Has Found That Discrimination Was Pervasive In Subprime Mortgage Lending During 2003 Through 2007**

50.     In 1975 Congress passed the Home Mortgage Disclosure Act ("HMDA"), implemented under the Federal Reserve Board's Regulation C, requiring all mortgage lenders, including the Defendants here, to compile by census tract and report to the Federal Reserve their mortgage loan origination and purchase information, which includes borrower race, ethnicity and gender.  One of the primary purposes of HMDA reporting is to enable federal regulators to identify discriminatory lending patterns, such as those that violate the Fair Housing Act.

51.     Concerned with potential discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, in 2004 the Federal Reserve began requiring lenders to identify loans originated as "high cost" or "rate spread" loans where the annual percentage rate cost of borrowing on such loans, including up-front points and fees, exceeds 3 percentage points above reported yields for U.S Treasury securities of comparable maturities for first mortgage liens and 5 percentage points for subordinate mortgage liens.[2]  At that

---

[2] Reflecting the dramatic increase in lending during this time period, in 2004 8,121 institutions reported approximately 41.6 million loan records pursuant to HMDA for calendar year 2003, compared to 7,771 institutions that reported approximately 31 million loan records for calendar year 2002.

time, mortgage lending industry groups successfully thwarted efforts by consumer lending groups to require lenders to include borrower credit score and other objective credit risk information in their HMDA reporting.

52.     HMDA data is the only readily available information, absent review of Defendants' actual mortgage loan files, from which to statistically demonstrate Defendants' discriminatory lending activity.

53.     Based on its review of HMDA data the Federal Reserve Board has confirmed that on a national basis African American and Latino borrowers were more likely to pay higher prices for mortgage loans than Caucasian borrowers during the excessive mortgage lending and refinance activity at issue here.  For example, the Federal Reserve's analysis of 2004 and 2005 HMDA[3] data revealed that "Blacks and Hispanics were more likely ... to have received higher-priced loans than non-Hispanic whites .... [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006).  Such findings were echoed by the Federal Deposit Insurance Corporation.  Martin J. Gruenberg, FDIC

---

[3] In 2005, 8,853 institutions reported approximately 33.6 million loan records for calendar year 2004 and in 2006, 8,848 institutions reported approximately 36.4 million loan records for calendar year 2005.

Vice Chairman, observed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders." Martin J. Gruenberg, *Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S.* (Oct. 18, 2006).

54.     The HMDA data that mortgage lenders reported, including the Defendants here, reveals profound loan pricing disparities between FHA protected minority borrowers and similarly-situated Caucasian borrowers even after controlling for borrowers' gender, income, credit scores, property location, and loan amount.

55.     After accounting for those differences in the 2004 HMDA data, a Federal Reserve report found that on average African-American borrowers were 3.1 times more likely than Caucasian borrowers to receive a higher-rate home loan and Latino borrowers were 1.9 times more likely to receive a higher rate loan that Caucasian borrowers. *See* Congressional Testimony of Keith S. Ernst, Senior Policy Counsel, Center for Responsible Lending, before the Subcommittee on Financial Institutions and Consumer Credit (June 13, 2006) at 2. Reporting on the Center for Responsible Lending's study of the HMDA data (the Center is a non-profit research organization) Ernst testified:

Our findings were striking. We found that race and ethnicity—two factors that should play no role in pricing—are significant predictors of whether a subprime loan falls into the higher-rate portion of the market. Race and ethnicity remained significant predictors even after we accounted for the major factors that lenders list on rate sheets to determine loan pricing.

In other words, even after controlling for legitimate loan risk factors, including borrowers' credit score, loan-to-value ratio, and ability to document income, race and ethnicity matter. African American and Latino borrowers continue to face a much greater likelihood of receiving the most expensive subprime loans—even with the same loan type and the same qualifications as their white counterparts. Across a variety of different loan types, African American and Latino borrowers were commonly 30% more likely to receive a higher-rate loan than white borrowers.

*Id* at 3.

56.     HMDA data for 2005 evidences that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159.

57.     Similar average discriminatory patterns exist on loan refinancing for the same period, where African Americans are 28.3 percent more likely than similarly situated Caucasians to receive higher priced loans. *See Id.* at A124, A159.

58.     The U.S. Department of Housing and Urban Development (HUD) found that in neighborhoods where at least 80% of the population is

27

African American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a subprime lender and even higher-income borrowers living in predominantly African American neighborhoods were twice as likely as lower-income Caucasian borrowers to have subprime loans. *See* U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions" (2002).

59.     In 2006 the Center for Responsible Lending uncovered "large and statistically significant" differences between the rates of mortgage loans offered to African Americans and Caucasians, even when income and credit risk were taken into consideration. Compared to their otherwise similarly-situated Caucasian counterparts, African Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans." Gruenstein, Bocian, Ernst and Li, "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages" (May 31, 2006).

60.     Similarly, HMDA Data for 2006 through 2007[4] evidences that African American and Hispanic borrowers continued to be much more likely to obtain higher-priced loans than Caucasian borrowers with the same qualifications.

61.     As further alleged below, Defendants' own reported HMDA data evidences discrimination in the lending activity by Defendants among minority borrowers who reside in Plaintiffs' communities and neighborhoods, reflecting that minority borrowers have been preyed upon by the Defendants here in particular, and illegally steered[5] into nonconforming subprime loans and/or higher cost conforming loans, as well as being improperly approved for loans or approved for inflated loan amounts, all of which increases the likelihood of loan delinquencies, defaults, home vacancies and eventual foreclosures.

## C.     Defendants Discriminated Against FHA Protected Minority Borrowers In Originating Predatory Mortgage Loan Products

62.     Defendants have engaged in the predatory and discriminatory retail and wholesale mortgage lending alleged herein in order to maximize the

---

[4] In 2007, 8,886 institutions reported approximately 34.1 million loan records for calendar year 2006.  Reflecting the dramatic decline in lending after the market for mortgage backed securities collapsed, in 2008, 8,610 institutions reported approximately 26.6 million loan records for calendar year 2007 and in 2009, 8,388 institutions reported approximately 17.4 million loan records for calendar year 2008.

[5] Indeed, a study commissioned by the Wall Street Journal found that in 2005 and 2006 55% and 61% respectively by of borrowers who received subprime mortgages could have qualified for traditional mortgages at the lower rates offered to prime borrowers.  "*Subprime Debacle Traps Even Very Creditworthy*," *Wall Street Journal*, December 3, 2007.

amount of income Defendants received from their subprime mortgage loan origination, loan purchase and repackaging, loan securitization, and loan servicing businesses by maximizing the volume of mortgage loans made, the amount of such mortgage loans, and the interest rates and other fees charged on such loans.

63. The primary financial incentive in Defendants' subprime mortgage lending activities – both in-house loan originations and broker or correspondent lender loan purchases – are the loan origination fees paid up front, typically from and therefore immediately reducing borrowers' equity in their homes. Because such fees do not depend upon the payment stream from the loan, Defendants' lending operations were primarily concerned with making as many subprime mortgage loans as possible, and not with whether the loans will be repaid over time. This is particularly true where such loans were repackaged, securitized and sold. However, the Defendants also utilized prepayment penalties to financially enslave their mortgage borrowers, making it prohibitively costly to refinance with another lender. Since as much as 88% of Defendants' originated and held mortgage loans had prepayment penalties, Defendants were in control of waving such fees when their mortgage loan clients needed to refinance.

64. As alleged above, Defendants publicly disclosed in 2003 that they acquired Household Finance to serve as their "sustainable growth channel" for subprime mortgage lending. Defendants also publicly disclosed at that time that

they were leveraging Household Finance's "consumer lending business" as "one of the largest sub-prime home equity originators in the US."  Indeed, HSBC plc intended to "export [the] Household model" globally as part of its integration process.

65.     At the time, Household described its core customer base in its consumer lending business as "subprime and non-conforming homeowners." Sixty-four percent of Household's outstanding consumer lending mix at the time was on first and second lien real estate mortgages, totaling approximately $28 billion.

66.     Importantly, Defendants stated their intention in HSBC plc's 2003 Form 20-F to market their subprime loans "under the HFC and Beneficial brand names through a network of over 1,300 branches in 45 states, direct mail, telemarketing, strategic alliances and the internet." Defendants also publicly described their definition of "subprime borrowers" as "customers who have limited credit histories, modest incomes, high debt-to-income ratios, high loan-to-value ratios (for real estate secured products) or have experienced credit problems caused by occasional delinquencies, prior charge-offs, bankruptcy or other credit related actions."

67.     Defendants' core target market segment at the time consisted of customers with an average home value well below the national average, who had

credit scores of between 550 to 660 under the Fair Isaac Company credit scoring system (FICO).  At the time, Defendants knew full well that, on average, FHA protected minority borrowers typically have FICO scores well below Caucasian borrowers and that the percentage of minority borrowers with FICO scores of less than 620 is more than double the percentage of Caucasian borrowers.

68.     Defendants also focused their mortgage lending activities on high loan-to-value ("LTV") ratio loans, typically a combination of first and second lien mortgage loans with greater than a total 100% LTV.

69.     Loan to value ratio is one of the most important factors in assessing default risk.  It is the amount of the loan divided by the value of the home as of the date of the loan origination. The higher the ratio the less equity borrowers will have and the more likely borrowers will default during times of financial hardship.

70.     Defendants' high LTV loans were typically made through piggyback loans (a first lien loan combined with a second lien loan), totaling 100% or greater LTV ratios.  Approximately 70% of Defendants' home equity loans had greater than 100% LTVs and greatly relaxed underwriting standards.

71.     Defendants' core customers, as evidenced by the economic criteria Defendants used to describe their customer base in the Form 20-F are disproportionately the types of customers protected by the FHA – minority

borrowers typically living in urban areas who have less access to traditional credit, limited credit histories, lower incomes, and homes with lower values but untapped equity.

72.     Defendants knew this based on the information Defendants were required to collect for HMDA reporting and, in fact, did collect in connection with each mortgage loan application taken, each mortgage closed loan closed and each mortgage loan Defendants purchased.  Indeed, Defendants maintained this data in a large, centrally operated, database that tracked over 60 categories of information relating to each loan including loan terms and pricing characteristics, borrower ethnicity, borrower FICO score, LTV ratios, debt-to-income ratios, loan amount, loan purpose, property location, appraised value, and owner-occupancy status,  among other information. When Defendants sold loans and/or mortgage backed securities collateralized with such loans, Defendants provided prospective purchasers with "loan tapes" in the form of Excel spread sheets containing such information.  Similarly, when Defendants purchased loans for repackaging in securitizations, Defendants were provided loan tapes containing such information by the sellers/originators of such loans and, through Defendants' due diligence knew the information contained therein.

73.     Already aware as early as 2003 of the "housing bubble," Defendants continued increasing their marketing and lending penetration into high

minority communities, including Plaintiffs,' where home values were relatively lower and home prices had not appreciated as rapidly as in other home market segments, but such homes had available untapped equity.

74.     At that time Defendants had generally experienced, and continued to expect, average loss severity on their mortgage lending operations of between 25% to 75%; i.e. the amount of the loss on defaulted loans divided by the original loan balance.

75.     Defendants' loss severity, combined with the key elements of Defendants' model for its subprime mortgage lending segment (making greater than 100% LTV ratio loans and, as further alleged below, reliance on the value of the underlying real estate asset), evidences that Defendants engaged in "equity stripping" – making mortgage loans not based on the borrowers' ability to repay but on the value in the borrowers' home.

76.     Defendants' predatory and discriminatory lending is not the result of random or non-discriminatory factors.  Rather, it is the direct and intended result of Defendants' business model; corporate policies; practices; employment of a two-step "upsell" strategy in targeting FHA protected minorities; use of "state of the art algorithms" that incorporated credit data and a sophisticated predictive behavior modeling techniques designed by HSBC that relied on data obtained from data mining companies that were used to identify the consumers best suited to

receive and likely to respond to marketing material; processes and/or procedures relating to the design, dissemination, control and/or implementation of specific, identifiable and uniform mortgage loan products; and mortgage loan credit decisions.

77.     Through vertically integrated corporate policies, practices, processes and/or procedures Defendants made first lien and second lien mortgage loans to FHA protected borrowers on more unfavorable terms than those offered to similarly situated Caucasian borrowers, charging minority borrowers higher interest rates and fees, and/or making loans on other unfavorable terms while knowing, or recklessly not knowing, that such loans likely would fail, ultimately leading to home vacancies and foreclosures.

i.     Targeted Marketing To Minorities

78.     Using Household Finance's various store-fronts; employment of a two-step "upsell" strategy in targeting FHA protected minorities; use of "state of the art algorithms" that incorporated credit data and a sophisticated predictive behavior modeling techniques designed by HSBC that relied on data obtained from data mining companies that were used to identify the consumers best suited to receive and likely to respond to marketing material; direct mail; telemarketing; and strategic alliances and internet marketing strategies, Defendants' marketing of first and second lien high cost, subprime and ALT-A conforming mortgages,

disproportionately focused on communities and neighborhoods throughout the United States with high levels of minority homeownership including Plaintiffs' neighborhoods and communities because they provided the quickest and easiest path – i.e., the path of least resistance – to rapidly obtain as many borrowers as possible willing to accept Defendants' loan products.

79.     Such borrowers were susceptible to Defendants' marketing efforts – and perceived as susceptible by Defendants – because: (a) FHA protected minority borrowers traditionally lacked access to low cost credit, lacked strong relationships with depository institutions, lacked adequate comparative information, and/or lacked financial sophistication (particularly in the case of minorities whose first language is not English or have not achieved a high level of education), such that they could not adequately evaluate the terms, conditions and risks of the mortgage loan agreements they were entering into; and (b) such borrowers already were customers of Defendants' consumer finance division having auto loans, credit cards or other personal unsecured loans from which Defendants could leverage their relationships.

80.     Moreover, because historical housing patterns had created communities and neighborhoods of high minority populations, those communities and neighborhoods provided an efficient means to target potential borrowers

seeking to refinance their home loans, consolidate consumer loans, or obtain credit for consumer spending by utilizing their existing home equity.

81.    A former HSBC Senior Marketing Analyst explained that HSBC built computer software models based on data that included information from the credit bureaus, such as credit header information. These used "state of the art algorithms" that incorporated data to identify the consumers best suited to receive and likely to respond to marketing material for HSBC products.  Once the target consumers were identified by the algorithms HSBC developed, HSBC used data provided by Acxiom to develop additional information on the target population.  For example, the Acxiom data provided details about consumers' "personal preferences" and "shopping patterns," which were used to design the marketing materials in a way that was most likely to appeal to consumers with the identified "personal preferences" or "shopping patterns." Such information provided HSBC with insight into borrower race and ethnicity.

82.    Another HSBC Marketing executive further described HSBC's targeting strategy was to "upsell" HSBC's consumer borrowers, particularly including minorities because mortgage loans were "more profitable."

83.    According to an HSBC Manager of Marketing Database Infrastructure by approximately 2004 or 2005, Household Finance had begun planning the build out of a new, much more robust and sophisticated database with

Acxiom.  The new database was "easily a multi-million dollar" project and was referenced as being the "largest database of its type in the financial services industry" at the time.

84.     This same Manager also indicated that Acxiom had the ability to "append" data from a database of "220 million names" at the time that the new database was being developed, including information about the number of children in a given household and vehicles owned.  Such information provided HSBC with further insight into borrower race and ethnicity.  The new database was intended to allow for more sophisticated uses of data and the ability to incorporate more and diverse types of data for the purposes of "prospecting."  The new database was "relational" in terms of its abilities and functionality. This allowed HSBC to more effectively upsell existing credit card customers with home equity lines of credit in order to convert the unsecured debt to secured debt.

85.     Another HSBC database manager indicated that the PersonicX program was developed by Acxiom, and used to "derive clusters" that are indicative of different consumer profiles.  PersonicX looked for "homogeneity" among the consumers and created "clusters with cute names" based on the findings. PersonicX was used by the HSBC retail credit card division as a "tool to narrow down" the possible recipients of direct mail.  "When you send direct mail, you want to be able to increase or have a higher chance of response."  PersonicX

was used to increase the response rate for direct mail campaigns, including clusters based on race or ethnicity so that customized marketing materials could be sent to them.  The response rate was improved by targeting consumers that are "most likely to respond" based on the "personalized" information about types of consumers made available to HSBC through PersonicX.

86.     Through Defendants' centralized marketing and credit risk departments, and proprietary front end sales software known as "Vision" (which Defendant HFC considered to be a "key competitive advantage"), Defendants' also generated and distributed sales leads, including leads on potential minority borrowers, that were obtained from Defendants' internal customer base of home loan borrowers, auto loan borrowers, credit card debt holders and personal loan borrowers or were purchased externally.

87.     These sales leads were generated by a strategy that  used "state of the art algorithms" that incorporated credit data and a sophisticated behavior modeling techniques designed by HSBC that relied on data obtained from data mining companies that were used to identify the consumers best suited to receive and likely to respond to particularized marketing material, identifying and evaluating, among other things, potential borrower delinquency status, ethnicity, FICO scores, available home equity (existing home loan amounts and home values), first lien lender type, surnames, home location and addresses, credit card

39

debt levels, and automobile values and loans. According to an HSBC Marketing Communications Project Manager, HSBC employed a direct mail marketing program in the native language of their target market including Spanish. Importantly, Defendants sought out borrowers with lower FICO scores and delinquencies in Defendants' consumer credit products in order to solicit predatory home equity and other mortgage loans secured by the borrower's real estate.

88.     Defendants also generated sales leads from their approximately 50 operating websites and relationships with approximately 5,300 tax preparers with approximately 14,000 outlets throughout the U.S.  Many of these websites and relationships were directed toward particular markets, including based on borrower race, language or location.

89.     Sales leads were then distributed to Defendants' branch stores and, in some cases, Defendants' "trust farm" of third party brokers and lenders for direct marketing efforts to the potential borrowers most likely to accept Defendants' high cost, subprime or ALT-A conforming first and second lien mortgage loan products.

90.     Defendants also utilized Household's "proprietary score cards and modeling," "niche market approach to underwriting," and "direct marketing expertise" as key competitive advantages enabling them to optimize their profits by leveraging their ability to directly market to their subprime borrower niche.  For

example, after receiving sales leads generated by Vision, Defendants' branch stores made outbound phone solicitations to potential minority borrowers and handled in bound minority borrower requests for information following up on targeted direct mail marketing to them by Defendants.

91.     According to a former Sales Account Executive and Underwriter employed in North Carolina by Defendant HFC from mid-2006 to mid-2008, prospective borrowers were contacted from a "queue" of names that were on automatic dial in the computer information system he used. The prospective borrowers in the system were existing HSBC customers who had personal loans, auto loans, credit cards (both HSBC cards and cards HSBC funded for retailers like Best Buy), or existing mortgages with HSBC. The leads were "recycled leads," such that the Sales Account Executive and Underwriter was calling the same prospective borrowers "over and over again."  The information on the prospective borrowers included the type of loans that the borrowers already had with HSBC and the balance or payment amounts on those loans. The "goal" was to try appear to reduce the overall payments the borrowers had to make, or provide some other purported benefit to the borrowers, so that the borrowers would agree to accept the refinance arrangement.

92.     However, such refinance arrangements typically provided no tangible benefits to the borrowers because they would effectively collateralize

against the borrower's home the borrower's other consumer debt that was previously uncollateralized, thus stripping out the borrower's home equity, in order to create an opportunity for Defendants to earn mortgage loan origination fees and mask the borrowers delinquent consumer loans.

93.     According to a former Senior Account Executive employed by Defendant HFC in Missouri during the relevant time, Defendants repeatedly called on existing HSBC borrowers to offer them an opportunity to refinance their mortgages and pay off other debt owed to HSBC.

94.     The Senior Account Executive also made clear – like the Sales Account Executive and Underwriter employed in North Carolina -- that the goal in targeting existing HSBC borrowers was "to make the unsecured debt secured" by using the proceeds from the mortgage refinance transactions to pay off other unsecured debt the borrower owed to HSBC.  In addition, according to the Senior Account Executive, Defendants' "goals also included doing as many refinances as possible," and targeting borrowers with the highest amount of debt.  "The more debt the better," meaning that the more debt the borrower had the better candidate he or she was in the eyes of Defendant HFC because it could issue a "larger mortgage" and convert more unsecured debt to secured debt by paying off the borrower's existing unsecured debt load.  According to the Senior Account Executive, emails and documents were circulated throughout Defendant HFC's

organization that detailed the goals of targeting borrowers who had the highest amount of debt for refinance mortgages and doing so to transfer unsecured debt to secured status. Moreover, Defendants' refinance mortgage loans were all sent to a central location in Illinois to be underwritten.

95.     As confirmed by the Senior Account Executive, Defendants used the refinance transaction as a way to pull equity from the homes owned by the borrowers and bring other debt owed to HSBC current. Incredibly, Defendant HFC constantly "rewrote" loans, including personal loans, to bring the borrowers current. Many borrowers who had not been able to even keep up with payments on their small personal loans were nevertheless issued large refinance mortgages at high interest rates. Defendants simply sought to have borrowers refinance their mortgages "as often as possible." Indeed, some borrowers refinanced their mortgages year after year, and others were called upon as frequently as six months after the last refinance transaction to refinance their mortgages again.

96.     As also confirmed by the Senior Account Executive, Defendant HFC repeatedly contacted borrowers listed in the Vision system to offer them the opportunity to refinance their mortgages. The information available in Vision included personal details submitted by the borrower and gathered from previous loans HFC had issued to the borrower, including borrower race and ethnicity. For example, Vision tracked the interest rates on existing loans HSBC made to

borrowers, details about the borrower's credit score from the time that the previous loan was made to the borrower, and whether borrowers were 30 or 60 days behind on payments to HSBC on debt owed to HSBC for personal loans or auto loans.

97.     According to the Senior Account Executive, opportunities to refinance mortgages typically were offered to subprime borrowers with credits scores in the 500s and 600s and those who were late on their consumer debt payments.  Although the interest rates charged on such mortgage loans were high, Defendant HFC misrepresented to the borrower that he or she was saving money each month by paying off credit card debt owed to HSBC (e.g., at a rate of 20 percent) by taking out a refinance mortgage (e.g., at a rate of 16 percent) and using the proceeds to pay off the credit card debt.  However, because the refinance mortgage interest rate was charged against the much higher loan balance of a mortgage loan -- in comparison to the higher interest rate charged on a much lower credit card balance – Defendants' stuck their borrowers with a larger payment for the much longer time period of a mortgage.  For example, when the average mortgage rate for a prime borrower in the market was five or six percent, Defendant HFC was charging its subprime borrowers 10 percent or more for refinance mortgages and charging borrowers origination fees near five percent.

98.     "Few people came out good" from refinance mortgages Defendants issued and customers came into the Senior Account Executive' branch

44

to complain that they had been misled about the rates on the refinance mortgages or other terms of the loans of which they were not informed.  It was obvious to the Senior Account Executive at the time Defendant HFC was making these refinance mortgage loans that as many as half of them were at risk of foreclosure because the "interest rates were too high and the loan balances were too big."

99.     Moreover, according to the Senior Account Executive, Defendants were well aware the mortgage loans were issued based on inflated appraisals.  Defendants' standards for appraisals became "more lax in 2005 and 2006" and the only way borrowers could refinance year after year, or even more frequently, was if the appraisal values went up time and time again.   Indeed, Defendant HFC utilized appraisers who often asked the lending staff "what they were looking for" in terms of appraisal value in order to complete the transaction and then did what they could to derive an appraisal value that met the expectations of Defendants' lending staff.  Thus, Defendants were well aware that the appraisals were "coming in high" in the 2005 and 2006 timeframe at the time the appraisals were issued.

100.     Thereafter, through Defendants' discretionary pricing policies, underwriting policies, appraisal policies and other policies, practices, processes and/or procedures Defendants' have authorized, approved, encouraged or otherwise allowed: (a) unchecked or improper credit approval decisions for

minority borrowers, resulting in borrowers being approved for and receiving loans they could not afford and consequently were likely to become delinquent and/or default on; (b) subjective surcharges on minority borrowers of additional points, fees and other credit and servicing costs over and above an otherwise objective risk-based financing rate for such loan products, increasing the likelihood of delinquencies and/or defaults on such loans; (c) minority borrowers to be steered into higher cost loan products, also increasing the likelihood of delinquencies and/or defaults on such loans; and (d) undisclosed inflation of appraisal values of minority residences in order to support inflated loan amounts to minority borrowers, further increasing the likelihood of delinquencies and/or defaults on such loans.

101.   Defendants' discretionary pricing policies, underwriting policies, appraisal policies and other policies, practices, processes and/or procedures were applied as a routine part of Defendants' entire mortgage lending business operation for both their retail and their wholesale mortgage lending activities at all times relevant and were not isolated or aberrant events.  Defendants regularly and actively orchestrated the pricing, terms and underwriting practices of their mortgage loan products to serve their loan pooling and securitization activities, and loan servicing income.

ii.   Discretionary Pricing Policies

102.   Defendant's Discretionary Pricing practices started with HSBC's direct mail campaigns. According to an HSBC database manager there were two types of direct mail campaigns – "pre-screens" and "invitation to apply." "Pre-screens" were direct mail campaigns that were "credit-based" and presented consumers with "firm offers" about products for which they qualified. The Fair Credit Reporting Act allowed companies like HSBC to utilize credit data to make "firm offers" to consumers and send "pre-screens" to consumers based on the consumer's profile and qualifications for the program offered. "Invitation to apply" campaigns were offers to consumers regarding products available through, in this instance HSBC, in which the consumers were likely to be interested. The Acxiom PersonicX categories were used in "invitation to apply" direct mail campaigns at HSBC, in which consumers identified as likely to be interested in HSBC products, and likely to respond to particularized direct mail advertisements, were mailed product information and "invited" to apply for the products available through HSBC. The concept of "invitation to apply" allowed HSBC to generate interest with consumers, but provide leeway for HSBC to charge the borrowers interest rates and fees at varying rates and amounts for each respondent.

103.    Defendants set the rates, fees and terms on high cost, subprime, and ALT-A loans at the corporate level, through a mainframe computer system, which were distributed on rate sheets provided to Defendants' employees, and branch managers and, as further alleged below, Defendants' network of brokers and correspondent lenders.

104.    Defendants' discretionary pricing policies expressly authorized and encouraged discretionary finance charges, including higher fees at closing, additional or add-on fees, higher interest rates, and/or other discretionary charges.

105.    These additional discretionary charges were collected at the time the loans were originated, and continue to be collected during the servicing of both nonconforming mortgage loans and mortgage loans underwritten using GSE underwriting guidelines, which Defendants disproportionately originated with minority borrowers both nationwide and in Plaintiff's communities.

106.    Once a loan applicant provided credit information through a loan officer, mortgage broker or correspondent lender, Defendants performed an initial objective credit analysis.  At this point, Defendants evaluated various traditional, objective, risk-related credit variables relating to the prospective borrower, including the borrower's debt-to-income ratios, the borrower's home's loan-to-value ratios, the borrower's credit bureau histories, FICO scores, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, and payment

histories, among other things.  From these objective factors Defendants derived a risk-based financing rate referred to in the mortgage industry as the "par rate," which they regularly communicated to their loan officers and branch managers.

107.   However, via "rate sheets" and other written communications made in conjunction with the par rates, Defendants regularly communicated, simultaneously encouraged, and automatically authorized their loan officers and branch managers to charge yield spread premiums and other discretionary fees and costs that were not based on any particular or appropriate credit risk factor.

108.   Defendants' discretionary pricing policy authorized and provided financial incentives to Defendants' loan officers and branch managers to mark up the par rate and impose additional subjective, non-risk-based charges and other discretionary fees on mortgage loans offered to FHA protected minority borrowers.  Such loans were reported by Defendants as "high cost" loans and are tracked in HMDA data.

109.   When mortgage loans made to FHA protected borrowers contained such marked up interest rates that resulted in a yield spread premium payment to Defendants, Defendants received additional income because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their mortgage loan than they would otherwise pay if they had been placed in a par rate loan without an additional rate mark up.

110.     In addition, Defendants included pre-payment penalties in most of their subprime mortgage loan products (approximately 88% of Defendants' subprime mortgage loans contained prepayment penalties) in order to either control the borrowers' refinance of the debt or generate additional fee income when borrowers refinanced their loans.

111.     FHA protected minority borrowers in Plaintiffs' communities and neighborhoods have paid and continue to pay discretionary fees and costs from loans originated by Defendants that have inflated those borrowers' ongoing finance charges payable throughout the servicing period of the loan.

112.     Such predatory, subjective loan pricing - which by design imposes differing finance charges on persons with the same or similar credit profiles - disparately impacts FHA protected minority borrowers in Plaintiffs' communities and neighborhoods.  As the HMDA data reflecting Defendants' lending patterns further alleged herein (and HMDA data analyzed by the Federal Reserve) indicates, minorities – even after controlling for credit risk – have been substantially more likely than similarly situated non-minorities to pay such charges that are built into Defendants' subprime or "high cost" loans.

113.     Because of Defendants' high LTV lending practices and high fees and other costs built into such loans, FHA protected minority borrowers often had no equity or negative equity in their home upon the closing of Defendants'

mortgage loans to such borrowers and depended upon an appreciation in housing prices – which Defendants knew would not continue because of the housing bubble – to enable borrowers to pay for such loans or refinance them at a later time.

114. Defendants took no precautions to avoid this result and instead acted at all times with reckless disregard of it. Indeed, despite their knowledge of the housing bubble, Defendants willfully continued to make equity stripping subprime loans to FHA protected minority borrowers in Plaintiffs' communities and neighborhoods in total disregard for the consequences.

115. Defendants' discretionary pricing policies ultimately caused FHA protected minority borrowers in Plaintiffs communities and neighborhoods to pay higher costs for obtaining mortgage loans than similarly situated Caucasian borrowers with identical or similar credit scores credit upon the issuance of the mortgage loans and on an ongoing basis throughout the servicing period of the loan.

116. As a result of the higher costs and reduced home equity related to such discretionary pricing policies, Plaintiffs' communities and neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults and home foreclosures on the loans Defendants were responsible for. This, in turn, has caused a downward spiral of additional mortgage delinquencies, defaults and home foreclosures in

Plaintiffs' communities and neighborhoods both with higher percentages of FHA protected minority borrowers as well surrounding areas that have lower percentages of FHA protected minority borrowers.

     iii.    <u>Uniform Underwriting Policies</u>

     117.    Defendants also established at the corporate level, and then distributed to Defendants' employees and branch managers (and, as alleged below, Defendants' brokers and correspondent lenders) uniform underwriting standards designed to approve mortgage loans to even un-creditworthy minority borrowers.

     118.    Defendants' underwriting policies were designed to, and did, authorize and encourage Defendants' loan officers and branch managers (and brokers and correspondent lenders) to approve mortgage loans or improperly increase loan amounts to under-qualified or unqualified FHA protected minority borrowers in order to further maximize the amount of Defendants' revenues and income by making of as many loans as possible and at the highest possible loan amounts.

     119.    For example, Defendants' utilized a hard copy underwriting matrix that was distributed to Defendants' underwriters, particularly including Defendant Decision One's underwriters, that was used to evaluate whether mortgage loans under review met lending programs available through Defendants' various operating entities.

120.    Defendants' underwriting matrixes were based on various tiers of criteria that included LTV ratios and prospective borrower FICO scores and debt ratios. These matrixes outlined Defendants' extraordinarily lenient underwriting guidelines that even included underwriting parameters to lend 100% LTV to borrowers with a 525 FICO score that had multiple foreclosures and that were still in bankruptcy.  For example, Defendant Decision One made mortgage loans to borrowers with debt to income ratios of 55 percent and issued greater than 100 percent LTV "stated income" loans.

121.    The intentional nature of Defendants' predatory and discriminatory conduct is reflected in the fact that Defendants financially incentivized and encouraged their branch managers and other employees to approve as many such mortgage loans as possible, including to FHA protected borrowers, by permitting branch managers wide discretion to override loan denials by underwriters and by paying branch managers bonuses based on loan volumes. The combination of such financial incentives and discretionary authority created a *fait accompli* of predatory and discriminatory lending.

122.    Defendants' underwriting policies ultimately caused FHA protected minority borrowers in Plaintiffs communities and neighborhoods to disproportionately receive mortgage loans they could not repay and which exceeded the values of their homes.  As a result, Plaintiffs' communities and

neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults and home foreclosures on loans for which HSBC was responsible. This, in turn, also has driven a downward spiral of additional mortgage delinquencies, defaults and home foreclosures in Plaintiffs' communities and neighborhoods both with higher percentages of FHA protected minority borrowers as well surrounding areas that have lower percentages of FHA protected minority borrowers.

   iv. Defendant Decision One's Appraisal & Override Practices

   123. Defendant Decision One's appraisal policies included policies, practices, processes and/or procedures designed to ensure that Defendants' loan officers and branch managers (as well as brokers and correspondent lenders) made mortgage loans to FHA protected minority borrowers at maximum possible loan amounts or otherwise made loans to under-qualified or unqualified FHA protected minority borrowers by either inflating the appraised value of FHA protected minority borrowers' homes or overriding and/or circumventing Defendants' own underwriters that otherwise would have denied mortgage loans to FHA protected minority borrowers' loans where the loan to value ratio (LTV) was too high.

   124. For example, according to an experienced mortgage loan Underwriter formerly employed in the Alpharetta, Georgia, branch office of Defendant Decision One, approximately 20% of Defendants' mortgage loans,

particularly "cash out" refinance loans, had issues with appraisals that would otherwise require denial of the loan or reduced loan amounts. Such issues would include the improper use of comparison properties ("comps") beyond more than a one mile radius of the subject property, stale comps, and properties that were not comparable comps.

125.    Defendants knew that appraisers often "pushed the value" of the properties they appraised, effectively becoming advocates for higher loan values for the brokers that had referred them the business instead of objective appraisers of the true fair market value of the properties. Nevertheless, Defendants' branch managers frequently made "business decisions" to override Defendants' underwriters to approve the loans particularly when such loans originated from brokers that were responsible for a significant amount of business to Decision One.

126.    According to the former Underwriter, Defendant Decision One "did not want to lose" the brokers' business by denying loans over concerns with appraisals. For instance, "business decisions" repeatedly were made to approve loans originated by First Option, an important broker to Decision One as a result of the amount of business First Option generated for Decision One, even though there were appraisal issues with many mortgage loan files brokered by First Option.

55

127.    At the time, Defendant Decision One had approximately 5,000 broker relationships that generated subprime mortgage loans pursuant to Defendants' pricing and underwriting policies.

128.    According to the former Decision One Underwriter, it was "customary" that the outside brokers "ordered the appraisal" and dealt with the appraisers.  The outside brokers "told the appraiser" what the purchase price of the home was and that the broker "expected the appraisal to come in at 'x'."  The brokers also informed the appraisers how much was needed to pay off an existing loan if the loan was a refinance and what the borrower expected to be able to take out in cash as part of a cash out refinance.

129.    Despite knowing of Defendant Decision One's lending activities, including frequent overrides of loan denials by underwriters as "business decisions," Defendants failed to implement any controls to prevent such behavior and instead continued the compensation structure and policies that rewarded such behavior.

130.    Defendant Decision One's appraisal policies and underwriter loan denial overrides caused FHA protected minority borrowers in Plaintiffs communities and neighborhoods to disproportionately receive mortgage loans they could not repay and which exceeded the values of their homes.  As a result, Plaintiffs' communities and neighborhoods with higher percentages of FHA

protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults and home foreclosures on mortgage loans for which Defendants were responsible.  This, in turn, has further driven the downward spiral of additional mortgage delinquencies, defaults and home foreclosures in Plaintiffs' communities and neighborhoods.

v.     Enforcement & Financial Incentives

131.    Defendants have enforced their discretionary pricing, underwriting and appraisal policies through Defendants' loan officers, loan processors, underwriters and branch managers in a variety of ways reflecting their knowledge and intent to engaging in the predatory and discriminatory lending practices alleged herein.

132.    Among other things, Defendants supplied such individuals with loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts.

133.    Defendants actively trained their loan officers, loan processors, underwriters and branch managers to follow Defendants' policies, practices, procedures and/or processes and reinforced that training with marketing support.

134.    In order to drive the volume growth of their high cost, subprime and ALT-A mortgage loan business – and thus try to make more money - Defendants financially incentivized employees and management to override and/or

circumvent prudent underwriting decisions, and financially incentivized employees to:

- steer otherwise qualified FHA protected borrowers into higher cost loans than loans provided to similarly situated Caucasian borrowers;

- approve otherwise unqualified FHA protected borrowers;

- approve FHA protected minority borrowers at loan amounts that were not supported by the values of their homes; and/or

- inflate the value of FHA minority borrower homes to increase the loan amounts.

135.   By establishing and enforcing centralized marketing, pricing, underwriting and compensation practices, designed to maximize the number and amount of predatory, equity striping, high cost, subprime or ALT-A conforming mortgage loans made to FHA protected minority borrowers, Defendants are responsible for the damages caused within Plaintiffs' communities and neighborhoods for all such loans they originated and, as further alleged below, purchased or funded through their wholesale lending channels pursuant to Defendants' pricing and underwriting policies.

vi.   Empirical Data Evidences Defendants' Discriminatory Practices

136.   Defendants' intentional targeting of FHA protected minority borrowers is evidenced by the nature and number of high cost, subprime, and ALT-A conforming mortgage loans Defendants originated within Plaintiffs'

neighborhoods and communities where FHA protected minority borrowers were far more likely to receive any loan, including high cost or subprime loans, than non-minority borrowers.

137.    HMDA data Defendants themselves reported relating to loans Defendants originated in Plaintiffs' communities and neighborhoods evidences the success of Defendants' targeted, predatory lending practices in making far more of both their total mortgage loans and far more of their "high cost," subprime mortgage loans to FHA protected minority homeowners in Plaintiffs' communities and neighborhoods than the demographics in Plaintiffs' communities and neighborhoods would indicate if such loans were not made on a non-discriminatory basis.

138.    Between 2004 and 2007 Defendants originated at least 2,433 mortgage loans in Plaintiff DeKalb County and reported the minority status of the borrowers to HMDA.  At least 80% of those loans (1,958 loans) were identified in HMDA data by Defendants as being made to minority borrowers.  However, the total percentage of DeKalb County housing units owned and occupied by minorities during that time was only approximately 54%.

139.    Between 2004 and 2007 Defendants originated at least 2,513 mortgage loans in Plaintiff Fulton County and reported the minority status of the borrowers.  At least 59% of those loans (1,484 loans) were identified in HMDA

59

data by Defendants as being made to minority borrowers. However, the total percentage of Fulton County housing units owned and occupied by minorities during that time was only approximately 38%.

140.    Similarly, between 2004 and 2007 Defendants originated at least 2267 mortgage loans in Plaintiff Cobb County and reported the minority status of the borrowers. At least 41% of those loans (931 loans) were identified in HMDA data by Defendants as being made to minority borrowers. However, the total percentage of Cobb County housing units owned and occupied by minorities during that time was only approximately 26%.

141.    This data evidences that Defendants made a substantially greater percentage of their total mortgage loans (i.e., high cost, subprime, and ALT-A conforming loans) to minority borrowers than to Caucasian borrowers far beyond what the racial makeup of Plaintiffs' communities and neighborhoods would otherwise indicate.

142.    Of the 1,777 "high cost" loans Defendants made in DeKalb County between 2004 and 2007 (and reported the minority status of the borrowers), at least 1,594 of those loans (approximately 90%) were made to FHA protected minority borrowers.

143.    Of the 1,579 "high cost" loans Defendants made in Fulton County between 2004 and 2007 (and reported the minority status of the

borrowers), at least 1,176 of those loans (approximately 74%) were made to FHA protected minority borrowers.

144.     Of the 1,529 "high cost" loans Defendants made in Cobb County between 2004 and 2007 (and reported the minority status of the borrowers), at least 732 of those loans (approximately 48%) were made to FHA protected minority borrowers.

145.     Defendants' high cost lending data evidences on its face that Defendants made a substantially greater percentage of their "high cost" mortgage loans to minority borrowers than to Caucasian borrowers in Plaintiffs' communities and neighborhoods far beyond what the racial makeup would otherwise suggest on non-discriminatory basis given the demographics of FHA protected minority homeowners in DeKalb, Fulton and Cobb Counties of only 54%, 38% and 26% respectively.

146.     Such empirical information evidences that Defendants' discriminatory targeting and discriminatory treatment of FHA protected minority borrowers relating to Defendants' predatory mortgage lending activities was, in fact, extremely successful.  Thus, the empirical data evidences that Defendants engaged in the discriminatory housing practice of "reverse redlining," i.e., the intentional extension of credit to FHA protected minorities on deceptive and/or on unfair terms (as further alleged below).

147.     Moreover, by upselling to their existing FHA protected minority borrower consumer lending customers high cost, home equity loans for purposes of credit card debt restructuring, Defendants also were able to collateralize previously unsecured debt with the equity in such borrowers' homes, further evidencing Defendants' predatory and discriminatory equity stripping practices.

148.     Additional evidence of Defendants' targeting of FHA protected minority borrowers through reverse redlining is evident from other allegations in this complaint, including the relatively higher foreclosure rates on mortgage loans Defendants made in Plaintiffs' communities and neighborhoods with high minority populations; the explosive growth in Defendants' subprime lending operations between 2004 through 2006; the nature and terms of the high cost, subprime, ALT-A conforming first and second lien mortgage loans Defendants specialized in; the financial incentives Defendants gave to their employees, managers, brokers, and correspondent lenders to maximize the volume of loans originated and purchased; Defendants' use of uniform underwriting guidelines while regularly ignoring or overriding such guideline; Defendants' actions to manipulate federally required mortgage lending data reporting; Defendants' efforts to shift the risk from their subprime lending operations through transfers among its corporate structure and to

third parties; and Defendants' attempt to conceal their actions through the use of MERS.

**D.    Defendants' Fostered, Enabled and Otherwise Encouraged Discrimination Against FHA Protected Minority Borrowers In Predatory Mortgage Loan Products Originated Within Defendants' Wholesale Channel of Broker and Correspondent Lenders**

149.    More important to Defendants' "sustainable growth channel" for subprime mortgage lending was Defendants' wholesale lending channel -- a network of over 200 unaffiliated third party broker and correspondent lenders -- through which Defendants' funded and/or purchased many tens of billions of dollars of predatory, high cost, subprime and/or ALT-A conforming first and second lien mortgage loans made to FHA protected minority borrowers (nationally and in Plaintiffs' communities).

150.    Defendants reported that they purchased from their brokers, correspondent lenders and/or third party lenders approximately 924,000 mortgage loans, approximately 47% of Defendants' entire mortgage lending business (approximately 1,953,000 mortgages) between 2004 and 2007.  Many of those purchased loans were placed in securitizations sold to GSEs and other investors. For example, between 2003 and 2007 Defendants sold at least $35 billion of mortgages into securitizations that were in turn sold to investors, including approximately $17 billion of which was sold to Freddie Mac and Fannie Mae.

Almost all of these loans were high cost, subprime or ATL-A conforming loans that Defendants acquired from then-known subprime originators. Indeed, Defendants maintained Sales Representatives based in Brandon, Florida, who were primarily responsible for traveling to wholesalers to negotiate deals to purchase pools of loans from brokers and correspondent lenders.

151.    Defendants purchased or funded these loans primarily with subprime brokers and correspondent lenders with whom Defendants had contractual relationships such as the now defunct, Accredited Home Lenders Inc. ("Accredited") and Fieldstone Mortgage Corporation ("Fieldstone"), and from other third party originators whom Defendants repeatedly purchased loans in bulk (including the now defunct, subprime lenders New Century Financial Corporation ("New Century"), Option One Mortgage Corporation, First Franklin Financial Corporation, and WMC Mortgage Corporation).

152.    Accredited was the largest wholesaler from which Defendant HMSI purchased loans, and Fieldstone also was near the top in terms of loan volumes.  For example, between 2003 through 2006 Defendants purchased $10.5 billion of subprime mortgage loans from Accredited, representing as much as 30% of Accredited's annual production, and $4.2 billion of subprime mortgage loans from Fieldstone Mortgage Corporation.

153.     Both Accredited and Fieldstone targeted FHA protected minority borrowers for high cost, subprime, predatory mortgage loans.  Nationally, in 2006 over 51% of Fieldstone's subprime mortgage applications were taken from minorities and 44% of Accredited's subprime mortgage applications were taken from FHA protected minorities.  However, the total percentage of FHA protected minority homeowners in the U.S. during that time period was only approximately 21%, reflecting that both Fieldstone and Accredited clearly focused their subprime loan marketing and origination efforts on FHA protected minority borrowers.

154.     Defendants' largest percentage of correspondent lender relationships (as a percentage of its overall business channel) was in the Southeast, including in Plaintiff's neighborhoods and communities where Defendants purchased numerous predatory high cost, subprime loans originated by Accredited and Fieldstone.

155.     For example, in Plaintiff DeKalb County (with 54% minority home ownership) over 85% of Accredited's total loans were made to FHA protected minorities and over 87% of Accredited's high cost loans were made to minorities.   In Plaintiff Fulton County (with 38% minority home ownership) over 80% of Accredited's total loans were made to FHA protected minorities and approximately 82% of Accredited's high cost loans were made to minorities.  In Plaintiff Cobb County (with 26% minority home ownership) over 56% of

Accredited's total loans were made to FHA protected minorities and over 58% of Accredited's high cost loans were made to minorities.

156.    Similarly, in Plaintiff DeKalb County approximately 87% of Fieldstone's total loans were made to FHA protected minorities and over 87% of Fieldstone's high cost loans were made to minorities.   In Plaintiff Fulton County approximately 83% of Fieldstone's total loans were made to FHA protected minorities and over 84% of Fieldstone's high cost loans were made to minorities. In Plaintiff Cobb County over 57% of Fieldstone's total loans were made to FHA protected minorities and approximately 60% of Fieldstone's high cost loans were made to minorities.

157.    Defendants maintained "Flow Purchase Agreements" with their correspondent lenders, such as Accredited and Fieldstone.  According to HSBC plc's 2003 Form 20-F, "[f]orward commitments are offered to selected correspondents to strengthen relationships and create a sustainable growth channel for this business." Indeed, approximately 78% of all of the originations in Defendants' correspondent lender channel were made pursuant to these agreements.

158.    The  Flow  Purchase  Agreements  required  Defendants' correspondent lenders to "register" their loans with Defendants *for approval* prior to Defendants' purchase of them *and subject to both Defendants' underwriting*

*criteria and the provisions of Defendants' "Sellers Guide."* Defendants' Sellers Guide set forth Defendants' underwriting guidelines, appraisal guidelines, and documentation requirements for purchased loans and loan programs.

159.   Defendants maintained "Credit Agreements" with certain correspondent lenders that provided correspondent lenders, such as Accredited and Fieldstone, with a secured revolving warehouse line of credit enabling their correspondent lenders to make mortgage loans and resell such loans to Defendants. The Credit Agreements required Defendants' correspondent lenders to meet Defendants' "General Underwriting Guidelines" that were made available to Defendants' correspondent lenders through Defendants' websites.

160.   Among other things, the Credit Agreements also provided enhancements in the form of pricing discounts and streamlined loan approval speeds based on the correspondent lenders' loan origination volumes, ranking such correspondent lender status in the attached pricing schedules through various levels; e.g, "Bronze Status," "Silver Status," "Gold Status" and "Platinum Status."

161.   Defendants designed their discretionary wholesale pricing policies to enable their brokers and correspondent lenders to obtain greater profits from originating first and second lien mortgage loans with substantial yield spreads, origination fees, higher loan amounts and higher loan volumes. Thus, Defendants' discretionary wholesale pricing policy provided financial incentives to

Defendants' brokers and correspondent lenders to maximize the interest rate charged to borrowers and to impose additional subjective, non-risk-based, charges and other discretionary fees on mortgage loans offered to borrowers.

162.    Consequently, this encouraged such brokers and correspondent lenders to make as many mortgage loans as possible, at the highest interest rates, and with as much in additional fees as possible to those types of individuals who were most likely to accept such predatory loans – e.g. FHA protected minority borrowers with less access to traditional credit, inadequate information on viable mortgage loan alternatives and/or lacking financial sophistication.

163.    Defendants regularly communicated their applicable wholesale pricing sheets (which incorporated Defendants' par rates, yield spread premiums, and discretionary fees) to their mortgage brokers and correspondent lenders via rate sheets and other written communications.

164.    Defendants also maintained "Bulk Continuing Loan Purchase Agreements" with their correspondent lenders that enabled Defendants to purchase, in bulk, mortgage loans originated by Defendants' correspondent lenders. The Bulk Loan Purchase Agreements also required Defendants' brokers and correspondent lenders to meet Defendants' underwriting standards and required the transfer of all loan servicing rights to Defendants in connection with any bulk loan purchases.

165.     Defendants are liable for the loans it purchased or funded because they were made pursuant to Defendants' own underwriting guidelines. Indeed, Defendants made clear in their own public filings with the SEC that their subprime mortgage loan purchases were made pursuant to Defendants' own underwriting policies:

> Our mortgage services business purchases non-conforming first and second lien position residential mortgage loans, including open-end home equity loans, from a network of over 200 unaffiliated third-party lenders (i.e., correspondents). This business has approximately $28.8 billion in managed receivables, 280,000 active customer accounts and 2,700 employees. Purchases are primarily "bulk" acquisitions (i.e., pools of loans) but also include "flow" acquisitions (i.e., loan by loan), **and are made based on our specific underwriting guidelines.**

Defendant HSBC Finance's 2004 Form 10-K (emphasis added); *see also* HSBC plc 2003 Form 20-F.

166.     Defendants clearly knew the predatory and discriminatory nature of the subprime loans made by Defendants' brokers and correspondent lenders pursuant to Defendants' underwriting standards because Defendants re-underwrote and/or reviewed each loan Defendants purchased from their brokers and correspondent lenders.

167.     Defendant HMSI, a wholly owned subsidiary of Defendant HFC, maintained a Bulk Underwriting department, based in South Carolina with scores of bulk underwriters reporting to Regional Bulk Underwriting Managers.

Bulk underwriters would typically travel to the offices of correspondent lenders such as Accredited (based in Escondido, CA) to re-underwrite and/or review mortgage loan files for bulk purchase pursuant to Defendants' contractual forward flow or bulk purchase agreements.

168.    According to one Bulk Underwriter who was employed by Defendant HMSI between early 2004 and December 2006, bulk underwriters traveled to different wholesalers locations for "buys," which were deals where wholesalers informed Defendants that they had "thousands" or "tens of thousands" of loans for review and purchase by HSBC. Each bulk underwriter typically reviewed between 12 and 15 loan files per day and "had to hustle to do so."

169.    Contrary to the traditional practice of reviewing loan files to attempt to prevent the purchase of risky loans, according to the bulk underwriters, Defendant HMSI tasked its bulk underwriters to "approve as many loans as possible for purchase" and were given very liberal" underwriting guidelines in order to "get as many loans as you could" for Defendant HMSI to purchase.  The bulk underwriters "followed protocol" that was "not at all meticulous," ensuring only that the documents noted to be in the file were actually in the file and that there were no "blatant lies," such as fake pay stubs or W2s.  The bulk underwriters did not analyze debt-to-income ratios "because they knew that the loans were

stated income" and that "the broker typically created an income number" to result in a "successful loan."

170.    The willful nature of Defendants' behavior is reflected in the fact that approximately 82% of the loans made in Defendants' correspondent channel passed Defendants' initial screenings by its bulk underwriters and the rest were approved by exception.

171.    According to the Bulk Underwriter, Defendants' bulk underwriters had to "overlook" the risks of the loans from the correspondent lenders – Defendants "knew what they were doing."  For instance, the Bulk Underwriter often was concerned that there was "no way" the borrower made "the kind of money" reported in the loan files and "no way" the borrower could afford the house being purchased.  The Bulk Underwriter then presented those concerns to the Regional Bulk Underwriter Manager in South Carolina, explaining a lack of comfort in approving the loan, but the Regional Manager regularly instructed the Bulk Underwriter to approve the loans anyway.

172.    In the words of the Bulk Underwriter, everyone knew that Defendants were "doing loans that did not need to be done."  There was "no benefit to the homeowners," but the "more loans" that were issued, "the more money was made."  This was particularly true with respect to the loans Defendants

purchased from Accredited.  100 percent of the loans Defendants purchased from Accredited were 100 percent finance or 80/20 loans, with "stated income" terms.

173.    The Bulk Underwriter spent an estimated "one-third to half" of the time – along with approximately 20 other HSMI bulk underwriters -- at Accredited's location in Escondido, CA, where loan files from different Accredited locations across the United States were sent, including files for subprime loans issued to borrowers in Georgia, California, and Florida.

174.    According to the Bulk Underwriter, Defendant HMSI was "extremely liberal with Accredited" because Accredited provided Defendants with "a huge amount of business." Consequently, the primary goal of the bulk underwriters was "not to send too many [loans] back" and to approve loans via "exception." Defendants turned down a very small percentage of loans from Accredited, approving and purchasing "well above 90 percent" of the loans reviewed by the bulk underwriters. 20 to 30 percent of the loans Defendants purchased from Accredited were purchased based on exceptions.  The few loans that were rejected included those for which there were "blatant lies," including "fake W2s" or where it was discovered that the "borrower did not even exist."

175.    According to the Bulk Underwriter, Defendant HMSI tasked its bulk underwriters to find "exceptions" for loans that did not already meet Defendants' extremely liberal underwriting guidelines and trained the bulk

underwriters "to find exceptions to approve the loans."  "We were always looking for some exception."  The Bulk Underwriter "knew we were there to approve loans."

176.    For example, for borrowers who only had a short time on the job or short term residency, bulk underwriters were tasked with finding exceptions including whether the borrower was married or might be promoted in the near future either of which conceivably provided additional income to make the loan payments.

177.    According to the Bulk Underwriter, Defendant HMSI approved loans from Accredited for borrowers who were gardeners or who worked at McDonald's who reported incomes of $90,000 as part of the "stated income" loan program.  In such cases where the Bulk Underwriter did not believe the income reported was accurate and informed the Regional Bulk Underwriter Manager of such, the Regional Manager instructed the loan to be approved anyway in line with Defendants' "liberal" guidelines.

178.    There were a lot of Hispanic borrowers among the Accredited loans that the Bulk Underwriter underwrote, including a high number of Hispanic borrowers in Georgia, in particular.  And, according to the Bulk Underwriter, one of Defendants' exceptions that was often made when loans to Hispanic borrowers by Accredited did not meet Defendants' already "liberal" underwriting guidelines

was to consider that Hispanic home owners typically had six to eight family members living in one household who could potentially assist in making the loan payments, even though there may have only been one borrower on the loan. The Bulk Underwriter indicated that Defendants were well aware that the borrowers were Hispanic based on the surname in the loan files and sometimes the type of employment that was reported.

179.    The bulk underwriters also were aware of issues with the appraisals they reviewed while performing bulk underwriting on behalf of Defendants. According to the Bulk Underwriter, the appraisals ordered by brokers and approved by the HSBC Appraisal Review department were "always on the high side." The appraisals "needed to be on the high side" to make the deals work. That is, the refinance loans were predicated on equity that materialized as a result of the appraisals being "on the high side." The bulk underwriters knew this having reviewed comparable properties in the relevant geographic areas or based on data from automated valuation models.

180.    According to a Fraud Manager of Defendant HSMI's Fraud Department (who was based in South Carolina from January 2007 until about July 2007 when Defendant HSMI "laid everyone off"), Defendant HSMI had approximately 30 employees in the department (plus another 6 or 8 in a Pomona California office) that were tasked with investigating potential fraud in mortgage

loans purchased by Defendant HMSI as the number of delinquent loans increased dramatically beginning in approximately December 2006.

181.     The Fraud Manager investigated many loans that Defendant HSMI purchased from Accredited in approximately 35 States, as well as loans originated by other wholesalers or that Defendant Decision One had originated directly or through its brokers.   Based on the Fraud Manager's extensive investigations, it was clear to the Fraud Manager that many brokers had blatantly "targeted certain geographic areas"; i.e., those areas with higher numbers of FHA protected minority borrowers.

182.     The Fraud Manager determined that many borrowers were "too naïve" to understand the loan terms and that the brokers did not thoroughly explain the loan terms to the borrowers.  As an example, the brokers used yield spread premiums and often charged the borrowers origination fees of two to three percentage points of the loan amounts.  This was especially true for refinance deals and many borrowers were led to believe that they were getting "zero cost loans." Although many borrowers received a check from the transaction, they were not properly informed or did not realize that they paid $3,000 or $4,000 to complete the transaction, amounts that were stripped out of the equity that the borrowers had in their homes and were borrowing against.

183.     Incredibly, despite having underwritten to Defendants' own standards any loans found to be fraudulent, Defendant HSMI later attempted to return such loans back to the correspondent lenders they were purchased from. However, the correspondent lenders such as Accredited refused to take any loans back because Defendants had underwritten them to their own "liberal" standards prior to their purchase and therefore had approved them.

184.     The result of Defendants' discretionary pricing policies, underwriting policies, appraisal policies and other policies, practices, processes and/or procedures is that Defendants have either authorized, approved, encouraged or otherwise allowed Defendants' employees, brokers, and correspondent lenders to:

- intentionally market to FHA protected minority borrowers high cost, subprime, ALT-A or other mortgage loan products while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally market to FHA protected minority borrowers – thorough direct marketing techniques - loans on terms more unfavorable than loans made to non-minority borrowers who were similarly situated under traditional lending criteria;

- intentionally steer FHA protected minority borrowers into high cost, subprime, ALT-A or other mortgage loan products through various practices including failing to advise such borrowers of lower cost alternatives or advising such borrowers not to submit proof of income;

- intentionally lend to FHA protected minority borrowers high cost, subprime, ALT-A or other mortgage loan products while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally lend to FHA protected minority borrowers loans on terms more unfavorable than loans made to non-minority borrowers who were similarly situated under traditional lending criteria;

- intentionally underwrite and lend to FHA protected minority borrowers high cost, subprime, ALT-A or other mortgage loan products at borrowers' maximum income/debt ratios while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally underwrite and lend to FHA protected minority borrowers ARM loan products at borrowers' maximum income/debt ratios but at the teaser interest rates rather than the minimum anticipated adjusted rate after the initial teaser rate period expires while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally underwrite and lend to FHA protected minority borrowers high cost, subprime, ALT-A and even loans backed by Government sponsored enterprises (i.e., the Federal National Mortgage Association ("FNMA"), the Federal Home Loan Mortgage Corporation ("FHLMC"), and the Government National Mortgage Association ("GNMA") collectively, the "GSEs") at inflated amounts beyond the fair value of their homes and based on inflated appraisals while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;  and

- include predatory pre-payment penalties in the loan products issued to FHA protected minority borrowers.

185.    Defendants' discretionary pricing policies, underwriting policies, appraisal policies and other policies, practices, processes and/or

procedures applicable to Defendants' employees, brokers, and correspondent lenders evidence Defendants' willful disregard for the ability of FHA protected minority borrowers to repay the mortgage loans made to them and the likely delinquencies, defaults, home vacancies and foreclosures that would, and in fact did, result from such predatory and discriminatory lending activity.

186.    As further alleged below, the deliberate nature of Defendants' actions are further reflected in their efforts to try to avoid segment the risk of their predatory and discriminatory lending through their corporate structure, shift or pass the risk of loan defaults through use of the securitization model, insure the risk through sales of securitizations to the GSEs such as Fannie Mae and Freddie Mac, and attempt to conceal their activity through the use of MERS.

## E.    The Securitization Model, Corporate Structure & MERS: Linchpins to Defendants' Predatory & Discriminatory Lending Scheme

187.    The predatory and discriminatory mortgage lending practices of Defendants, and other industry participants, was driven by the opportunity to generate enormous fees by originating, or purchasing and then repackaging, and selling high volumes of higher yielding, higher risk, mortgage loans (i.e., high cost

loans)[6] for structured financial instruments such as mortgage backed securities

("MBS") – which inflated the housing bubble -- while simultaneously passing

along the risk of loss on the underlying mortgage loan products to third parties and

breaking or obfuscating the chain of liability.

188.    This business model was designed – and as Defendants in fact

implemented – to be quickly ramped up during the boom years and then attempt to

avoid the responsibility of bad loans by passing the risk to other parties.

189.    Defendants   and   other   industry   participants   were   highly

incentivized to engage in the predatory and discriminatory lending practices

alleged here because Defendants, and other market participants, earned greater fee

income through higher per loan origination and securitization fees, tremendously

increased loan volumes, and higher loan servicing fees by making as many high

cost loans as possible.  And, as alleged above, Defendants' top executives received

---

[6] An October 2007 congressional report issued by the Joint Economic Committee, *The Subprime Lending Crisis, The Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, reflects that by 2004/2005, 90 percent of all subprime loans were "teaser rate," hybrid adjustable rate mortgages ("ARMS").  These products were underwritten to the teaser rates and market participants knew the loans would or were likely to fail when the rates reset after the initial teaser rate period.  Moreover, nearly 50% of the mortgages during this time were also "no doc" loans and more than a third were also "interest only" loans (no principal payments).

enormous compensation packages and bonuses from Defendants' mortgage lending and securitization activities at issue.

190.    To feed the demand for these loan products – which was increasingly driven by the securitization model itself - Defendants and other industry participants directly or indirectly targeted minority borrowers (particularly those in racially and ethnically marginalized urban communities traditionally excluded from mainstream credit markets and historically more vulnerable to deception and abuse because of the lack of information and viable choices) - as the most expedient and efficient way to obtain customers willing to accept Defendants' predatory loan products that were destined to fail as a result of the predatory nature of the loan terms themselves. Thus, the driving force behind Defendants' predatory lending activity was not borrower demand, but the greed of Defendants and Defendants' executives.

191.    Defendants were emboldened to engage in the predatory and discriminatory lending activity alleged here because Defendants engaged in activities to isolate, eliminate, shift and/or conceal as much of the risk to Defendants as possible. These actions further reflect the intentional nature of Defendants' conduct.  As further alleged below, Defendants' corporate structure was designed to isolate the risk from loan defaults and Defendants' discriminatory practices within its North American structure (and avoid passing it to their foreign

corporate parent, HSBC plc).  And, Defendants' origination activity, assignments and ownership of such loans were concealed through the Mortgage Electronic Registration Systems, Inc. ("MERS"), an entity that Defendants and other industry participants created to circumvent proper public recording processes, facilitate the transfer and distribution of mortgage loans among Defendants' corporate structure and securitization instruments, and obfuscate the chain of liability in the foreclosure process.  Through the securitization model, Defendants then strove to cleanse such loans of direct predatory lending claims by borrowers, pass the risk of default on such loans to third parties, and mitigate losses through monoline insurance or derivative instruments (e.g., credit default swaps).

     i.     <u>Defendants' Structure Isolated & Concealed Risk</u>

192.    Effective January, 1 2004, HSBC plc created a segmented North American organizational structure that isolated and concealed Defendants' predatory subprime lending activities, segregating the operations of its newly acquired Household Finance business unit from its regulated bank entities. This organizational structure enabled Defendants' U.S. subprime mortgage lending related businesses to be legally separate from, but still centrally controlled by, Defendant HNAH and beyond the oversight of Defendants' federal banking regulators.

193.     Defendants knew at that time that U.S. banking regulators, primarily concerned with bank safety and soundness issues, considered the avoidance of predatory and discriminatory lending practices (particularly including violations of the Fair Housing Act) to be an "essential component of a well-structured risk management program for subprime lenders," such as Defendants here, given the operating, compliance and legal risks involved.  Defendants knew that such a risk management program required institutions that originated or purchased subprime loans were required to "take special care to avoid violating fair lending and consumer protection laws and regulations" because "higher fees and interest rates combined with compensation incentives [could] foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness."  Defendants also knew at that time that U.S. banking regulators were focused on the risks of abusive lending practices such as equity stripping, incorporating pricing terms that far exceeded the true risk of the loan, loan flipping, and one-way referral practices within a multi-subsidiary organization.  And, Defendants also knew at that time that if they appeared to be treating similar loan applicants differently on the basis of a prohibited factor (e.g., race, ethnicity or gender) they would have to provide a credible explanation for their disparate treatment or face an agency finding of intentional discrimination.

194.     In its Form 20-F for the year ended December 31, 2006, HSBC plc acknowledged these regulatory matters and touted that its structure and operations were designed to minimize these risks to Defendants' parent, HSBC plc: "A number of steps have been taken to mitigate risk in the affected parts of the portfolio [of subprime mortgage loans generated between 2005 and 2006]. These include enhanced segmentation and analytics to identify the higher risk portions of the portfolio, and increased collections capacity." Defendants' enhanced segmentation and analytics are reflected in their distribution of mortgage loans and loan applications between their regulated bank entities (Defendant HUSA and its subsidiaries) and their non-regulated entities (Defendant HFC and its subsidiaries).

195.     Contrary to known interagency banking regulatory guidance requiring Defendants to establish an adequate compliance management program that "must identify, monitor and control the consumer protection hazards associated with subprime lending" – as to both originations and purchases – Defendants utilized their organizational structure to avoid regulatory scrutiny of their subprime origination and wholesale lending activities.

196.     Approximately 92% of all of Defendants' completed mortgage loan applications (i.e., applications not reported as withdrawn or closed/incomplete) during 2004 through 2007 were attributed to Defendants' non-banking entities (Defendant HFC and its subsidiaries), with 8% attributed to

Defendants' regulated banking entities (Defendant HUSA and its subsidiaries). This reflects that most of Defendants' loan application reporting occurred in the non-regulated enterprises.

197.    However Defendants' non-bank entities made approximately 76% of all the loans originated by Defendants, with approximately 24% made by Defendants' bank regulated entities. Defendants' aggregate approval rate across all their enterprises for all completed mortgage loan applications was approximately 32% compared to an approximate 91% approval rate in Defendants' regulated banking entities. This evidences a higher quality loan application and applicant within Defendants' regulated banking entities compared to their non-bank entities. This is further evidenced by the extremely low percentage (0.9%) of high cost loans to total loans originated in Defendants' regulated banking entities compared to extremely high percentage (75%) of high cost loans to total loans originated in Defendants' non-bank entities.

198.    This data evidences that Defendants were reporting their higher quality loan applications and their higher quality loans (i.e., non-high cost loans) in their bank regulated entities, thus avoiding regulatory scrutiny through a one-way loan application referral process within the HSBC organization.  Such one-way referral lending practices have been identified as "abusive" by the Office of the Comptroller of the Currency, Administrator of National Banks, in a July 25, 2000,

advisory letter distributed to all chief executives and certain other officers of national banks.

199.    In addition, Defendants engaged in various other business practices that have obfuscated the reporting of race and ethnicity data so as to minimize the appearance of discriminatory lending patterns.  For example, by distributing high cost, other subprime and ALT-A conforming mortgage loans made to FHA protected minority borrowers throughout Defendants' various reporting entities, Defendants were able to manipulate the appearance of their minority lending patterns.

200.    In contrast to Defendants' mortgage originations, Defendants were not legally required by HMDA to report ethnicity or high cost loan designations with respect to loans that Defendants purchased from brokers, their correspondent lenders and from other third parties.  Unlike other subprime lenders that voluntarily reported such data, however, Defendants chose not to.  Not surprisingly, the vast majority of those loans were originated within high foreclosure rate areas which were within communities with the highest percentages of minority homeowners.

201.    Indeed, in Plaintiffs' communities and neighborhoods in particular, Defendants reported that they purchased 9,843 mortgage loans between 2004 through 2007, but reported race or ethnicity *on only 59* of those loans.  This

practice concealed Defendants' predatory and discriminatory behavior at issue here particularly given that 6,229 of the 9,843 loans where minority status was not reported (approximately 65%) were made within the *highest two* HFR areas in Plaintiffs' communities and neighborhoods, precisely where the highest percentages of FHA protected minority borrowers reside.

202.    Because of Defendants' close relationships with its correspondent lenders and third party subprime originators, and because Defendants underwrote each loan they purchased, Defendants had full access to and knowledge of these lenders' predatory and discriminatory practices relating to their subprime lending, as well as the ethnicity of the borrowers.

203.    Indeed, as further alleged below Defendants provided the funding advances for such loans and many were required to be underwritten to HSBC's underwriting standards pursuant to Defendants' warehouse funding agreements.  Moreover, Defendant HUSA acted as sponsor in many of Defendants' securitizations in order to market them with the HSBC brand and provide investors with comfort that Defendants stood behind the quality of the underlying mortgages in the securitizations; i.e. were responsible for the financial obligations with respect to such securitizations.

204.    By not reporting to the federal government high cost designations, race and ethnicity on purchased or wholesale mortgage loans, and

using their predatory lending structure, Defendants avoided regulatory fair lending oversight with respect to their purchases and securitizations of massive amounts of predatory and discriminatory subprime mortgage loans.

205.    Knowing they would transfer originated and purchased predatory and discriminatory subprime mortgage loans among Defendants' various enterprises and securitizations of these loans, Defendants utilized MERS to facilitate loan transfer and distribution across its corporate structure and to obfuscate loan origination, loan purchases, loan assignment and loan foreclosure activity.

ii.    <u>Defendants Concealed & Obfuscated Liability With MERS</u>

206.    Defendants' role in the creation and use of MERS provides further evidence of Defendants' intentional predatory and discriminatory mortgage lending and foreclosure conduct.

207.    MERS – of which Defendants are founding members - is a separate legal entity that was created by Defendants and other industry participants to act as a nominee for mortgage lenders and lenders' successors and assigns (e.g., securitization trusts) through a confidential computer registry (containing over 70 million mortgage loan records) enabling mortgage lenders to privately originate, track, assign and/or trade mortgage loans, circumventing the entire public recording process.    Thus, MERS obscures Defendants' and other industry

participants' mortgage loan origination and ownership, assignment and securitization activity.

208.    MERS describes itself as "an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. Created by the real estate finance industry, MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans." According to MERS, it also provides money savings to lenders by eliminating assignment costs, document correction costs and tracking fees - "Once the loan is assigned to MERS . . . tracking servicing and beneficial rights can occur electronically for all future transfers. The need for any additional assignments after this point will be eliminated unless the servicing rights are sold to a non-MERS member."   MERS has thus saved industry participants – and denied public recording systems operated by county and municipal governments such as Plaintiffs here – a total of over $2 billion in public recording fees.

209.    MERS' admittedly deliberate circumvention of the public recording process damages Plaintiffs by making it extremely difficult for Plaintiffs to determine ownership of vacant or abandoned properties that have not yet been foreclosed upon to cure building code deficiencies, ensure compliance with building codes, obtain unpaid taxes and/or utility bills, and/or determine the ownership or lien holders to enable in rem or tax foreclosure sales.

88

210.    Because Plaintiffs do not have access to MERS there is virtually no way for Plaintiffs to identify parties – e.g., mortgage note holders or securitization trustees – legally and financially obligated to pay the costs of maintaining abandoned or vacant properties, and such costs are born by Plaintiffs. These practices, also by design, denies Plaintiffs of the revenue from recording fees and taxes that Plaintiffs otherwise would have received had the various assignments and other changes in title been properly recorded.

211.    More importantly, however, by circumventing public lien holder recording processes by design, MERS obscures Defendants' and other industry participants' mortgage foreclosure practices. This has served to conceal Defendants' and other industry participants' predatory lending practices and improper mortgage foreclosure processes, making it extremely difficult for Plaintiffs – and other interested parties - to identify the predatory lenders "whose practices led to the high foreclosure rates that have blighted some neighborhoods." Mike McIntire, *Tracking Loans Through a Firm That Holds Millions, N.Y. Times* (April 24, 2009). It effectively "removes transparency over what's happening to these mortgage obligations and sows confusion, which can only benefit the banks." *Id*.

212.    The majority of foreclosures (estimated at 60% nationwide) are conducted in the name of MERS as designee, assignee or title holder of Defendants

as originator or securitization trustee making it virtually impossible to determine from publicly available data which Defendants hold the mortgages to, are in possession of, and/or are or may be foreclosing on properties in Plaintiffs' communities and neighborhoods, further obfuscating the predatory and discriminatory lending practices of Defendants and other industry participants.

213.    Thus, the only way to precisely determine the properties possessed by, or in control of, Defendants and other industry participants, will be through discovery of Defendants and MERS' mortgage origination, purchase, assignment, securitization, servicing and foreclosure records.  Complicating the problem, both Defendants' and MERS' electronic mortgage lien and assignment records contain extensive errors, which errors have been publicly acknowledged, and further necessitate review of Defendants' underlying mortgage loan files. Moreover, Defendants' "robo signing" practices by employees that did not review underlying property ownership records or confirm their accuracy have created false assignments, masking gaps in the chain of title and, therefore, Defendants' legal right to foreclose.

214.    Despite having previously agreed in a 2003 settlement with ACORN to end their discriminatory servicing practices, on April 13, 2011, Defendants HSBC North American Holdings, Inc. and HSBC Finance Corporation, entered into a Consent Order with the Federal Reserve in which

Defendants agreed to implement a variety of changes to their mortgage servicing practices (as further alleged below) particularly including "an acceptable plan to ensure appropriate controls and oversight of [Defendants'] . . . activities with respect to MERS and compliance with MERS membership rules, terms, and conditions," which plan "shall include, at a minimum" processes to ensure that: (i) Defendants' mortgage assignments and endorsements owned in MERS name are properly executed and approved by properly certified officers; and (ii) Defendants accurately and reliably report all mandatory data to MERS, including the accuracy of all of Defendants' foreclosures pending in MERS name.

215.    Defendants' entry into the Consent Order and the changes Defendants agreed to implement concerning MERS reflects that Defendants, as founding members of MERS, are responsible for its oversight and for MERS' actions, including to the extent MERS has or will act as Defendants' agent.  In addition, Defendants will have control of MERS' records for discovery purposes relating to this litigation.

iii.    Defendants Passed Risk To Third Parties With Securitizations

216.    In addition to their complex, segmented, legal structure and development and use of MERS, Defendants' use of the securitization model further reflects their intentional conduct relating to their predatory and discriminatory mortgage lending scheme.

217.     Traditional mortgage lending operations involved lenders making mortgage loans and typically holding them for long term investment, matching their liabilities to their assets.  This model changed substantially by 2004 with the entrance of large financial institutions like Defendants into the subprime mortgage lending sector where mortgage loans were pooled, packaged, and sold as investments, enabling default risk (and predatory lending risk) to be shifted onto third parties and large amounts of capital to be gathered and employed to fund the fee driven securitization mortgage lending model.

218.     Under the securitization model utilized by Defendants, after a subprime mortgage loan was originated either directly, through a broker or correspondent lender, or purchased from other third party subprime originators, it often was closed directly in the name of MERS and a MERS tracking number was assigned.  Typically, the loan was then pooled with other loans across geographical regions, packaged and sold, with Defendants frequently retaining lucrative servicing rights as additional revenue streams.

219.     Defendants' Flow Purchase Agreements and Credit Agreements with their correspondent lenders expressly required correspondent lenders to close mortgage loans directly in the name of MERS to enable Defendants to more readily package and resell such loans into securitization instruments.  The Flow

Purchase Agreements and Credit Agreements also required that Defendants would retain the servicing on such loans.

220.    Defendants' typical securitization transactions involved the establishment of a special purpose vehicle (SPV) such as a trust. The SPV trust itself typically had little or no excess capital, receiving only the repayment of principal and interest from the underlying pool of loans that ultimately must be passed back to the trusts' investors that supplied the cash to purchase the loans. The securitization trustees are obligated to receive and distribute payments – typically from the mortgage servicer - to holders of the trust's securities, as well as keep appropriate documentation relating to the assets of the trust – namely the mortgage loans and properties underlying those loans.

221.    When mortgage loans are made by Defendants or their brokers or correspondent lenders, the loans become negotiable instruments and when assigned to a trust or other SPV, the trust becomes a holder in due course under the Uniform Commercial Code.  This enables the assignee of the loan (e.g. the trust and trustee) to hold the note and enforce it without many of the defenses the borrower would have had against the original lender, effectively cleansing the loan note of direct predatory lending claims and obfuscating who owns the loan. Investors purchase portions of the trust or SPV (i.e., portions of the loan pool) as securities, thereby leveraging small amounts of the lenders' capital to marshal

large amounts of investors' capital so that lenders such as Defendants can make many, many more loans.

222.    At the same time, Defendants passed the risk of loss on the underlying mortgage loans into the trust -- and ultimately onto its private or public investors (e.g., government sponsored enterprises (GSEs) such as Fannie Mae and Freddie Mac, pension funds, municipal governments, mutual funds and monoline insurance companies) – by effectively selling the loan to the trust.

223.    The deliberate nature of Defendants' actions are further evidenced by their effort to protect themselves from the downside risk of increased predatory mortgage loan delinquencies and defaults by obtaining credit derivative instruments on mortgage loans they either originated or purchased and continued to retain a financial interest in. As of June 30, 2008 Defendant HNAH held *$3.9 trillion* in notional amount of over-the-counter derivative instruments.  *See "The Financial Crisis Inquiry Report*," Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011), at 300.

224.    Because mortgage borrowers effectively lose their rights to raise the initial act of predatory or discriminatory lending by the loan originator as a defense to foreclosure, Defendants and other industry participants were able to

lend with deliberate indifference as to legality or propriety of the underlying loan origination and in fact were incentivized to engage in such misconduct.

225.     Defendants frequently served as sponsors and/or trustees to securitization trusts set up by other mortgage originators and securitizers such as New Century and Deutsche Bank, respectively. Commencing in 2005 Defendants also served as sponsors and trustees in many securitizations of pools of loans that Defendants originated themselves and/or purchased from Defendants' correspondent lenders and/or third party originators like New Century.  This was to apply the HSBC brand, and presumably its financial backing, to the representations and warranties made with respect to the loan pools underlying the securitizations that such loans complained with state and federal regulations and lending laws.

226.     In sponsoring such securitizations, Defendants repeatedly purchased billions of dollars of subprime mortgage loans from now defunct third party originators including New Century, Option One, First Franklin, and WMC Mortgage Corp, as well as Countrywide Home Loans, each of which have been found by federal regulators to have broadly circumvented their underwriting guidelines and manipulated property appraisals in making predatory subprime loans, particularly to minority borrowers.

227.     After acquiring Household Finance, Defendants' securitization activity was substantial and grew rapidly.   Thus, between 2003 and 2007

Defendants securitized $35 billion of first and second lien mortgages into securitizations as follows:

|  | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
|---|---|---|---|---|---|---|
| Home Equity | $1,389,964,000 | $877,689,000 | $2,715,500,000 | $4,416,900,000 | $2,333,500,000 | $11,733,553,000 |
| 1st or 2nd Lien | $ 0 | $ 0 | $2,132,972,000 | $15,274,112,715 | $5,939,447,609 | $23,346,532,324 |
| **Total** | **$1,389,964,000** | **$877,689,000** | **$4,848,472,000** | **$19,691,012,715** | **$8,272,947,609** | **$35,080,255,303** |

228.    The explosion of Defendants' securitization activity between 2004 through early to mid-2007 reflects the extremely aggressive manner in which Defendants implemented the "sustainable growth channel" touted in HSBC plc's 2003 Form 20-F discussing the acquisition of Household Finance and the use of Household's direct targeted marketing techniques to maximize Defendants' subprime mortgage lending business.

229.    Indeed, this same growth in Defendants' subprime lending and securitization activities provided the basis for the massive compensation packages paid to Defendants top executives during this time frame. And, Defendant HNAH transferred the financial benefit from Defendants' predatory and discriminatory lending activity to HSBC plc in the form of dividends totaling approximately $5 billion between just 2005 through 2007, despite the fact that Defendant HNAH's minimum regulatory capital level began deteriorating at a rapid pace because of

growing losses in its subprime lending operations and expanded asset base including subprime assets held both on and off of its balance sheet.

230.     As sponsors of securitizations, Defendants knew the predatory and discriminatory nature of the high cost, subprime, ALT-A and/or other conforming loans underlying their securitizations because they had access to the loan files themselves and made representations and warranties in their securitizations with respect to such loans.

231.     As sponsor (and trustee) Defendants, particularly Defendant HBNA, made representations and warranties to the investors in the securitizations that each mortgage loan within the underlying loan pool was in compliance with applicable state and federal regulations. However, Defendants in fact misrepresented the risk of default and credit related losses in the pools of subprime mortgage loans underlying the SPVs as a result of Defendants' subprime loan origination and purchasing practices.

iv.     Subprime Lending &Securitizations Caused the Financial Crisis

232.     The risk in Defendants' subprime lending began to materialize as early as the second half of 2006 when Defendants' subprime mortgage delinquency rates rapidly began increasing.  Indeed, by early 2007 several less well capitalized subprime lenders had collapsed, industry-wide increases in subprime defaults become known as the cost of insuring pools of mortgages – particularly

home equity loans - began increasing in February 2007.  Through the spring and early summer of 2007 unfavorable news of large losses, margin calls and downgrades at financial institutions related to subprime lending occurred.  By this time Defendants had determined to quickly exit the subprime mortgage market and through a $1.8 billion dividend to HSBC plc, stripped out the last of Defendant HNAH's remaining historical retained earnings and an additional $650 million.

233.    As regulators and investors realized that the amount of risk in the structured finance products relating to subprime loans and the SPVs holding them was far greater than the market had previously been led to believe (by the second quarter of 2007 through the same period in 2008 delinquency rates were exploding beyond anything the mortgage lending industry had ever experienced in its history), the demand for securitizations and related structured finance products dried up.  Indeed, this led to three distinct illiquidity waves -- the first of which occurred on August 9, 2007 when LIBOR rates spiked, as liquidity and default risk of financial institutions rose.  Thereafter, numerous asset write-downs by financial institutions relating to subprime losses began to occur in January and February 2008.

234.    Throughout the spring and summer of 2008, the mounting losses at financial institutions led to a full blown liquidity crisis because of concerns over large financial institutions' exposure to both counterparty credit risk

and their own lending risk with respect to both their securitizations and the high risk mortgage loans underlying them.  This, in turn, was primarily a result of the mismatch in maturities between long term liabilities (i.e., the pools of mortgages underlying securitizations) and the short funding mechanisms used in the off-balance sheet, special investment vehicles ("SIVs") created and/or sponsored by Defendants (and other industry participants) that also held pools of subprime mortgages.

235.     By creating the securitization vehicles – the SPEs -- Defendants sought to transfer the risk of loss to off-balance sheet investment vehicles that were highly leveraged, concealed the related default risk, and skirted regulatory oversight and minimum regulatory capital requirements.

236.     Until June of 2008 unemployment levels in the U.S. had not yet begun to rise and remained low even as foreclosure rates began to explode. Consequently, unemployment did not cause the foreclosure crisis.   Instead, increasing unemployment occurred in connection with the financial crisis that was caused by the predatory and discriminatory lending activities, and the concealment and risk spreading of those activities, as alleged herein.

237.     Finally, in the fall of 2008 the U.S. and global credit markets froze – leading to a much greater liquidity crisis - when regulators, investors and other market participants realized that the full extent of the credit losses,

counterparty risk and default risk on subprime mortgage loans underlying securitizations was unknown (particularly given the lack of transparency and the use of leverage by Defendants and other market participants in connection with their securitization, off-balance sheet SIVs, and other lending activities) and that such unknown levels of risk had infected a wide swath of other investment market segments and U.S and global financial institutions.

238.    After having stripped out Defendant HNAH's remaining historical retained earnings at the end of 2007 with a $1.8 billion dividend to HSBC plc, in order to maintain minimum liquidity and Tier 1 capital levels within Defendants' regulated banking entities in 2008, Defendants then needed to obtain assistance from the U.S. government primarily in the form of emergency federal lending under the Term Auction Facility (TAF), which provided emergency funding to deposit taking institutions to provide liquidity.  Between September 26, 2008 and July 2, 2009, Defendants borrowed approximately $7 billion under TAF in 16 individual transactions.   $4 billion of that amount was borrowed by Defendant HBNA in 5 transactions, pledging total collateral of $69.9 billion to secure the loans, and HSBC Securities borrowed $3 billion over 11 transactions, pledging total collateral of $3.8 billion.  Indeed, the $69.9 billion of collateral Defendant HBNA was required to pledge for its $4 billion in loans reflects the

extremely poor quality of the assets pledged and that such assets were likely subprime loans.

239.    In order to obtain such loans to provide liquidity, Defendants were required to inject $9.75 billion of capital into their regulated banking entities and sell off assets because Defendants' regulated banking entities needed to maintain minimum regulatory capital levels.   However, Defendants then abandoned the subprime lending markets they had helped create and the borrowers who relied on continuing access to the credit they had provided, albeit in a predatory and discriminatory manner.   As a result, as further alleged below Defendants also failed to properly provide the loan servicing support on all their loans that borrowers were paying for monthly as part of Defendants' loan servicing operations.

240.    In the fall out from the financial crisis and foreclosure crisis, the Federal Housing Finance Agency ("FHFA"), as the conservator for Fannie Mae and Freddie Mac, investigated the loan origination and securitization practices of Defendants.   FHFA found that Defendants had "falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans."   FHFA subsequently sued Defendants

for federal securities fraud involving their offer and sale of residential mortgage backed securities to the GSEs.

241.    FHFA's investigation also found, among other things, that Defendants had materially overstated the appraised value on a significant number of the loans that were purchased by FNMA and FHLMC, causing large numbers of borrowers to have loans greater than the value of the underlying property.  The findings of FHFA reflect that Defendants' predatory lending activity, designed to increase Defendants' mortgage origination and securitization fee income at the expense of minority borrowers and investors in the securitizations, was widespread and systematic throughout its lending operations.  Defendants' overstatements of the appraised value in the underlying loan values, coupled with Defendants' high percentages of ALT-A and subprime loans having greater than 100% LTV ratios, reflects Defendants' efforts to conceal their predatory and discriminatory equity stripping lending practices.

242.    In sum Defendants' predatory subprime mortgage lending (as well as the predatory lending of other industry participants), along with their attempt to conceal and shift the risk of their activities, ultimately caused the financial crisis, economic downturn and increased unemployment rates, all further exacerbating the foreclosure crisis resulting from their original predatory lending

activities and thereby exacerbating the injuries to Plaintiffs due to Defendants' predatory and discriminatory lending.

## F.      Predatory & Discriminatory Lending Caused The Foreclosure Crisis

243.      The foreclosure crisis throughout the United States, and within Plaintiffs' neighborhoods and communities leading up to the current period, result from the predatory lending activities of the mortgage industry, *Report to Congress on the Root Causes of the Foreclosure Crisis,* Report of Department of Housing and Urban Development (January 2010) (hereafter, the "*Root Causes Report*"), including the predatory and discriminatory lending activities of Defendants that are alleged here.   Thus, the foreclosure crisis was not caused by either borrower behavior or general economic conditions, but was due to the inherent risk of foreclosure in the mortgage loan products themselves, e.g. the high cost, subprime, ALT-A and other conforming loan products with predatory features (e.g., prepayment penalties and adjustable interest rates) discriminatorily sold to minority borrowers at issue here. *See* Congressional Testimony of Keith S. Ernst, Center for Responsible Lending, before the Joint Economic Committee of Congress, "*Current Trends in Foreclosure and What More Can be Done to Prevent Them*" (July 28, 2009) ("*Ernst Testimony*") (*available at*http://www.jec.senate.gov/public/?a=Files.Serve&File_id=36d87b93-a0a6-47b4-96ad-1475c70dc9ce).

103

244.     As housing prices escalated after 2003 "lenders began offering new mortgage products intended to stretch borrowers' ability to afford ever more expensive homes as a means of keeping loan origination volumes high" *Root Causes Report, Executive Summary* at ix.   The resulting foreclosure crisis was "unusual in that general economic weakness did not play a significant role in producing delinquencies and foreclosures in most market areas—at least not initially." *Id* at 29.   Instead, "the leading cause of the problem was the characteristics of the market and mortgage products sold, rather than the characteristics of the borrowers who received those products." *Ernst Testimony* at 2.  Thus, the foreclosure crisis was "driven by the very design of the loans at issue. The loan products at the heart of the crisis were structured in a way that made widespread failure virtually inevitable." E. Harnick, *The Crisis In Housing and Housing Finance: What Caused It? What Didn't? What's Next?,* 31 Western New England L. Rev. 625, 628 (2009).

245.     Nationwide, between 2001 and 2006:

- Adjustable rate mortgages as a share of total subprime loans originated increased from about 73 percent to more than 91 percent;

- The share of loans originated for borrowers unable to verify information about employment, income or other credit-related information ("low-documentation" or "no- documentation" loans) jumped from more than 28 percent to more than 50 percent; and

- The share of ARM originations on which borrowers paid interest only, with nothing going to repay principal, increased from zero to more than 22 percent.

*See*, *Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, Report & Recommendations by Majority Staff of Joint Economic Committee (October 25, 2007).  Defendants were one of the largest originators and/or purchasers and securitizers of ARM loans and other subprime loans.

246.     As the direct result of the terms of the mortgage loan products disproportionately sold to them, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) pay materially higher monthly mortgage payments, on higher loan balances, than similarly situated Caucasian borrowers, and face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies on loans for which Defendants are responsible.  Minority borrowers (and other borrowers) steered into or receiving a high cost loan may pay hundreds of dollars more each month in mortgage payments than a similarly situated borrower who has obtained a conforming loan at market interest rates.

247.     The intentional predatory lending activity at issue – steering minority borrowers into higher cost loans, approving minority borrowers for loans that are not otherwise qualified, or inflating the loan costs and amounts to minority

borrowers – in of itself dramatically increases the likelihood of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies because they undermine the ability of the borrower to repay the loan in the first place, creating a self-destructive lending cycle.

248.    Defendants and other industry participants knew full well of the likely outcome of their predatory lending activity.  Indeed, during the 2004-2006 period when more than 8 million adjustable rate mortgage loans ("ARMs") were originated, the subprime mortgage industry (including Defendants) knew that "[t]ypical subprime borrower had a housing-payment-to-gross-income ratio of 40 percent" and upon initial reset of the ARM, 39% of borrowers would face a payment increase of between 25 and 50 percent, 10% of borrowers would face a payment increase of 51 to 99 percent, and15% of borrowers would face a payment increase of 100 percent or more.  *See Root Causes Report* at 29.

249.    Defendants further increased the likelihood of delinquencies, defaults, vacancies and eventual foreclosures on all their mortgage loan products sold to minority borrowers – high cost, subprime and conforming ALT-A GSE backed mortgage loans – by steering borrowers to "low-doc" or "no-doc" loans (no verification of employment, income or other credit-related information) and "interest only" ARM products, which eventually accounted for more than 50% and 22%, respectively, of all subprime ARM originations by 2006.

106

250.     "The incidence of early payment defaults among these loans suggests that much of their poor performance may be related to lax underwriting that allowed borrowers to take on monthly payments that were unaffordable even before interest rate resets occurred." *Root Causes Report* at 9.

251.     Thus, general economic conditions did not cause the foreclosure crisis.  Instead, it was the predatory lending practices of Defendants and other industry participants – combined with the related credit risk, deteriorating performance, and lack of transparency in these mortgage loan assets pooled in mortgage backed securities - that de-stabilized U.S and global credit markets and, in turn, brought down the economy.  This in turn led to higher unemployment and therefore more mortgage loan delinquencies, defaults, foreclosures and vacancies.

252.     At the very height of the predatory and discriminatory lending activity here (during mid to late 2006), just as mortgage delinquencies, defaults, and foreclosures began rapidly increasing, U.S. unemployment rates were low and home values were at their highest.  It was only as the housing bubble began bursting, and the market for mortgage backed securities and credit default swaps dried up during the second half of 2007 and early 2008 that the Financial Crisis began and the economy subsequently collapsed.

107

253.     As reported by the Government Accountability Office ("GAO") "[m]ortgages originated from 2004 through 2007 accounted for the majority of troubled loans." Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, "*HOME MORTGAGES Recent Performance of Nonprime Loans Highlights the Potential for Additional Foreclosures,*"GAO-09-922T (July 28, 2009 ) at 5:

> Of the active subprime loans originated from 2000 through 2007, 92 percent of those that were seriously delinquent as of March 31, 2009, were from those four cohorts. Furthermore, loans from those cohorts made up 71 percent of the subprime mortgages that had completed the foreclosure process. This pattern was even more pronounced in the Alt-A market. Among active Alt-A loans, almost all (98 percent) of the loans that were seriously delinquent as of March 31, 2009, were from the 2004 through 2007 cohorts. Likewise, 93 percent of the loans that had completed the foreclosure process as of that date were from those cohorts.

> Cumulative foreclosure rates show that the percentage of mortgages completing the foreclosure process increased for each successive loan cohort (see fig. 3). Within 2 years of loan origination, 2 percent of the subprime loans originated in 2004 had completed the foreclosure process, compared with 3 percent of the 2005 cohort, 6 percent of the 2006 cohort, and 8 percent of the 2007 cohort. Within 3 years of loan origination, 5 percent of the 2004 cohort had completed the foreclosure process, compared with 8 percent and 16 percent of the 2005 and 2006 cohorts, respectively. The trend was similar for Alt-A loans, although Alt-A loans foreclosed at a slower rate than subprime loans. For example, within 3 years of origination, 1 percent of Alt-A loans originated in 2004 had completed the foreclosure process, compared with 2 percent of the loans originated in 2005, and 8 percent of the loans originated in 2006.

254.     Similarly, HSBC Holding plc disclosed in its 2006 Form 20-F filed with the SEC that Defendants' U.S. portfolios of high cost, Alt-A, subprime and second lien loan mortgage loans primarily originated in 2005 and 2006 were experiencing increased delinquencies and defaults at levels higher than previously experienced and as a result of declining property values and increases in borrower interest rates as adjustable loans repriced:

> HSBC continues to monitor a range of trends affecting the US mortgage lending industry. Housing markets in a large part of the US have been affected by a general slowing in the rate of appreciation in property values, or an actual decline in some markets, while the period of time properties remain unsold has increased. In addition, the ability of some borrowers to service their adjustable-rate mortgages (ARM's) has been compromised as interest rates have risen, increasing the amounts payable on their loans as prices reset higher under their contracts. The effect of interest rate adjustments on first mortgages are also estimated to have had a direct impact on borrowers' ability to repay any additional second lien mortgages taken out on the same properties. Similarly, as interest-only mortgages leave the interest-only payment period, rising payment obligations are expected to strain the ability of borrowers to make the increased payments. Studies published in the US, and HSBC's own experience, indicate that mortgages originated throughout the industry in 2005 and 2006 are performing worse than loans originated in prior periods.
>
> The effects of these recent trends have been concentrated in the mortgage services business ('mortgage services'), which purchases first and second lien mortgages from a network of over 220 third party lenders. As detailed in the table below, this business has approximately US$49.5 billion of loans and advances to personal customers, 10.4 per cent of the Group's gross loans and advances to personal customers.

In 2005 and continuing into the first six months of 2006, second lien mortgage loans in mortgage services increased significantly as a percentage of total loans acquired compared with prior periods. During the second quarter of 2006 HSBC began to experience deterioration in the credit performance of mortgages acquired in 2005 by mortgage services in the second lien and portions of the first lien portfolios. The deterioration continued in the third quarter of 2006 and began to affect second and first lien loans acquired in that year. Further deterioration in the fourth quarter of 2006 was largely in the first lien adjustable-rate and second lien portfolios. HSBC also determined that a significant number of its second lien customers have underlying adjustable-rate first mortgages that face repricing in the near-term which, based on experience, are estimated to adversely affect the probability of repayment on the related second lien mortgage. As numerous interest rate rises have occurred as credit has tightened and there has been either a slowdown in the rate of appreciation of properties or a decline in their value, it is estimated that the probability of default on adjustable-rate first mortgages subject to repricing, and on any second lien mortgage loans that are subordinate to adjustable-rate first liens, is greater than has been experienced in the past. As a result, loan impairment charges relating to the mortgage services portfolio have increased significantly.

Accordingly, while overall credit performance, as measured by delinquency and write-off rates, has performed broadly in line with industry trends across other parts of the US mortgage portfolio, higher delinquency and losses have been reported in mortgage services, largely in the aforementioned loans originated in 2005 and 2006. A number of steps have been taken to mitigate risk in the affected parts of the portfolio. These include enhanced segmentation and analytics to identify the higher risk portions of the portfolio, and increased collections capacity. HSBC is restructuring or modifying loans in accordance with defined policies if it believes that customers will continue to pay the restructured or modified loan. Also, customers who have adjustable-rate mortgage loans nearing the first reset, and who are expected to be the most affected by a rate adjustment, are being contacted in order to assess their ability to make the higher payment and, as appropriate, refinance or modify their loans. Furthermore, HSBC has slowed growth in this portion of the portfolio

by implementing repricing initiatives in selected segments of the originated loans and tightening underwriting criteria, especially for second lien, stated income (low documentation) and other higher risk segments. These actions, combined with normal attrition, resulted in a net reduction in loans and advances in mortgage services during the second half of 2006. It is expected that this portfolio will remain under pressure as the loans originated in 2005 and 2006 season. It is also expected that this portfolio will run off faster than in the past as originations in it will be limited in 2007 and beyond. Accordingly, the increasing trend in overall delinquency and write-offs in mortgage services is expected to continue.

## G.  The Foreclosure Crisis Disparately Impacts Minorities

255.    Numerous publicly available studies by reputable industry watchdog groups have found that the foreclosure crisis has hit African-American and Hispanic neighborhoods and home owners disproportionately harder than non-minority Caucasian homeowners and that this is the result of predatory lending activity.  For example, as noted in one recent study issued by the Center for Responsible Lending of mortgage loan originations between 2004 and 2008, "*Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures*," D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia (November 2011) (hereafter the "*Lost Ground* Report"):

> Our study provides further support for the key role played by loan products in driving foreclosures. Specific populations that received higher-risk products—regardless of income and credit status—were more likely to lose their homes. While some blame the subprime disaster on policies designed to expand access to mortgage credit, such as the Community Reinvestment Act (CRA) and the affordable housing goals of Fannie Mae and Freddie Mac (the government-

sponsored enterprises, or GSEs), the facts undercut these claims. Rather, dangerous products, aggressive marketing, and poor loan underwriting were major drivers of foreclosures in the subprime market.

*Id*. at 6.

256.    The *Lost Ground* Report reports that the percentage share of delinquent loans, loans in the foreclosure process and loans already foreclosed on, increases in direct relationship to increased concentrations of minorities in neighborhoods within Plaintiffs' communities and neighborhoods.

257.    Indeed, the *Lost Ground* report reflects that although 51.3% of loan originations within the Atlanta metropolitan statistical area ("MSA") between 2004 and 2008 were to Caucasian borrowers (25% were made to African Americans and 4.7% to Latinos), Caucasian borrowers faced only 6.5% of the total number of completed foreclosures and the total number of seriously delinquent loans (i.e., *future* foreclosures).  In stark comparison, African American and Latino borrowers in the Atlanta MSA disproportionately incurred 14.6% and 14.7%, respectively, of all completed foreclosures and 15.8%, and 13.4%, respectively, of seriously delinquent loans (future foreclosures).

258.    As stated in the *Lost Ground* report, mortgage loans made to minorities pursuant to the Community Reinvestment Act ("CRA") and the affordable housing goals of Fannie Mae and Freddie Mac were not a cause of the

foreclosure crisis. Indeed, the number of mortgage loans made to FHA protected minority borrowers in Plaintiffs' communities and neighborhoods pursuant to the CRA were a tiny fraction of the total mortgage loans at issue, were not predatory in nature, generally were properly underwritten, and generally have performed far better than non-CRA mortgage loans.

259.    Other conclusions and findings of the *Lost Ground* report, which Plaintiffs also allege here, include that:

- "We are not even halfway through the foreclosure crisis…."

- "Loan characteristics and foreclosures are strongly linked. . . . Loans originated by brokers, hybrid adjustable-rate mortgages ("ARMs," such as 2/28s), option ARMs, loans with prepayment penalties, and loans with high interest rates (a proxy for subprime mortgages) all have much higher rates of completed foreclosures and are more likely to be seriously delinquent."

- "African-American and Latino borrowers are almost twice as likely to have been impacted by the crisis. Approximately one quarter of all Latino and African-American borrowers have lost their home to foreclosure or are seriously delinquent, compared to just under 12 percent for white borrowers."

- "Racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example, approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African Americans and

middle- and higher-income Latinos have experienced the highest foreclosure rates."

- "Loan type and race and ethnicity are strongly linked. African Americans and Latinos were much more likely to receive high interest rate (subprime) loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs. These disparities were evident even comparing borrowers within the same credit score ranges. In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a FICO score of over 660 (indicating good credit), African Americans and Latinos received a high interest rate loan more than three times as often as white borrowers."

- "Impacts vary by neighborhood. Low- and moderate-income neighborhoods and neighborhoods with high concentrations of minority residents have been hit especially hard by the foreclosure crisis. Nearly 25 percent of loans in low-income neighborhoods and 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities."

- "Foreclosures have ramifications that extend beyond the families who lose their homes. Communities with high concentrations of foreclosures lose tax revenue and incur the financial and non-financial costs of abandoned properties and neighborhood blight. . . ."

- "[L]ow-income neighborhoods in other cities such as Atlanta . . . have completed foreclosure rates of over 20 percent. Such high levels of concentrated foreclosures will place a significant burden on these neighborhoods and also the wider communities, which, without substantial interventions, will almost certainly suffer reduced revenues for vital city services, higher rates of crime, and myriad other adverse effects."

260.     Prior to the predatory and discriminatory lending practices of Defendants and other industry participants alleged herein, Plaintiffs had no "high foreclosure risk" (HFR) areas as defined and designated by the U.S. Department of Housing & Urban Development (HUD) and historical annual foreclosure rates were averaging below approximately 1% in the Atlanta MSA.  HUD designated HFR areas reflect neighborhood characteristics that are estimated by HUD to have a high level of risk for foreclosure – e.g., those neighborhoods with a relatively high concentration of high cost loans and highly leveraged loans (high mortgage loan to income ratios), among other factors.

261.     Subsequent to and during the predatory and discriminatory lending and servicing practices of Defendants and other industry participants alleged herein, Plaintiffs experienced a massive increase in the number of high cost and highly leveraged loans made within Plaintiffs' neighborhoods and communities with high populations of FHA protected minority borrowers leading to numerous HUD designated HFR areas.  Indeed, the level and severity of the risk of foreclosures across the nation and in Plaintiffs' communities and neighborhoods become so great that HUD changed its HFR ranking system from a scale of 1-10 (10 being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas).

115

262.    The HUD designated HFR areas coincide directly with high minority percentage rate population census tracks in Plaintiffs' communities and neighborhoods.  And, the HUD designated HFR areas coincide directly with high foreclosure rates in Plaintiffs' communities and neighborhoods. Indeed, Plaintiffs' neighborhoods and communities with the highest HFR areas, have proportionately the highest percentages of FHA protected minority homeowners, and have experienced tremendously higher foreclosure rates.

263.    HMDA reported foreclosure data reflects that the average foreclosure rate among census tracks in Plaintiffs' neighborhoods dramatically increases in census tracks with increased percentages of minority population.

264.    In DeKalb County, the initial foreclosure rates from 2004 through 2006 in census tracks with demographics of less than 40% FHA protected minority homeowners increased from the historical 1% to approximately 6%. However, the initial foreclosure rates in census tracks with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was over 9%, 12% and 18%, respectively, reflecting nearly a 300% increase in foreclosure rates between census tracks with demographics of less than 40% FHA protected minority homeowners and 80%-100% FHA protected minority homeowners.

265.     Similarly, in Fulton County, the initial foreclosure rates from 2004 through 2006 in census tracks with demographics of less than 40% FHA protected minority homeowners had jumped from the historical 1% to approximately 7%.  However, the initial foreclosure rates in census tracks with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was approximately 11%, 13% and 18%, respectively, reflecting nearly a 275% increase in foreclosure rates between census tracks with demographics of less than 40% minority homeowners and 80%-100% minority homeowners.

266.     In Cobb County, the initial foreclosure rates from 2004 through 2006 in census tracks with demographics of less than 40% FHA protected minority homeowners had jumped from the historical 1% to approximately 8%.  However, the initial foreclosure rates in census tracks with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was 11%, 11% and 13%, respectively, reflecting nearly a 62% increase in foreclosure rates between census tracks with demographics of less than 40% minority homeowners and 80%-100% minority homeowners.

267.     Clearly, mortgage loans Defendants made to FHA protected minority borrowers were more likely to result in delinquency, default and foreclosure than the loans Defendants made to Caucasian borrowers.

268.     Of the 1,958 reported total loans Defendants made in DeKalb County between 2004 and 2007 to FHA protected minority borrowers, at least 1,684 of those loans (approximately 86%) ended up in the ***highest two*** foreclosure risk areas (designated 19 and 20 by HUD) in DeKalb County.  Similarly, of the 1,484 reported total loans Defendants made in Fulton County between 2004 and 2007 to FHA protected minority borrowers, at least 1,200 of those loans (approximately 81%) were in the ***highest two*** foreclosure risk areas in Fulton County.  Of the 931 reported total loans Defendants made in Cobb County between 2004 and 2007 to FHA protected minority borrowers, at least 587 of those loans (over 63%) were in the ***highest two*** foreclosure risk areas in Cobb County.

269.     Of the 2,433 loans Defendants made in DeKalb County between 2004 and 2007 (and reported the minority status), 1,684 of those loans (approximately 70%) were to FHA protected minority borrowers and ended up in the highest foreclosure risk census tracks compared to just 97 loans (under 4%) made to Caucasian borrowers that ended up in the highest foreclosure risk census tracks.  Of the 2,513 loans Defendants made in Fulton County between 2004 and 2007 (and reported the minority status), 1,200 of those loans (approximately 48%) were to FHA protected minority borrowers and ended up in the highest foreclosure risk census tracks compared to just 537 loans (approximately 21%) made to Caucasian borrowers that ended up in the highest foreclosure risk census tracks.

270.     Such statistical information provides direct evidence of both the discriminatory treatment and the disparate impact of foreclosures caused by Defendants' predatory subprime lending activities in Plaintiffs' communities and neighborhoods.

271.     But for Defendants' predatory and discriminatory actions alleged herein, the foreclosure rate among, and the number of foreclosures experienced by, FHA protected minority borrowers in Plaintiffs' communities and neighborhoods would have been far lower.

## H.     Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory &Discriminatory

272.     While Defendants' subprime mortgage origination practices at issue subsided substantially after the Financial Crisis, they still continue to a lesser degree.   More importantly, however, Defendants continue to service such loans and continue to receive periodic payments on outstanding predatory and discriminatory loans at issue here and such loans continue to become delinquent and defaulted on, leading to property vacancies and foreclosures.   Thus, the statute of limitations on Defendants' scheme has not yet begun to run.

273.     Because many of the largest lenders, such as Defendants here, retained the servicing rights on the mortgage loans underlying their loan originations and purchased loans transferred into securitizations, they obtained yet

another source of revenue from the loans after they securitized them and passed along the risk of loss to investors.  In addition to maintaining servicing rights on many of the first lien mortgages Defendants originated or purchased, Defendants also serviced all second lien (e.g., home equity) loans they originated and/or purchased.

274.    Loan servicers, such as Defendants, are paid a percentage of each mortgage payment made by a borrower as compensation for handling the various administrative aspects of the mortgage loan payment process including, but not limited to, collecting mortgage payments, crediting those payments to the borrowers' loan balance, assessing late charges, establishing escrow accounts for the payment of taxes and insurance, making such payments when due, collecting and making the payments to private mortgage insurance, and making distributions of principal and interest to the SPVs or other investors that have purchased such loans.

275.    Although the servicing fees paid on an individual loan is relatively small - typically 0.25% (on prime loans) and 0.5% (on subprime loans) of the outstanding principal balance of each mortgage loan each month - when added across the millions of mortgage loans typically serviced by a servicer, the fee revenue is enormous. Mortgage servicers like Defendants also typically earn

interest income on the float of borrower mortgage payments to be remitted to the SPVs, as well as late payment fees and other fees.

276.     Mortgage loan servicers such as Defendants are responsible for managing loss mitigation when a borrower becomes delinquent (collection and work out activities) or defaults on the loan (evictions, foreclosures and management of vacant or foreclosed properties, including property maintenance and repairs).

277.     Importantly, loan servicers are paid significant additional fees to provide such loss mitigation services (as well as late fees on overdue mortgage payments) and, because they typically do not bear the risk of loss on the underlying asset where they have sold it into a securitization, they are further incentivized to maximize their servicing fees, including through the foreclosure process itself, where Defendants have actually added upcharges to borrowers.

278.     For loans they do not hold, loan servicers such as Defendants are either indifferent to borrower delinquencies, defaults, home vacancies or foreclosures, or are actually incentivized to cause borrower delinquencies, defaults, home vacancies or foreclosures because they make more net income in those circumstances (i.e., fees less the cost to service), and receive that income the sooner that foreclosure occurs. This is because servicers, like Defendants, are

reimbursed for their servicing fees before any money passes to investors in securitizations as a result of a foreclosure.

279.     For home mortgage loans where Defendants have a financial interest in addition to the servicing rights (e.g. they hold the underlying first lien loan or a secondary loan), Defendants might be incentivized not to foreclose in order to avoid a write down of the asset.  In such circumstances, the borrower may be in default and simply vacate the property, leaving it uncared for, unprotected, and vulnerable to vandalism and/or criminal activity that increases the harm to Plaintiffs.

280.     At the same time, Defendants and other industry participants have become increasingly willing to walk away from the foreclosure – refusing to take ownership and possession – where the costs associated with the foreclosure and repair of the property outweigh the financial recovery Defendants can obtain from the foreclosure.   All of this has led to the growing "shadow inventory" of vacant home that have not yet been foreclosed upon and which have increased Plaintiffs' damages.

281.     Defendants have engaged in predatory and discriminatory mortgage loan servicing that was part and parcel of their predatory and discriminatory mortgage lending scheme and which further increased the number of FHA protected minority borrowers' mortgage delinquencies, defaults and

ultimately home vacancies and foreclosures on loans for which Defendants are responsible.

282.     Defendants predatory and discriminatory mortgage servicing and foreclosure activities included policies, practices and/or processes and procedures, including, but not limited to:

- failing to respond in a sufficient and timely manner to the increased level of home delinquencies, defaults and/or foreclosures by increasing financial, staffing, and managerial resources to ensure that HSBC's mortgage servicing companies adequately handled the foreclosure process;

- failing to respond in a sufficient and timely manner to the increased level of loss mitigation activities by increasing management and staffing levels to ensure timely, effective and efficient communication with borrowers with respect to loss mitigation activities and foreclosure activities and full exploration of loss mitigation options or programs prior to completion of foreclosure activities; and

- failing to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and board oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to the loans serviced for others;

- filing or causing to be filed in connection with minority borrower bankruptcy proceedings in federal courts numerous affidavits, executed by employees of Defendants' mortgage servicing companies or employees of third-party providers, falsely or recklessly making various assertions such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books

and records, when, in many cases, they were not based on such knowledge or review;

- filing or causing to be filed in courts in various states and in connection with minority borrower bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; and

- Litigating foreclosure proceedings and bankruptcy proceedings, and initiating non-judicial foreclosure proceedings, against minority borrowers without consistently ensuring that mortgage loan documentation of Defendants' ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party.

283.    Defendants have engaged in these discriminatory mortgage servicing practices through vertically integrated corporate policies, practices and/or processes and procedures (the "Servicing Policies") that authorized, approved, encouraged or otherwise allowed such predatory and discriminatory conduct.  In addition, as a result of the terms of the predatory high cost loans Defendants discriminatorily made to FHA protected minority borrowers Defendants improperly charged such borrowers inflated mortgage servicing and foreclosure related fees and costs.

284.    These actions individually and/or collectively with Defendants' other practices alleged herein have further led to disproportionate rates of delinquencies, defaults, home vacancies and/or foreclosures on loans originated,

purchased, and/or serviced by Defendants that were made to FHA protected minority borrowers.

285.     During the recent financial crisis, a substantially larger number of residential mortgage loans became past due than in earlier years. Many of the past due mortgages have resulted in foreclosure actions. From January 1, 2009 to December 31, 2010 alone, Defendants' mortgage servicing companies initiated 43,442 foreclosure actions nationally, most of which were through third party agents such as MERS.

286.     A borrower on a mortgage loan serviced by Defendants – who also was a former employee of Defendant HFC in various mortgage underwriting and related positions between early 2004 and mid 2007 – was even misled by Defendant HFC regarding the servicing of the mortgage loan and the borrower's requested modification of it.   The former employee/borrower was verbally promised by Defendants that if payments were made on the mortgage loan for one year, Defendants would modify the principal balance on the loan.  However, after making such payments for a year on the loan as agreed, Defendants then refused to modify the principal of the loan.  The former employee/borrower then told Defendants that they could "have the keys back" to the house.  Although the former employee borrower moved out of the house and has not made a payment on

the loan in over three years, Defendants still had not foreclosed on the property at that time.

287.     According to the former employee/borrower, Defendants are "so overwhelmed" that they "can't keep up" with the amount of foreclosures they have experienced.  Defendants' servicing department can't keep up because there are "too many loans" that are delinquent or which have defaulted.  For example, as of June 25, 2010, over 46% of the mortgage loans underlying $64 million in mortgage backed securities Defendants sold to just one purchaser in Massachusetts in 2005 and 2006 were in delinquency, default, foreclosure, bankruptcy or repossession.

288.     Defendants' servicing personnel involved with the former employee/borrower's issues have "no knowledge of mortgages" and are simply collectors.  Moreover, the former employee/borrower believes that Defendants are "not following any guidelines" for home loan modifications.

289.     In April 2011 Defendants entered into a Consent Order with the Board of Governors of the Federal Reserve Bank to ensure that Defendants' mortgage servicing operations were operated in a safe and sound manner and in compliance with the terms of the mortgage loan documentation and related agreements with borrowers.

290.     Among other things, Defendants were required by the Consent Order to conduct an independent review of all their residential mortgage foreclosure actions and sales, whether brought in the name of any Defendant entity, investor, or any agent for the mortgage note holder (including MERS) from January 1, 2009 to December 31, 2010. The purpose of the independent foreclosure review was to determine: (i) whether the foreclosure was in accordance with applicable state and federal laws, including and the U.S. Bankruptcy Code; (ii) whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmation were in accordance with the terms of the mortgage loan and state law requirements; (iii) whether a foreclosure sale occurred when the borrower had requested a loan modification or other loss mitigation and the request was under consideration; (iv) whether any delinquent borrower's account was charged fees or penalties that were not permissible under the terms of the borrower's loan documents, state or federal law, or were otherwise unreasonable.  In addition, Defendants were required to (a) remediate, as appropriate, errors, misrepresentations, or other deficiencies in any foreclosure filing or other proceeding; (b) reimburse or otherwise provide appropriate remediation to the borrower for any impermissible or otherwise unreasonable penalties, fees or expenses, or for other financial injury identified;

127

and (c) take appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized.

291.   Defendants' entry into the Consent Order evidences that Defendants engaged in the wrongful acts identified therein and, in particular that Defendants knew, or were reckless in not knowing, that large numbers of subprime and GSE backed loans it made to FHA protected class member borrowers were approved by Defendants' underwriters at maximum principal amounts and maximum monthly payment levels under the teaser rates and therefore would result in default, and eventually foreclosure, either early in the borrowers' repayment periods or upon initial interest rate resets.  Moreover Defendants' entry into the Consent Order evidences that Defendants knew, or were reckless in not knowing, that a large number of loans were made in amounts that significantly exceeded the value of the underlying property and were not supported by valid appraisals.

## I.   Defendants' Predatory & Discriminatory Mortgage Lending, Servicing & Foreclosure Practices Have Injured Plaintiffs

292.   The predatory and discriminatory mortgage lending and servicing practices engaged in by Defendants and other industry participants seriously harmed Plaintiffs' communities and neighborhoods by effectively diluting -- or completely eliminating -- the equity of minority borrowers' homes, placing those borrowers in far greater jeopardy of loan payment delinquencies or

defaults, dramatically increasing the numbers and rates of home vacancies and foreclosures Plaintiffs communities and neighborhoods are currently experiencing (and will continue to experience into the future) and, ultimately, causing extensive monetary and non-monetary damages to Plaintiffs.

293.     Indeed, HSBC plc has publicly disclosed that it is experiencing a 100% severity loss on their second lien (e.g. home equity) loans when the underlying first lien loans are foreclosed on – i.e., all the equity in the borrower's home has been eliminated.

294.     As a result, the injury to Plaintiffs will continue long after the last wrongful act in the Defendants' scheme – the inevitable, if not intended, vacancy and/or foreclosure on the predatory and discriminatory mortgage loan products Defendants sold to homeowners in Plaintiffs' neighborhoods and communities.

295.     Defendants' illegal discriminatory conduct has caused substantial, measurable damages to Plaintiffs' communities and neighborhoods including, but not limited to:

- out-of pocket costs in providing municipal governmental services (e.g. necessary building code inspections and repairs, police and fire protection, and significant administrative, court and legal costs) related to various affected properties and neighborhoods;

- reduced property values on foreclosed properties and surrounding properties;

- lost property tax revenue on vacant or abandoned properties, and on foreclosed and surrounding properties as a result of lower home values;

- lost municipal utility and other tax revenues;

- lost recording fees as a result of the use of MERS to avoid such fees; and

- various other injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities.

296.    Such injuries arise from both the effect of the foreclosure process itself (lower home values and tax revenues) and from vacant or abandoned properties that either already have been foreclosed upon or are facing foreclosure (i.e., the shadow inventory of foreclosures) as a result of borrower defaults.  Not surprisingly, the brunt of this injury is disproportionately suffered in Plaintiffs' communities and neighborhoods with relatively higher FHA protected minority borrowers, however the harm has spread throughout Plaintiffs' communities.

297.    Relying on data supplied by the Mortgage Bankers Association – a mortgage industry business association - the GAO found in November 2011 that high foreclosure rates correlate to increased numbers of home vacancies.  For example, the GAO found that Georgia experienced over an 87% increase in non-seasonal home vacancies between 2000 and 2010, and a 125% increase in other

vacant housing units over the same period.  In comparison, on a nationwide basis, non-season vacancies over the same period increased only 51% and other vacancies increased only 59%.

298.    Fulton County's overall vacancy rate increased from 7.90% in 2000 to 13.90% in 2010, peaking at 16.10% in 2007 as the initial waves of defaults and foreclosures began to hit.  DeKalb County's overall vacancy rate increased from 4.60% in 2000 to 10.9% in 2010, peaking at 11.70% in 2007.  Similarly, Cobb County's overall vacancy rate has steadily increased from 4.20% in 2000 to 10.6% in 2010.

299.    The GAO also found in November 2011 that vacant and/or foreclosed properties have reduced prices of nearby homes between $8,600 to $17,000 per property.

300.    Plaintiffs have incurred out-of-pocket costs with respect to specific vacant foreclosure and pre-foreclosure properties secured by the predatory, subprime loans, originated and/or acquired and repackaged by Defendants because Plaintiffs have been required to provide a multitude of municipal services relating to such properties that would not have been necessary if such properties were occupied and shift dwindling resources to address problems created by such vacancies and foreclosures.

301.    For example Plaintiffs have sustained financial injuries for providing municipal services to such vacant homes that have not been cared for, have been vandalized and/or have provided a location for illegal activities, all leading to violations of Plaintiffs' municipal housing code, including the creation of physically unsafe structures that threaten public safety.  This, in turn, has led to substantial personnel time and out-of-pocket costs incurred by Plaintiffs' housing, code enforcement and law departments having to inspect, investigate and respond to violations at such vacant properties, including boarding up or tearing down vacant properties that are open to casual entry; making structural repairs to stabilize vacant properties that threaten public safety or address public health concerns including vermin infestation, burst water pipes, collection of accumulated garbage, and/or cutting high grass; and taking legal action to investigate and prosecute housing code violations at the vacant properties and/or to condemn properties that are not structurally sound and threaten public safety.

302.    The task of Plaintiffs' Law Departments in identifying responsible parties in order to take legal action have been made all the more difficult, causing greater financial injury to Plaintiffs, as a direct result of the difficulty in determining the identity of the correct owner of such subprime loans. This is because transfers and assignments of the loans were not properly recorded

by Defendants, including its transferees, assignees, agents and/or trustees of the pools of loans that issued MBS secured by such subprime loans.

303.    As another example, Plaintiffs' policy and fire departments have had to send personnel and equipment to such vacant properties to respond to public health and safety threats that arise at these properties because the properties are vacant.

304.    Using property address and mortgage lien and foreclosure data obtained from Defendants in discovery, Plaintiffs can isolate out-of-pocket and lost revenue damages attributable to each individual property secured by a predatory subprime loan issued by Defendants as a direct result of Defendants' discriminatory and predatory lending practices and resulting foreclosures.

305.    Routinely maintained property tax and other financial data allow precise calculation of the property tax revenues Plaintiffs have lost as a direct result of Defendants' discriminatory and predatory lending practices and the resulting property vacancies and foreclosures.

306.    Using well-established GPS mapping techniques that locate specific properties within census tracks, property addresses and mortgage lien and foreclosure data, and well-established statistical regression techniques, Plaintiffs' damages attributable to lost property tax revenue (as a result of the drop in home

value) on properties surrounding foreclosed properties attributable to as Defendants' discriminatory and predatory lending practices also can be calculated.

307.    Plaintiffs' primary source of revenue is ad valorem taxes on real property, particularly residential real estate.   O.C.G.A.  48-5-2(3)(B)(iv) (fair market value of real property) requires county tax assessors to consider bank sales (i.e., foreclosure sales) when determining the fair market value of real property for determining the tax digests.

308.    As a primary result of Defendants' (and other industry participants') predatory lending activities, Plaintiffs' tax digests – representing the value of all property subject to tax – have declined by a total of approximately $12 billion from their high point in 2009.  For example, Fulton County's tax digest has declined $4 billion between its high point in 2009 of $32.7 billion and its 2012 value of $ 28.7 billion.   DeKalb County's tax digest has declined $4.5 billion between its high point in 2009 of $ 22 billion and its 2012 value of $ 17.5 billion. Cobb County's tax digest has declined $ 3.9 billion between its high point in 2009 of $ 25.2 billion and its 2012 value of $ 21.3 billion.

309.    The overwhelming majority of these declines are the decline in the value of the residential real estate located in Plaintiffs' communities as a result of the foreclosure crisis caused by Defendants' (and other industry participants') predatory lending activities.   The declines in Plaintiffs' tax digests reflect a

134

corresponding reduction in Plaintiffs' tax receipts, budgets and related reductions in Plaintiffs' ability to provide critical services within Plaintiffs' communities.

310.     Defendants are responsible for the percentage of Plaintiffs' damages that equates to Defendants' percentage share of predatory mortgage lending activity in both its retail and wholesale operations in Plaintiffs' communities.

311.     Plaintiffs also have been injured as a result of the frustration of the various purposes and missions of their Housing Authorities to foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for its residents at large.  In addition, Plaintiffs' Housing Authorities also have been injured as a result of having to reallocate its human and financial resources away from its missions and purposes in order to address the foreclosure and home vacancy crisis caused in part by the discriminatory and predatory subprime mortgage lending practices, including those of Defendants.

312.     Plaintiffs will continue to incur all of the above types of damages on properties that will become vacant and/or will be foreclosed upon that are secured by a predatory subprime loan issued by Defendants.

313.     Although nationally there have been well over 5 million foreclosures since 2007, it has been estimated by industry stakeholders that the

foreclosure cycle relating to the predatory lending activity between 2004 through 2007 is only half way complete, with another 5 million more foreclosures likely to come.   In March 2010, CRL estimated that "5.7 million borrowers were at imminent risk of foreclosure. . . . African American and Latino borrowers continue to be disproportionately at risk relative to non-Hispanic white borrowers."   D. Gruenstein, Bocian, W. Li and K. Ernst, "*Foreclosures by Race and Ethnicity: The Demographics of a Crisis*" (June 18, 2010) at 10.   CRL's data reflects such disparate impact across all income ranges for African American and Latino borrowers. *See id*.

314.   Many of these homes are in the "shadow inventory," i.e., are vacant or are occupied with the homeowner seriously delinquent or in default of their mortgage, but foreclosure proceedings have not yet begun.  As reported in a November 2011 *Wall Street Journal* article, "*How Many Homes Are In Trouble?,*" industry estimates of housing units in the shadow inventory range up to 10.3 million (Laurie Goldman, Amherst Securities) with the low end of the range of 1.6 million housing units by CoreLogic (which relies on a lagging indicator of credit score to estimate loan performance and the probability of default).

315.   Nationally, home prices hit a near-decade low in February 2012, declining approximately 23% since 2007.  In Atlanta, home prices have fallen over 46% from their peak (over 17% in the last year alone), making the

136

Atlanta area one of the hardest hit regions in the nation.  As of January 2011, Standard & Poor's Rating Service estimated that Atlanta had approximately 49 months of shadow inventory housing supply with an estimated $25 billion in original mortgage loans balances.

316.     Consequently, numerous additional delinquencies, defaults, and foreclosures on Defendants' predatory and discriminatory loans likely will occur and Plaintiffs are entitled to injunctive relief and the recovery of damages that are about to occur from Defendants actions.

317.     Academic studies -- prepared prior to the collapse in U.S. housing prices -- of the financial impact of foreclosures on communities such as Atlanta reflect up to $34,000 in community wide damages resulting from ***each foreclosure***.   This includes actual governmental expenditures in the form of additional costs of services (police, fire, code enforcement, trash removal, property boarding up, inspections, etc.), losses of revenue (foregone property taxes and utility taxes) and losses in property value.

318.     Based on recent, related academic studies, the average cost to Plaintiffs for each foreclosure on a loan made by Defendants is approximately $19,000, with additional damages accruing as a result of deteriorated property values and harm to Plaintiffs' communities and neighborhoods. As such, compensatory damages alone in this case likely will exceed $100 million given

that Defendants are responsible – through direct originations or their wholesale channel of correspondent lenders – for approximately 9800 high cost predatory and discriminatory mortgage loans made within Plaintiffs communities and neighborhoods to minorities and approximately 60% of those loans already have or can be expected to become delinquent, default and eventually be foreclosed upon.

319.    Because the total number of predatory and discriminatory mortgages originated by Defendants, or for which Defendants are otherwise responsible for, as well as the number of foreclosures related to such mortgages have been obfuscated and concealed through the securitization process and the use of MERS, discovery of all of Defendants' loan files for loans made or purchased in Plaintiffs' neighborhoods and communities may be necessary before a precise damages calculation can be made.

320.    Plaintiffs' damages, resulting from their out-of pocket costs in providing additional municipal governmental services and their lost tax and utility revenue, relating to properties secured by the predatory, subprime loans, originated and/or acquired and repackaged by Defendants can be established from Plaintiffs' records once the locations of the homes upon which such loans were made can be identified from discovery of Defendants.

321.    Plaintiffs' damages, resulting from lower home values and other injuries resulting from the deterioration and blight to the hardest hit

neighborhoods and communities, can be established with statistical evidence and expert testimony.

## CAUSE OF ACTION
(Federal Fair Housing Act)

322.    Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 321 as if fully set forth herein.

323.    Defendants' enterprise operated through various fragmented corporate entities but was based on centralized marketing, underwriting and credit policies established at the highest levels of Defendants' operations. Ultimately, the single and common enterprise operated under the control of Defendant HNAH.

324.    Defendants' acts, policies, and practices as documented above constitute intentional discrimination on the basis of ethnicity and/or race by intentionally targeting FHA protected minority borrowers (predominantly African-American and Hispanic borrowers) in Plaintiffs' communities and neighborhoods for predatory high cost, subprime, ALT-A and/or conforming mortgage loans (including primary, secondary and home equity loans) on terms more unfavorable (e.g., increased interest rates, points, and fees) and without regard to borrowers' ability to repay such loans, than similar loans made to Caucasian borrowers.

325.    Defendants' acts, policies, and practices have had an adverse, disproportionate and disparate impact on FHA protected minority borrowers in

Plaintiffs' communities and neighborhoods in terms of the relative percentage of predatory high cost, subprime, ALT-A and/or conforming mortgage loans (including primary, secondary and home equity loans) made to them, as compared to the relative percentage of such loans made to similarly situated Caucasian borrowers.

326.    Defendants' predatory actions have caused African Americans, Hispanic Americans and residents of predominantly African-American and Hispanic neighborhoods in Plaintiffs' communities to receive mortgage loans that were destined or expected to fail, and in fact failed, at levels and on materially more unfavorable terms than mortgage loans given to similarly situated Caucasians and residents of predominantly Caucasian neighborhoods in Plaintiffs' communities, leading to substantially higher rates of foreclosure than in non-minority areas.

327.    Defendants' acts, policies, and practices also have had an adverse, disproportionate and disparate impact on FHA protected minority borrowers in Plaintiffs' communities and neighborhoods in terms of the percentage of mortgage loan delinquencies, defaults, home vacancies and foreclosures, suffered by FHA protected minority borrowers relative to the relative percentages of mortgage loan delinquencies, defaults, home vacancies and foreclosures suffered by similarly situated Caucasian borrowers.

328.    These adverse and disproportionate impacts are the direct result of Defendants' policies of making loans destined to fail and giving substantial discretion and incentivizing loan officers, brokers and others responsible for mortgage lending to make and steer people into subprime loans without regard for whether they could repay the loan or might qualify for better loans.

329.    Defendants' pattern and practices of predatory and discriminatory lending cannot be justified by business necessity, and could have been avoided through the use of alternative business policies and procedures that had less discriminatory impact.

330.    Defendants' unlawful actions described above constitute a pattern or practice of discriminatory lending and a continuing violation of federal law.

331.    Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for Plaintiffs' federally protected rights.

332.    Defendants' unlawful actions described above are continuing and were part of a broad scheme to maximize profits at the expense of FHA protected minority borrowers and Plaintiffs.

333.    Defendants' acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604 and 3605:

(a) Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

(b) Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b);

(c) Defendants' published policies and statements have expressed and continue to express a preference on the basis of race and/or color, in violation of 42 U.S.C. § 3604(c); and

(d) Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions and privileges on the basis of race and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

334.    Plaintiffs have been, and continue to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents.

335.    Plaintiffs' injuries are continuing and will increase unless and until Defendants cease to continue to carry out their scheme through the foreclosure process.   Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiffs.

## DEMAND FOR JURY TRIAL

336.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

(1) enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 42 U.S.C. §§ 3604 and 3605;

(2) enter a permanent injunction enjoining Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce their illegal, discriminatory conduct described herein through the foreclosure process and directing Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3) award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for its injuries caused by the conduct of Defendants alleged herein;

(4) award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5) award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(6) order such other relief as this Court deems just and equitable.

Dated:  October 18, 2012

/s/ James M. Evangelista
James M. Evangelista (GA Bar 707807)
Jeffrey R. Harris (GA Bar 330315)
Darren W. Penn (GA Bar 571322)
J. Antonio DelCampo (GA Bar 216815)
David J. Worley (GA Bar 776665)

HARRIS PENN LOWRY &
     DELCAMPO LLP
400 Colony Square, Suite 900
1201 Peachtree Street, NE
Atlanta, GA  30361
Phone: (404)961-7650
Fax: (404)961-7651

Hezekiah Sistrunk, Jr. (GA Bar 649413 )
Jane LambertiSams (GA Bar 432025)
Shean D. Williams (GA Bar 764139)

COCHRAN, CHERRY, GIVENS, SMITH,
     SISTRUNK and SAMS P.C.
127 Peachtree Street
Atlanta, GA 30303
(404) 222-9922
(404) 222-0170

*Co-Counsel for Plaintiffs DeKalb County,*
*Fulton County & Cobb County*

Thomas G. Sampson, Sr. (GA Bar 623600)
Jeffrey E. Tompkins (GA Bar 714608)

THOMAS KENNEDY SAMPSON &
        TOMPKINS LLP
3355 Main Street
Atlanta, Georgia 30337
(404) 688-4503 (phone)
(404) 761-3224 (fax)

*Additional Co-Counsel for Plaintiff*
*Fulton County*

145