## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DEKALB COUNTY, FULTON COUNTY, and COBB COUNTY, GEORGIA,<br><br>Plaintiffs,<br><br>v.<br><br>HSBC NORTH AMERICA HOLDINGS INC., ET AL.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL CASE NO.:
1:12-cv-03640-SCJ

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE COMPLAINT

The HSBC Defendants (collectively, "HSBC") respectfully submit this Brief in support of their Motion to Dismiss the Complaint filed by DeKalb County, Fulton County, and Cobb County, Georgia (collectively, the "Counties") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Complaint is time-barred. In addition, the Court does not have subject matter jurisdiction over this action because the Counties do not allege that they have suffered a discrete or palpable injury that is fairly traceable to the conduct of HSBC. The Counties also have failed to offer factual allegations that plausibly support their disparate impact claim, which is not cognizable under the Fair Housing Act.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................1

BACKGROUND ..............................................................................4

    I.    A WIDE RANGE OF SOCIAL AND ECONOMIC
        PROBLEMS HAVE PLAGUED THE ATLANTA AREA FOR
        DECADES ..............................................................................4

    II.   THE COUNTIES IMPROPERLY ATTEMPT TO BLAME
        HSBC ....................................................................................8

ARGUMENT ....................................................................................9

    I.    THE FHA'S STATUTE OF LIMITATIONS BARS THE
        COMPLAINT ..........................................................................9

        A.    The Counties' Claim is Untimely. ...............................9

        B.    The Continuing Violation Doctrine Does Not Excuse Plaintiffs'
            Untimely Filing. ......................................................11

            1.    The Complaint Does Not Allege A Discriminatory
                Act Within the Limitations Period. ................11

            2.    The Counties Did Not Timely Assert Their Claims. ......14

    II.   THE COMPLAINT SHOULD BE DISMISSED FOR LACK
        OF SUBJECT MATTER JURISDICTION BECAUSE THE
        COUNTIES LACK STANDING ......................................................17

        A.    The Counties Fail to Allege an Injury in Fact. .........................19

        B.    The Counties Fail to Allege an Injury Fairly Traceable to the
            Actions of HSBC. ....................................................20

    III.  THE COMPLAINT FAILS TO STATE A CLAIM UPON
        WHICH RELIEF CAN BE GRANTED. ............................................26

A.     The Counties Do Not Plead a Disparate Impact Claim. ...........27

     1.     The Counties Fail to Allege Disparate Impact. ..............28

     2.     The Counties Do Not Identify an Actionable
        Policy to Support Their Disparate Impact Claim. ..........30

     3.     The Counties Fail to Allege a Causal Connection
        Between Purported Lending Policies and Practices
        and the Alleged Disparate Impact. .................................32

B.     The Counties Fail to Allege a Disparate Treatment Claim. ......34

IV.     THE FHA DOES NOT PERMIT DISPARATE IMPACT
    CLAIMS. ............................................................................................37

CONCLUSION .......................................................................................40

# TABLE OF AUTHORITIES

**Cases**

ACLU of Fla. v. Dixie Cnty., Fla., 690 F.3d 1244 (11th Cir. 2012) ......................26

Acree v. Republic of Iraq, 370 F.3d 41 (D.C. Cir. 2004) ........................................40

Allegheny Gen. Hosp. v. Phillip Morris, Inc., 228 F.3d 429, (3d Cir. 2000)..........34

Allen v. Wright, 468 U.S. 737 (1984) .................................................. 18, 19, 20, 21

Anderson v. Douglas & Lomason Co., 26 F.3d 1277 (5th Cir. 1994)....................31

ASARCO Inc. v. Kadish, 490 U.S. 605 (1989) .......................................................19

Ashcroft v. Iqbal, 556 U.S. 662 (2009) .......................................................... 23, 26

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) .............................. 23, 26, 27

Bennett v. Flagstar Bank, 2011 WL 6152940 (S.D. Ga. Dec. 8, 2011) .................36

Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005)...............................................19

Blue Cross & Blue Shield of Ala. v. Weitz, 913 F.2d 1544 (11th Cir. 1990).........11

Brown v. Coach Stores, Inc., 163 F.3d 706, (2d Cir. 1998) ...................................32

Center for Biological Diversity v. Hamilton, 453 F.3d 1331 (11th Cir. 2006).......14

Cervantes v. Countrywide Home Loans, Inc., No. Cv. 09-517-PHX-JAT,
    2009 WL 3157160 (D. Ariz. Sept. 24, 2009)................................................ 14, 17

City of Birmingham v. Citigroup, Inc., No. CV-09-BE-467-S,
    2009 WL 8652915 (N.D. Ala. Aug. 19, 2009)............................................ passim

City of Cleveland v. Ameriquest Mortgage Sec., Inc., 621 F. Supp. 2d 513
    (N.D. Ohio 2009)...................................................................................... 1, 3, 25

City of Memphis and Shelby County v. Wells Fargo Bank, N.A.,
    No. 09-02857-STA, 2011 WL 1706756 (W.D. Tenn. May 4, 2011) ...................1

City of Philadelphia v. Beretta U.S.A., Corp., 126 F. Supp. 2d 882
     (E.D. Pa. 2000) ................................................................................34

Cowell v. Palmer Twp., 263 F.3d 286 (3d Cir. 2001) ..............................15

Davenport v. Litton Loan Servicing, LP, 725 F. Supp. 2d 862
     (N.D. Cal. 2010) ..............................................................................14

Dillard v. Chilton Cnty. Comm'n, 495 F.3d 1324 (11th Cir. 2007)........20

Doe v. Pryor, 344 F.3d 1282 (11th Cir. 2003)..........................................20

Donnelly v. R.I. Bd. Of Governors for Higher Educ., 929 F. Supp. 583
     (D.R.I. 1996)............................................................................... 30, 32

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005) ...............................34

Durante v. Qualcomm, Inc., 144 Fed. Appx. 603 (9th Cir. 2005)...........31

EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263 (11th Cir. 2000) ..........28

Elend v. Basham, 471 F.3d 1199 (11th Cir. 2006) ...................................20

Estate of Davis v. Wells Fargo Bank, 633 F.3d 529 (7th Cir. 2011).......10

Federer v. Midland Mortg. Co., No. 1:12-CV-2492-TWT, 2012 WL 5880916
     (N.D. Ga. Nov. 21, 2012) ........................................................ passim

Fulcher v. City of Wichita, 445 F. Supp. 2d 1271 (D. Kan. 2006) .........31

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91 (1979) ............17

Goodwin v. Executive Trustee Service, LLC, 680 F. Supp. 2d 1244
     (D. Nev. 2010).................................................................................13

Gregory v. Mihaylov, Civil Action File No. 1:12-CV-2266-TWT,
     2013 WL 75773 (N.D. Ga. Jan. 4, 2013) ..........................................8

Hallmark Developers, Inc. v. Fulton County, 466 F.3d 1276
     (11th Cir. 2006) .......................................................................... 28, 37

Harris v. Fulton-DeKalb Hosp. Auth., 255 F. Supp. 2d 1347
    (N.D. Ga. Mar. 27, 2002) ............................................................ 14, 15

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982).........................................11

Hernandez v. Sutter West Capital, No. C 09-03658 CRB, 2010 WL 3385046
    (N.D. Cal. Aug. 26, 2010) ...................................................................13

Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208 (11th Cir. 2001).............. passim

Hoffman v. Option One Mortgage Corp., 589 F. Supp. 2d 1009
    (N.D. Ill. 2008) ...................................................................37

Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259
    (11th Cir. 2011) ..................................................................... 17, 20, 26

Hous. Opportunities Project for Excellence, Inc. v. Key Colony No. 4 Condo.
    Ass'n, Inc., 510 F. Supp. 2d 1003 (S.D. Fla. 2007) .............................................16

In re African-American Slave Descendants Litig., 304 F. Supp. 2d 1027
    (N.D. Ill. 2004) ...................................................................8

In re Countrywide Fin. Mortgage Lending Practices Litig.,
    No. 08-MD-1974, 2011 WL 4862174 (W.D. Ky. Oct. 13, 2011).........................31

In re Mortgage Elec. Registration Sys. (MERS) Litig.,
    744 F. Supp. 2d 1018 (D. Ariz. 2010)...................................................17

In re Wells Fargo Residential Mortgage Lending Discrimination Litig.,
    No. 08-MD-01930 MMC, 2011 WL 3903117 (N.D. Cal. Sept. 06, 2011).........31

Jackson v. Okaloosa County, Florida, 21 F.3d 1531 (11th Cir. 1994)...................37

Jacobs v. Tempur-Pedic Int'l Inc., 626 F.3d 1327 (11th Cir. 2010)................. 26, 33

Little v. Peach Cnty. School Dist., No. 5:07-CV-101 (CAR), 2009 WL 198003
    (M.D. Ga. Jan. 27, 2009)...................................................................15

Logan v. Denny's, Inc., 259 F.3d 558 (6th Cir. 2001) ...............................................4

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ...................................... 18, 19

Lyons v. First Am. Title Ins. Co., No. C 09–4156 PJH, 2009 WL 5195866
  (N.D. Cal. Dec. 22, 2009) ........................................................................ 13

Magner v. Gallagher, 132 S. Ct. 548 (2011) ............................................. 37

Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410 (10th Cir. 1993) .............. 15

Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A. & Wells
  Fargo Fin. Leasing, Inc., 677 F. Supp. 2d 847 (D. Md. 2010) .................... passim

Mayor and City Council of Baltimore v. Wells Fargo, Bank, N.A.,
  No. JFM-08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011) ................................ 1

Moore v. Hughes Helicopters, Inc., a Div. of Summa Corp.,
  708 F.2d 475 (9th Cir. 1983) .................................................................. 30

Nat'l Ass'n for Advancement of Colored People v. Ameriquest Mortgage Co.,
  635 F. Supp. 2d 1096 (C.D. Cal. 2009) .................................................... 37

Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.,
  597 F. Supp. 2d 120 (D.D.C. 2009) ........................................................ 37

Ohio Civil Rights Comm'n v. Wells Fargo Bank, N.A.,
  No. 1:11-cv-623, 2012 WL 1288489 (N.D. Ohio Apr. 16, 2012) ...................... 13

Paige v. California, 291 F.3d 1141 (9th Cir. 2002) .................................... 28

Peters v. Del. River Port Auth., 16 F.3d 1346 (3d Cir. 1994) ...................... 4

Poolis v. Countrywide N.A., No. CIV-F-09-0669 AWI DLB,
  2010 WL 3853046 (E.D. Cal. Sept. 30, 2010) ............................................ 14

Prawoto v. PrimeLending, 720 F. Supp. 2d 1149 (C.D. Cal. 2010) ................ 14

Price v. Owens, 634 F. Supp. 2d 1349 (N.D. Ga. 2009) .......................... 11, 15

Raines v. Byrd, 521 U.S. 811 (1997) ...................................................... 17

Roberts v. Gadsden Mem'l Hosp., 850 F.2d 1549 (11th Cir. 1988) .............. 15

Robinson v. Argent Mortg. Co., LLC, No. C-09-2075 MMC,
  2009 WL 2485749 (N.D. Cal. Aug. 11, 2009) ............................................ 14

Rodriguez v. Nat'l City Bank, 277 F.R.D. 148 (E.D. Pa. 2011) ...........................31

Smith v. City of Jackson, 544 U.S. 228 (2005) ................................ passim

Stalley v. Orlando Regional Healthcare System, Inc., 524 F.3d 1229
(11th Cir. 2008) ...................................................................19

Steed v. EverHome Mortgage Co., 308 Fed. Appx. 364 (11th Cir. 2009) ..............27

Steele v. City of Port Wentworth, Georgia, No. CV 405-135, 2008 WL 717813
(S.D. Ga. Mar. 17, 2008) .......................................................15

Swann v. Secretary, Georgia, 668 F.3d 1285 (11th Cir. 2012) ...............................18

Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062
(S.D. Cal. 2008) ...................................................................13

Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162 (4th Cir. 2007) .......................34

Township of Mount Holly v. Mount Holly Gardens Citizens in Action, Inc.,
2012 WL 2151511 (June 11, 2012).........................................................37

Turner v. City of Auburn, 361 Fed. Appx. 62 (11th Cir. 2010) ...............................32

United States v. Mitchell, 580 F.2d 789 (5th Cir. 1978) .........................................37

Uribe v. Countrywide Fin., No. 08-cv-1982 L(NLS), 2009 WL 1953413
(S.D. Cal. July 7, 2009) .......................................................14

Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541 (2011)............................ 30, 31, 32

Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) .............................. passim

Warth v. Seldin, 422 U.S. 490 (1975) ..................................................................19

Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988) ....................... 27, 28, 31

Wood v. Briarwinds Condo. Ass'n Bd. of Dirs., No. 09-12704, 369 Fed. Appx. 1
(11th Cir. Mar. 3, 2010)................................................................ 10, 15

**Statutory Authority**

42 U.S.C. § 3613 ....................................................................................10

Fed. R. Evid. 201 .....................................................................................5

**Other Authorities**

Federal Reserve Bulletin, Vol. 98, No. 6, The Mortgage Market in 2011:
   Highlights from the Data Reported under the Home Mortgage Disclosure Act at
   32 (December 2012) .............................................................................34

HUD Urban Empowerment Zones and Enterprise Communities, 24 C.F.R. §
   597.102 (2013) ........................................................................................6

## <u>PRELIMINARY STATEMENT</u>

This case crudely replicates complaints shopped to and rejected by federal courts on a theory of liability under the federal Fair Housing Act, 42 U.S.C. § 3605 ("FHA"), blaming mortgage lenders for the financial crisis through an attenuated causal chain based on general allegations of discriminatory subprime lending that do not identify a single victim or a single injury-causing property.  <u>See</u> <u>Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A. & Wells Fargo Fin. Leasing, Inc.</u>, 677 F. Supp. 2d 847 (D. Md. 2010); <u>City of Birmingham v. Citigroup, Inc.</u>, No. CV-09-BE-467-S, 2009 WL 8652915 (N.D. Ala. Aug. 19, 2009).[1]  As an initial matter, the Counties' allegations relating to discriminatory subprime mortgage lending begin in 2003 and end in 2007.  The statute of limitations under the FHA is two years, and the Complaint was filed on October 18, 2012—almost three years too late.  The untimely filing is not excused by the continuing violation doctrine.

---

[1] <u>City of Cleveland v. Ameriquest Mortgage Sec., Inc.</u>, 621 F. Supp. 2d 513 (N.D. Ohio 2009), unsuccessfully pursued similar damages claims under a public nuisance theory.  In <u>City of Memphis and Shelby County v. Wells Fargo Bank, N.A.</u>, No. 09-02857-STA, 2011 WL 1706756 (W.D. Tenn. May 4, 2011), the court allowed reverse redlining allegations to proceed, in part because the complaint sought "limited claims for damages" that were specific to 50 properties identified by Memphis in the complaint.  Similarly, the court in <u>Baltimore</u> granted two motions to dismiss, before allowing a third amended complaint to proceed, which focused on "property specific" damages, including damages stemming from 190 allegedly vacant properties.  <u>Mayor and City Council of Baltimore v. Wells Fargo, Bank, N.A.</u>, No. JFM-08-62, 2011 WL 1557759, at *3 n.2 (D. Md. Apr. 22, 2011).

The Complaint also is fatally flawed because the Counties do not have standing.  They cannot survive Rule 12 without identification of specific properties purported to be sites of injury, and they do not identify a single one.  The Complaint relates only generally to alleged policies and practices, and does not address the fundamental traceability gap between HSBC making a loan and causing damages to the Counties by identifying specific foreclosed properties that caused specific cognizable damages.  Just as federal courts in Alabama and Maryland reasoned in dismissing substantially identical complaints, the Complaint requires "a series of speculative inferences . . . to connect the injuries asserted with the alleged wrongful conduct by the Defendants" in light of the fact that "the minority borrowers in this case could have defaulted on their mortgages for a number of reasons, none of which related to the Defendants' alleged 'reverse redlining.'"  City of Birmingham, 2009 WL 8652915, at *4; Baltimore, 677 F. Supp. 2d at 850 n.2 (noting that claims were "all the more implausible because . . . the severe problems faced by the inner city preexisted the . . . loans").

In addition, the court in City of Birmingham found, when confronted with similar allegations, "that the alleged injuries to the City are too tenuously connected, and so not fairly traceable, to the Defendants' alleged misconduct in this case," and that "loss of tax revenue from property taxes and the increase in

spending, like the depreciation in home values, could have been caused by any number of factors having nothing to do with the Defendants' alleged 'reverse redlining.'"  City of Birmingham, 2009 WL 8652915, at *4-5.  The court in City of Cleveland, 621 F. Supp. 2d at 533-34, similarly found that "[i]t would be tremendously difficult, if not completely impossible, to determine which of the City's damages are attributable to Defendants' alleged misconduct and not to some absent party" in light of the fact that "the borrower may have lost a job . . . suffered a catastrophic injury, borrowed too much on credit cards . . . suffered investment losses that depleted savings . . . or, despite an ability to pay, simply decided to walk away from the mortgage . . . ."

The Counties' theories of injury rely on long, speculative, causal chains legally insufficient to state a claim under the FHA, which fail to connect allegations of poverty, blight, and crime to any alleged discriminatory conduct by HSBC.  The Complaint also makes no factual allegations that plausibly support a disparate impact or disparate treatment claim.  In particular, the Complaint does not plead facts that plausibly show a disparate impact on a protected group or demonstrate a causal connection between a specific policy and alleged disparate impact.  The Counties do not compare "similarly-situated" borrowers and posit only inapposite statistics in support of their disparate impact claim.  The injuries

alleged, moreover, are far too remote to state a claim, particularly in light of the

Atlanta region's socioeconomic malaise.

Finally, the FHA does not permit disparate impact claims as a matter of law,

an issue as to which the Supreme Court is currently determining whether to grant

certiorari.

## BACKGROUND[2]

### I.    A WIDE RANGE OF SOCIAL AND ECONOMIC PROBLEMS HAVE PLAGUED THE ATLANTA AREA FOR DECADES.

The Complaint is predicated on the notion that HSBC's lending resulted in a

huge number of vacant properties, increased expenditures, and increased crime.  In

fact, a vacancy epidemic in the Counties long preceded the allegations and is the

result of factors having nothing to do with HSBC.  Moreover, contrary to the

Counties' allegations, crime rates in the region fortunately improved over the

course of the period at issue.  And even if these trends did not belie the

complained-of injuries, other lenders dwarfed HSBC's market share in the

Counties, which was just over 2% in 2004 and declined to 1.5% by 2007 according

to publicly-available HMDA data.

---

[2]  The relevant factual background is based on material that can be considered on a Rule 12(b)(1) motion or by judicial notice on a Rule 12(b)(6) motion.  See Logan v. Denny's, Inc., 259 F.3d 558, 578 & n.9 (6th Cir. 2001) (taking judicial notice of facts stated in newspaper articles); Peters v. Del. River Port Auth., 16 F.3d 1346, 1356 n.12 (3d Cir. 1994) (taking judicial notice of newspaper accounts of political rivalry); Fed. R. Evid. 201.

Nearly 15 years ago, Mayor William Campbell detailed housing and economic distress in the Atlanta region.   (See Ex. A, William Campbell, Urban Holism: The Empowerment Zone and Economic Development in Atlanta, 26 Fordham Urb. L.J. 1411 (1999)).  He focused in particular on Atlanta's Empowerment Zone, a designation first granted to parts of Fulton County in 1994 by the U.S. Department of Housing and Urban Development ("HUD") due to "pervasive poverty, unemployment and general distress," including "homelessness, abandoned housing, and deteriorated infrastructure."  HUD Urban Empowerment Zones and Enterprise Communities, 24 C.F.R. § 597.102 (2013) ); Ex. B, Notice of Designation of Empowerment Zones and Enterprise Communities, 60 Fed. Reg. 10,018 (Feb. 23, 1995).

Mayor Campbell noted vacancies in "[o]ver one-fourth of all housing and business facilities" in the Empowerment Zone areas.  (Ex. A at 1412).  Plaintiff DeKalb County received nearly $24 million in HUD grants between 2008 and 2010, in part to address 14,510 vacant homes.  (See Ex. C, Press Release, U.S. Rep. Hank Johnson, Rep. Johnson: $7 Million-Plus Headed to DeKalb, Gwinnett for Neighborhood Stabilization (Sept. 10, 2010); Ex. D, Carla Parker, New Foreclosure Ordinance Called Vague by Bankers, Lawyers, CrossRoadsNews (Sept. 17, 2010)).  Mayor Campbell also cited deficiencies in education; high

unemployment; a median income below $11,000; an escalation of "social

problems;" and insufficient public resources.  (Ex. A at 1412-13).

The Atlanta region also lags in job growth, suppressing incomes and

property values.  The Metro Atlanta Chamber of Commerce has observed that

Atlanta has "virtually the same number of jobs now as in 2000."  (Ex. E, Sam

Williams, Returning Sizzle to 'Hotlanta,' Atlanta Journal-Constitution (July 17,

2012)).  The employment downturn is due to factors stretching back over a decade.

Because Atlanta was "the hub of the tech sector in the Southeast," the bursting of

the tech bubble in the early 2000s had a dramatically negative effect.  (Ex. F, Steve

Bergsman, Atlanta Suffers Triple Economic Whammy:  A Look at the Factors

Pushing Metro's Median Home Price Below $100K, Inman News (Apr. 6, 2012)).

Atlanta relied heavily on the manufacturing sector, and thus suffered a significant

blow when demand for housing materials dropped precipitously when the housing

bubble outside the region began to deflate in 2007.  (Id.).  Atlanta also lost

approximately 17% of its financial sector jobs in the fallout from the housing

collapse, compared to a nationwide average of nine percent.  (Id.).  Unemployment

in the Atlanta area in early 2012 was at 9.2% because so many of its jobs were tied

to real estate and financial services.  (See Ex. G, Motoko Rich, In Atlanta, Housing

Woes Reflect Nation's Pain, N.Y. Times (Jan. 31, 2012)).

Although the Complaint alleges injuries resulting from subprime lending, Atlanta's true housing problems have their origins in the 1990s and are not related to the subprime boom.  During the relevant period (Compl., ¶ 6), Atlanta experienced "an odd, economic fluke."  It was largely immune to the drastic rise in housing prices because it already had an oversupply of housing, which mitigated price increases.[3]  (Ex. F).  As a result, the median home sale price in the area is now approximately $100,000, roughly $10,000 lower than it was in 1993.  (Id.).  In short, Atlanta "didn't enjoy the upside of the [housing] bubble" that preceded the financial crisis.  (Id.).  Its housing bubble took place years before the subprime boom fueling the Complaint, and thus could not have resulted from the misconduct alleged.

Similarly, Atlanta saw crime drop by 40% since 2000 and thus any alleged spike in costs associated with crime also could not have resulted from the misconduct alleged.  Indeed, Atlanta ranked in the top five highest crime cities for nearly 30 years, but its public safety improved between 2001 and 2009 at more than twice the rate of the rest of the country.  (See Ex. J, David Edwards, How to

---

[3]  Atlanta's housing surplus also can be traced to overbuilding associated with preparations for the 1996 Olympics.  (See Ex. H, Kathy Lohr, The Economic Legacy of Atlanta's Olympic Games, NPR (Aug. 4, 2011) (citing overbuilding in Atlanta before and after the Olympics); Ex. I, Andrew Zimbalist, 3 Reasons Why Hosting the Olympics Is a Loser's Game, The Atlantic (July 23, 2012)).

<u>Create A Safer Atlanta</u>, Atlanta Journal-Constitution (Nov. 1, 2010) (citing Federal

Bureau of Investigation crime data)).

## II.  <u>THE COUNTIES IMPROPERLY ATTEMPT TO BLAME HSBC.</u> [4]

The Complaint alleges that HSBC engaged in "reverse redlining" (Compl., ¶

47) by targeting minority borrowers and neighborhoods within the Counties for

subprime loans, charging inflated interest rates and fees, and steering minority

borrowers into subprime mortgages when they could have qualified for prime loans.

The Complaint does not specify how minority borrowers and neighborhoods were

targeted, except to allege use of race-neutral consumer data and "algorithms."  (<u>Id.</u>,

¶ 76).  The Counties allege that these practices caused borrowers to default, which

led to foreclosures and vacancies.  In turn, these vacancies caused the Counties to

---

[4] A number of the named defendants are not proper parties to this action, either because they are misidentified or because they did not originate residential mortgage loans in the Counties.  Seven HSBC entities originated residential mortgage loans within the Counties between 2004 and the present:  HSBC Bank USA, N.A., HSBC Mortgage Corporation (USA), Beneficial Mortgage Corporation of Georgia, Beneficial Financial I Inc., Household Realty Corporation, HSBC Mortgage Services Inc., and Decision One Mortgage Company, LLC.  (<u>See</u> Exs. K and L, Declarations of Lynne C. Zaremba and Phyllis I. Johnston).  Because the gravamen of the Complaint relates to discriminatory residential mortgage lending, there is neither subject matter jurisdiction nor personal jurisdiction over entities without mortgage lending operations, and they should be dismissed from this lawsuit outright.  <u>See, e.g.</u>, <u>Gregory v. Mihaylov</u>, Civil Action File No. 1:12-CV-2266-TWT, 2013 WL 75773, at *7 (N.D. Ga. Jan. 4, 2013) (requiring nexus between purposeful contacts and allegations in the complaint); <u>In re African-American Slave Descendants Litig.</u>, 304 F. Supp. 2d 1027, 1048 (N.D. Ill. 2004) ("The allegations of Plaintiffs' Complaint do not link these Defendants to the alleged harm.  Plaintiffs fail to allege any facts in their Complaint that link the specifically named Defendants to the alleged injuries suffered. . . .").  The parties have conferred and will work together to come to an agreement on proper parties insofar as the case goes forward.

suffer decreases in tax revenues and increases in municipal expenditures.  There are no allegations, however, relating to the number of vacancies.  Notwithstanding that the total number of loans alleged to have been <u>originated</u> by HSBC in the Counties between 2004 and 2007 is only 7,213 (<u>id.</u>, ¶¶ 138-40), and publicly-available HMDA data shows that the total number of all originations was approximately 500,000, the Counties assert that HSBC is responsible for "hundreds of millions of dollars" in damages (<u>id.</u>, ¶¶ 2-4, 295, 318).  As another federal judge remarked of such astronomical damages claims for costs associated with vacant properties, "that's a lot of plywood."  (<u>See</u> Ex. M, Transcript of Mot. Hr'g at 66:14, <u>Mayor & City Council of Baltimore v. Wells Fargo</u>, 1:08-cv-00062 (D. Md. Dec. 14, 2009)).

## ARGUMENT

## I.     THE FHA'S STATUTE OF LIMITATIONS BARS THE COMPLAINT.

### A.     The Counties' Claim is Untimely.

Under the FHA, "[a]n aggrieved person may commence a civil action … not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice."  <u>See</u> 42 U.S.C. § 3613(a)(1)(A).  The statute of limitations begins to run when "'facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'"  <u>Wood v.</u>

Briarwinds Condo. Ass'n Bd. of Dirs., No. 09-12704, 369 Fed. Appx. 1, at *3 (11th Cir. Mar. 3, 2010) (quoting Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1222 (11th Cir. 2001)).  The statute begins to run under the FHA "on the date the Plaintiff obtains a discriminatory loan."  Federer v. Midland Mortg. Co., No. 1:12-CV-2492-TWT, 2012 WL 5880916, at *3 (N.D. Ga. Nov. 21, 2012) (citing Estate of Davis v. Wells Fargo Bank, 633 F.3d 529, 532 (7th Cir. 2011)).

The Counties filed their Complaint on October 18, 2012, alleging a single claim under the FHA.  They were required to allege that HSBC made discriminatory loans on or after October 18, 2010.  The Complaint, however, does not identify a single allegedly discriminatory loan originated during that period. Instead, it couples conclusory allegations of discrimination with nationwide statistics about mortgage loan originations between 2003 and 2007 (see, e.g., Compl., ¶¶ 53-60);[5] data relating to loans originated in DeKalb County, Fulton County, and Cobb County between 2003 and 2007 (id., ¶¶ 138-40; 268-69, 298); and commodious observations about the "subprime crisis" (id., ¶¶ 232-37, 245). Because the Counties fail to identify any loans originated on or after October 18,

---

[5] For example, the Complaint alleges that "[b]ased on its review of HMDA data, the Federal Reserve Board has confirmed that on a national basis African American and Latino borrowers were more likely to pay higher prices for mortgage loans than Caucasian borrowers during the excessive mortgage lending and refinance activity at issue here."  (Compl., ¶ 53; see also ¶ 58).

2010—or even generally allege facts relating to mortgage loan originations on or after that date—the Complaint is untimely and should be dismissed.

**B.   The Continuing Violation Doctrine Does Not Excuse Plaintiffs' Untimely Filing.**

The Counties appear to rely on the continuing violation doctrine to salvage their untimely claims.  Under the doctrine, "a Plaintiff's action is not time-barred where some of the alleged violations occurred within the statutory period, even though other violations did not, because the early acts were part of a continuing wrong."  Price v. Owens, 634 F. Supp. 2d 1349, 1354 (N.D. Ga. 2009) (citing Hipp, 252 F.3d at 1221); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 380 (1982).  A plaintiff carries the burden to prove its application.  See Blue Cross & Blue Shield of Ala. v. Weitz, 913 F.2d 1544, 1552 n.13 (11th Cir. 1990); Federer, 2012 WL 5880916, at *3.  Plaintiffs cannot rely on the doctrine here because (i) the Complaint fails to identify any discriminatory conduct occurring within the limitations period; and (ii) the Counties were aware of the bases for their purported FHA claim long before expiration of the limitations period.

**1.   The Complaint Does Not Allege A Discriminatory Act Within the Limitations Period.**

The Complaint relates to alleged subprime mortgage lending policies and practices between 2003 through 2007, and identifies no borrower alleged to have

been discriminated against and no loan alleged to be discriminatory.  (See, e.g., Compl., ¶¶ 138-40, 142-44, 243).  Thus, the continuing violation doctrine does not apply.  See Hipp, 252 F.3d at 1221 (continuing violation doctrine permits plaintiff to sue on otherwise time-barred claims when violations occurred within the limitations period).  The Counties attempt to avoid the statute of limitations by alleging that loan payments and servicing activities on loans made prior to the limitations period constitute continuing violations during the limitations period.  (See Compl., ¶ 272) ("Defendants continue to service…loans and continue to receive periodic payments on [them] and such loans continue to become delinquent and defaulted on. . . . .").[6]  This Court recently rejected the same argument.

In Federer, 2012 WL 5880916, the plaintiff filed a complaint more than two years after alleged discrimination in the origination of a subprime loan and "simply [did] not allege[] any discriminatory act made after the loan was issued."  Id. at *5. The court noted that the FHA's statute of limitations begins to run on the date of origination and held that the continuing violation doctrine did not apply.  Id. at *6. The court reasoned that (i) the allegations of discrimination related to the

_____

[6] The Counties allege that the "foreclosure cycle relating to the predatory lending activity between 2004 through 2007 is only half way complete."  (Compl., ¶ 313).  While foreclosure does not renew the statute of limitations, it is worth noting the Counties' own emphasis on the relevant period of lending activity.

origination of her loan, and (ii) loan servicing-related activities—including foreclosure actions, negative credit reporting and sending of notices of default—do not constitute separate acts of discrimination.  Id.  The court observed that if servicing activities could constitute separate acts of discrimination, the statute of limitations would be "meaningless."  Id. at *5 (citing Ohio Civil Rights Comm'n v. Wells Fargo Bank, N.A., No. 1:11-cv-623, 2012 WL 1288489, at *5 (N.D. Ohio Apr. 16, 2012) (holding that applying continuing violation doctrine to mortgage payments would "produce unwieldy results")).

The reasoning in Federer is consistent with a multitude of courts to have faced the question.  See, e.g., Hernandez v. Sutter West Capital, No. C 09-03658 CRB, 2010 WL 3385046, at *3 (N.D. Cal. Aug. 26, 2010) (finding that the act of discrimination is the origination of the loan with the mortgage payments merely "effects" that flow from the initial act of discrimination); Lyons v. First Am. Title Ins. Co., No. C 09–4156 PJH, 2009 WL 5195866, at *4 (N.D. Cal. Dec. 22, 2009) ("The fact that plaintiffs continue to pay premiums, based on the single refinancing act, constitutes only a continuing effect [not a continuing violation].").[7]  Making a

---

[7] But see Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062, 1065 (S.D. Cal. 2008). Similarly, the vast majority of courts have held that discrimination occurs, and the statute of limitations begins to run, when a loan is originated.  See, e.g., Goodwin v. Executive Trustee Service, LLC, 680 F. Supp. 2d 1244, 1251 (D. Nev. 2010) (dismissing FHA claim where statute of limitations began running on the date the plaintiff executed the deed of trust, more than two

*(cont'd)*

monthly mortgage payment years after originating a loan simply does not void the

FHA's statute of limitations.

## 2.   The Counties Did Not Timely Assert Their Claims.

Even if discriminatory conduct is alleged to continue into the statutory filing

period—and here it is not— the operative question is whether a plaintiff was aware

of such conduct earlier.  The continuing violation doctrine "is premised on the

equitable notion that the statute of limitations ought not to begin to run until facts

supportive of the cause of action are or should be apparent to a reasonably prudent

person similarly situated."  Hipp, 252 F.3d at 1222 (citation omitted); Center for

Biological Diversity v. Hamilton, 453 F.3d 1331, 1335 (11th Cir. 2006); Harris v.

Fulton-DeKalb Hosp. Auth., 255 F. Supp. 2d 1347, 1366 (N.D. Ga. Mar. 27, 2002).

Accordingly, "[i]f an event or series of events should have alerted a reasonable

person to act to assert his or her rights at the time of the violation, the victim

_____
*(cont'd from previous page)*
years before the action was initiated); Davenport v. Litton Loan Servicing, LP, 725 F. Supp. 2d
862, 875 (N.D. Cal. 2010) (noting that a claim that "hones in on the origination and
consummation of" a loan does not provide a basis for adoption of a "continuing violation"
approach to FHA claims); Cervantes v. Countrywide Home Loans, Inc., No. Cv. 09-517-PHX-
JAT, 2009 WL 3157160, at *7 (D. Ariz. Sept. 24, 2009) (finding that the "discriminatory act
took place at the time Defendants extended the loan to Plaintiffs", aff'd, 656 F.3d 1034 (9th Cir.
2011); Poolis v. Countrywide N.A., No. CIV-F-09-0669 AWI DLB, 2010 WL 3853046, at *5
(E.D. Cal. Sept. 30, 2010); Prawoto v. PrimeLending, 720 F. Supp. 2d 1149, 1159 (C.D. Cal.
2010); Robinson v. Argent Mortg. Co., LLC, No. C-09-2075 MMC, 2009 WL 2485749, at *1
(N.D. Cal. Aug. 11, 2009); Uribe v. Countrywide Fin., No. 08-cv-1982 L(NLS), 2009 WL
1953413, at *6 (S.D. Cal. July 7, 2009).

14

cannot later rely on the continuing violation doctrine . . . ."  Hipp, 252 F.3d at 1222 (quoting Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1415 n.6 (10th Cir. 1993)); Price, 634 F. Supp. 2d at 1354; Harris, 255 F. Supp. 2d at 1366; Cowell v. Palmer Twp., 263 F.3d 286, 295 (3d Cir. 2001) (the "continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims").  The continuing violation doctrine is not a free pass for litigants who sit on their claims, and "the statute of limitations will run from the moment the violation begins if the violation continues only because of the plaintiff's knowing failure to seek relief."  Wood, 369 Fed. Appx. at *4 (citing Roberts v. Gadsden Mem'l Hosp., 850 F.2d 1549 (11th Cir. 1988)); Little v. Peach Cnty. School Dist., No. 5:07-CV-101 (CAR), 2009 WL 198003, at *7 (M.D. Ga. Jan. 27, 2009) .

Claims under the FHA are held to the same standard.  See, e.g., Wood, 369 Fed. Appx. at *4 (rejecting application of the continuing violation doctrine to an FHA claim where plaintiff acknowledged being "aware" of alleged violation more than two years prior to the filing of the action); Steele v. City of Port Wentworth, Georgia, No. CV 405-135, 2008 WL 717813, at *16 (S.D. Ga. Mar. 17, 2008) (noting that the Eleventh Circuit gives "considerable weight to a plaintiff's awareness of his or her rights and the duty to bring a timely claim" and refusing to

apply doctrine for plaintiff aware of alleged violation "many years outside of the two-year limitations period"); Hous. Opportunities Project for Excellence, Inc. v. Key Colony No. 4 Condo. Ass'n, Inc., 510 F. Supp. 2d 1003, 1011 (S.D. Fla. 2007) (denying application of continuing violation doctrine and dismissing FHA claim where a "reasonably prudent person" in the plaintiff's position would know that he had a cause of action "long before the filing of this case").

There can be no reasonable dispute that the Counties were aware of their alleged claims for many years before they filed the Complaint:

- The complained-of conduct relates to loans originated between 2003 and 2007, and foreclosures that occurred in that period or shortly thereafter. (See, e .g., Compl., ¶¶ 138-40, 142-44, 243).

- The Complaint relies on publicly-available HMDA data nearly ten years old. (See, e.g., id., ¶¶ 52-57).

- DeKalb County received millions of dollars in grants from HUD in 2008, and again in 2010, to address thousands of abandoned homes.  (See Ex. C).

- Other municipalities filed nearly identical lawsuits with significant media attention beginning in 2008.  See, e.g., Baltimore, 677 F. Supp. 2d 847 (filed January 2008); City of Birmingham, 2009 WL 8652915 (filed November 2008).

In light of these factors, it is apparent that the Counties "slept on [their] rights," Hipp, 252 F.3d at 1222 n.12, and are out of time.[8]

## II. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE THE COUNTIES LACK STANDING .

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997). The Supreme Court has always required "strict compliance" with the standing element of the cases or controversy requirement. Id. at 819. The party invoking federal court jurisdiction bears the burden of demonstrating that it has standing.[9] Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259, 1265 (11th Cir. 2011) (citations omitted).

---

[8] The Counties appear to claim that the Mortgage Electronic Registration Systems ("MERS") fraudulently impaired their ability to discover discriminatory acts in order to toll the statute of limitations.  (See Compl., ¶ 191).  Numerous courts have acknowledged the legitimacy of MERS.  See, e.g., Cervantes, 2009 WL 3157160, at *10 (MERS not a "sham beneficiary"); In re Mortgage Elec. Registration Sys. (MERS) Litig., 744 F. Supp. 2d 1018, 1029 (D. Ariz. 2010) ("The MERS system is not fraudulent, and MERS has not committed any fraud").

[9]  Although standing issues may involve both constitutional and prudential limitations, see Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979), prudential considerations are irrelevant here because the FHA permits standing "as broad as is permitted by Article III of the Constitution." Id. at 108.

17

To satisfy the standing requirement of the Article III case-or-controversy limitation on judicial authority, the party invoking federal court jurisdiction must show, at the "irreducible constitutional minimum," that (i) it has suffered an injury in fact that is "concrete and particularized" and "actual or imminent," not conjectural or hypothetical; (ii) the injury is fairly traceable to the defendants' actions; and (iii) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision.  Id.  Constitutional standing concepts are "not susceptible of precise definition" and "cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise."  Allen v. Wright, 468 U.S. 737, 751 (1984).

A plaintiff must demonstrate that it is likely that an injury was caused by the challenged conduct, and is not the result of the "independent action of some third party not before the court."  Swann v. Secretary, Georgia, 668 F.3d 1285, 1288 (11th Cir. 2012) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  Accordingly, a party does not have standing to bring an action when "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to

control or to predict.'" Lujan, 504 U.S. at 562 (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989)).[10]

### A.   The Counties Fail to Allege an Injury in Fact.

In order to have standing, a plaintiff must demonstrate an injury that is "distinct and palpable" and not "abstract" or "conjectural" or "hypothetical." Bennett v. Hendrix, 423 F.3d 1247, 1253 (11th Cir. 2005) (citing Allen, 468 U.S. at 751). The Counties fail to make any non-speculative factual allegation that they have actually suffered injury in connection with any property allegedly foreclosed upon by HSBC. They do not even provide the address of a property where there might have suffered injury, nor do they identify a single borrower alleged to be the victim of discrimination. They have identified no records of property tax assessments, police or fire responses, or any expenses incurred in securing or rehabilitating a single property. This failure to allege concrete harm fairly traceable to conduct by HSBC requires dismissal of the Complaint. See, e.g., Warth, 422 U.S. at 508 (requiring plaintiff to plead "specific, concrete facts

---

[10] A defendant may move to dismiss a complaint for lack of subject matter jurisdiction pursuant to a facial or factual attack on the complaint. See Stalley v. Orlando Regional Healthcare System, Inc., 524 F.3d 1229, 1232 (11th Cir. 2008) (citations omitted). A facial attack requires the court to examine whether the plaintiff has "sufficiently alleged a basis of subject matter jurisdiction," assuming the complaint allegations are true. Id. at 1232. A factual attack allows the court to use "material extrinsic from the pleadings, such as affidavits or testimony." Id. at 1233; see also Warth v. Seldin, 422 U.S. 490, 501-502 (1975) (trial court has the power to require plaintiff to submit affidavits in support of standing).

demonstrating that the challenged practices harm him") (emphasis added); <u>Dillard v. Chilton Cnty. Comm'n</u>, 495 F.3d 1324, 1333 (11th Cir. 2007) (holding that "mere generalized grievances" are insufficient to confer standing and require dismissal of complaint); <u>Elend v. Basham</u>, 471 F.3d 1199, 1208-10 (11th Cir. 2006) (affirming dismissal where alleged damages were "not alleged with any particularity").

### B.   The Counties Fail to Allege an Injury Fairly Traceable to the Actions of HSBC.

Consistent with the governing Supreme Court precedent on the strictures of "fairly traceable" causation, each court that has confronted the theories of causation advanced here—without the identification of specific, allegedly injury-causing properties—has rejected them.  <u>See, e.g.</u>, <u>Baltimore</u>, 677 F. Supp. 2d 847; <u>City of Birmingham</u>, 2009 WL 8652915.  "The causation element of Article III standing requires a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  <u>Hollywood Mobile Estates</u>, 641 F.3d at 1265 (citations omitted); <u>see also</u> <u>Doe v. Pryor</u>, 344 F.3d 1282, 1285 (11th Cir. 2003) (emphasizing that the causal link must clearly reach back to the challenged action of the defendant). <u>Allen</u>, 468 U.S. 737, is the seminal Supreme Court case addressing traceability.  In

<u>Allen</u>, parents of African-American public schoolchildren sued the Internal Revenue Service, alleging that the agency failed to enforce its policy of denying tax-exempt status to racially discriminatory schools, harming the parents directly and interfering with the ability of their children to receive an education in desegregated public schools.  <u>Id.</u> at 739-40.  The Supreme Court concluded that the parents had no standing because "[t]he line of causation between that conduct [the granting of tax exempt status] and desegregation of respondents' schools is attenuated at best."  <u>Id.</u> at 757.

The Counties have theorized three types of injury.  Each relies on a lengthy, speculative, and attenuated causal chain that is legally insufficient to support standing:

- <u>The Property Tax Theory</u>.  This approach theorizes that (i) the HSBC loan (and not some other factor such as illness, divorce, job loss, incarceration, or death) caused the borrower to default; (ii) the mere notice of foreclosure caused the home to be abandoned, and there was no buyer willing to purchase the subsequently foreclosed-upon home; (iii) this caused potential real estate buyers to become less interested in the surrounding properties (and not any other reason such as a weakening economy, a decline in industry, or a slumping real estate market in unidentified "communities") (Compl., ¶ 296); (iv) this, and not, for example, a weakening economy, a decline in industry, or a slumping real estate market, caused "reduced property values on foreclosed properties and surrounding properties" (<u>id.</u>, ¶ 295); (v) this caused the Counties' boards of tax assessors to lower property assessments; (vi) which led to "lost property tax revenue on vacant or abandoned properties, and on foreclosed and surrounding properties" (<u>id.</u>, ¶ 295).

21

- The Crime Theory.  This approach theorizes that (i) the HSBC loan (and not some other factor, including, for example, those identified above) caused the borrower to default; (ii) the mere notice of foreclosure caused the home to be abandoned, and there was no buyer willing to purchase the subsequently foreclosed-upon home; (iii) which led to an increase in the number of vacant homes; (iv) which prompted gangs and criminals to increase their level of illegal activity or to initiate new illegal activity because of unidentified additional vacant homes "that have not been cared for, have been vandalized and/or have provided a location for illegal activities" (id., ¶ 301), notwithstanding a precipitous drop in crime during the relevant period; (v) which led the Counties' police and fire departments "to send personnel and equipment to such vacant properties to respond to public health and safety threats that arise at these properties because the properties are vacant" (id., ¶ 303).

- The Rehabilitation Theory.  This approach theorizes that (i) the HSBC loan (and not some other factor, including, for example, those identified above) caused the borrower to default; (ii) the mere notice of foreclosure caused the home to be abandoned, and there was no buyer willing to purchase the subsequently foreclosed-upon home; (iii) which led to an increase in the number of vacant homes; (iv) which led to the risk of the home being damaged by people, animals, or weather; (v) which led the Counties to "inspect, investigate and respond to [code] violations . . . including boarding up or tearing down vacant properties that are open to casual entry; making structural repairs. . . or address public health concerns including vermin infestation, burst water pipes, collection of accumulated garbage, and/or cutting high grass;" (vi) which led to "substantial personnel time and out-of-pocket costs" (id., ¶ 301).

The court in Baltimore noted in rejecting these same theories that a

plaintiff's showing of "attenuated causal connection is insufficient."  Baltimore,

677 F. Supp. 2d at 849.  "Too much speculation is required to connect the links in

the chain of causation" when injuries alleged are "highly indirect" and result from

the actions of third parties not before the court.  Id.  As well, noting the Supreme

Court's recent decisions in Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), the court said that the

allegations (including standing) against a defendant must assert a "plausible" claim,

and that these do not.  Baltimore, 677 F. Supp. 2d at 850.

The court based this conclusion on two factors.  First, the court found that,

> using the City's own figures, Wells Fargo is responsible for only a
> negligible portion of the City's vacant housing stock.  This fact alone
> demonstrates the implausibility of any alleged causal connection
> between Wells Fargo's alleged reverse redlining activities and the
> generalized type of damages claimed by the City, e.g., decline in
> value of homes and decreased property tax revenues resulting,
> increased criminal and gang activities, and increased police and fire
> protection resulting from building vacancies.

Id.

Here, the Counties advance no allegations specifically relating to HSBC

foreclosure or vacancy rates.  The best they muster is general statistics about

increased vacancy rates within their boundaries between 2000 and 2010, and

increased foreclosure rates in census tracts with minority populations of at least

40% between 2004 and 2006 (Compl., ¶¶ 22, 264-66).  They also make much of an

observation—again not specific to HSBC loans—that loans to minority borrowers

are more likely than loans to white borrowers to be secured by properties in

minority neighborhoods.  (Id., ¶¶ 268-69).  From this, they inexplicably conclude

that foreclosure rates "would have been far lower" but for the alleged lending practices.  (<u>Id.</u>, ¶ 271).  This is especially unpersuasive in light of the fact, apparent in the publicly-available HMDA data on which the Counties rely, that HSBC held slightly more than 2% of market share in the Counties in 2003, and that its presence steadily declined to 1.5% over the relevant period.

Second, the court found that "the alleged connection is even more implausible when considered against the background of other factors leading to the deterioration of the inner city, such as extensive unemployment, lack of educational opportunity and choice, irresponsible parenting, disrespect for the law, widespread drug use, and violence."  <u>Baltimore</u>, 677 F. Supp. 2d at 850.  Indeed, the court noted that the claims "are all the more implausible because, as the allegations in the Amended Complaint make clear, the severe problems faced by the inner city preexisted the making of Wells Fargo's loans."  <u>Id.</u> at 850 n.2.

In dismissing Birmingham's virtually identical complaint, the court rejected the "series of speculative inferences" required to establish standing.  <u>City of Birmingham</u>, 2009 WL 8652915, at *4.  The court reasoned that borrowers "could have defaulted on their mortgages for a number of reasons, none of which related to the Defendants' alleged 'reverse redlining.'"  <u>Id.</u>  Specifically, the court said:

> [It] is quite speculative that the depreciation in value of the
> neighboring homes in the City was caused by the foreclosures of

> minority borrowers' properties rather than as a result of a myriad of other factors, which…could include rising unemployment in the region, changes in the housing market, or other economic conditions.

Id. (citation omitted).  The court also pointed out that the decision to foreclose itself could be "for reasons totally apart from the alleged 'reverse redlining.'"  Id.

In City of Cleveland, 621 F. Supp. 2d 513, Cleveland advanced a nuisance claim under a similar theory of causation.  Cleveland alleged that subprime lending caused "the epidemic of foreclosures afflicting the City," and sought a recovery from mortgage lenders.  Id. at 516.  The court found that "the borrower may have lost a job . . . suffered a catastrophic injury, borrowed too much on credit cards . . . suffered investment losses that depleted savings . . . or, despite an ability to pay, simply decided to walk away from the mortgage . . . ."  Id. at 534.  The court concluded  that "[i]t would be tremendously difficult, if not completely impossible, to determine which of the City's damages are attributable to Defendants' alleged misconduct and not to some absent party."  Id. at 533.

The court also noted that Cleveland itself had acknowledged that "the foreclosure crisis was precipitated by the broad decline in the housing market, which itself was the product of a myriad of factors occurring in unknown and unknowable proportions, many of which were completely beyond Defendants' control."  Id. at 535.  Here, the Counties concede that the freezing of global credit

markets and increased risk in investment markets precipitated the foreclosure crisis.

(Compl., ¶ 237).  Further, as discussed above, the Atlanta area's real housing

bubble occurred years before the subprime boom, and the crime rate in Atlanta

<u>dropped</u> by 40% between 2001 and 2009.  Far from adequately pleading causation,

the Counties' purported injuries do not even correlate to the alleged misconduct.

Quite simply, the Counties have failed to demonstrate the "causal connection

between the injury and the alleged constitutional violation" necessary to invoke

standing.  <u>ACLU of Fla. v. Dixie Cnty., Fla.</u>, 690 F.3d 1244, 1254 (11th Cir. 2012);

<u>see also</u> <u>Hollywood Mobile Estates</u>, 641 F.3d at 1265.

## III.   <u>THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.</u>

Even if the Counties had timely filed this suit and could demonstrate

standing, they have failed to plead factual allegations in the Complaint that

plausibly support a disparate impact theory under the FHA.  The Complaint is

vague, speculative, and conclusory, notwithstanding Fed. R. Civ. P. 8 pleading

standards and the Supreme Court's explicit caution that racial discrimination

claims must be focused and specific, <u>Smith v. City of Jackson</u>, 544 U.S. 228, 241

(2005), and that a plaintiff must assert enough facts to show a "plausible" and non-

speculative right to relief, <u>Twombly</u>, 550 U.S. at 553-55; <u>see also</u> <u>Iqbal</u>, 556 U.S.

662; <u>Jacobs v. Tempur-Pedic Int'l Inc.</u>, 626 F.3d 1327, 1333 (11th Cir. 2010) (a

"complaint must contain more than labels and conclusions. . . .") (citations omitted).  Without such specificity, courts face an intolerable risk of applying the disparate impact theory where chance, unexplained coincidence, or other factors having nothing to do with the defendant's alleged conduct are the real cause of any disparities.  City of Jackson, 544 U.S. at 241; Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657 (1989); Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 991-93 (1988).

To state a specific and plausible reverse redlining claim, the Counties must allege "that the defendants' lending practices and loan terms were unfair and predatory, and that the defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race."  Steed v. EverHome Mortgage Co., 308 Fed. Appx. 364, 368 (11th Cir. 2009) (internal quotations and citation omitted).

A.    The Counties Do Not Plead a Disparate Impact Claim.

To "plausibly" plead disparate impact, see Twombly, 550 U.S. 544, the Complaint must set forth (i) a specific and clearly delineated practice or policy adopted by the defendant; (ii) a disparate impact on a protected group; and (iii) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact.  See Wards Cove, 490 U.S. at 657-58;

City of Jackson, 544 U.S. at 241; EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274 (11th Cir. 2000); Paige v. California, 291 F.3d 1141, 1144-45 (9th Cir. 2002).

### 1.    The Counties Fail to Allege Disparate Impact.

While the Complaint describes the securitization of residential mortgage loans and the secondary market, it is completely devoid of allegations of a specific and clearly delineated policy or practice that had a disparate impact on a protected class.  Indeed, the Complaint fails at the most basic level even to allege disparate impact as to a particular class.  Watson, 487 U.S. at 994-95; Wards Cove, 490 U.S. at 657.

The Complaint alleges that HSBC loans contained pricing disparities between minority and white borrowers (Compl., ¶¶ 54, 77), but includes zero statistical support for this assertion.  Wards Cove, 490 U.S. at 651-53; Hallmark Developers, Inc. v. Fulton County, 466 F.3d 1276, 1286 (11th Cir. 2006) ("Typically, disparate impact is demonstrated by statistics.").  Similarly, the allegations concerning statements about neutral policies allegedly made by unidentified HSBC employees (see, e.g., Compl., ¶¶ 81-87, 91-99, 102, 124, 126, 128, 168-82, 286-88) contain no specifics about any such alleged disparate impact.

To overcome this fundamental deficiency, the Counties pad the Complaint with paltry and inapposite statistics unrelated to any disparate impact in the

origination of residential mortgage loans at all, and certainly not within their own

boundaries, where HSBC's market share was miniscule during the relevant period:

- Analyses by the Center for Responsible Lending, the U.S. Department of Housing and Urban Development, and the Federal Reserve of HMDA data for all lenders nationwide that found discrimination in subprime mortgage lending between 2003 and 2007 (Compl., ¶¶ 50-60);

- A HUD report to Congress on the "root causes" of the foreclosure crisis that describes only generalized national trends relating to mortgage lending and housing markets (id., ¶ 243);

- A conclusion that African-American borrowers accounted for a percentage of foreclosures that was disproportionate to the number of loans originated by African-American borrowers (id., ¶ 257);

- Conclusions that foreclosure rates increased in certain high-minority census tracts (id., ¶¶ 264-66), and that loans to minorities tend to be in neighborhoods where foreclosure rates are high (id., ¶ 268); and

- A scattering of HMDA data—which Federal Reserve economists have concluded does not show disparate discriminatory impact[11]—largely relating to general lending patterns throughout the United States (id., ¶¶ 53-55).

This Court recently reaffirmed that such general, inapposite "statistics" are

insufficient to plead actionable discrimination.  The plaintiff in Federer, 2012 WL

5880916, claimed discrimination in connection with a subprime loan.  The court

found that her "pleadings addressing discrimination in any way do so only in a

---

[11] See Federal Reserve Bulletin, Vol. 98, No. 6, The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act at 32 (December 2012), available at http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf.

broad and general fashion." Id. at *4.  Like the Counties here, the Federer plaintiff

cited general statistics about the likelihood that a female borrower would receive a

subprime loan, but included no "specific, ongoing acts of discrimination against

the Plaintiff." Id.[12]

**2.      The Counties Do Not Identify an Actionable Policy to Support Their Disparate Impact Claim.**

The Counties allege that unspecified "discretionary pricing" policies and

"financial incentives" for underwriting "overrides" led to a disparate impact on

minority borrowers.  (Compl. ¶¶ 100-16, 129, 134).  Putting aside that the

Complaint does not identify such policies or even theorize how they might

coordinate their conclusory effects, a policy of allowing employees to exercise

discretion is not a uniform practice required for disparate impact analysis; it is a

policy against having a uniform practice.  See, e.g., Wal-Mart Stores, Inc. v. Dukes,

131 S.Ct. 2541, 2554-55 (2011).  Indeed, a "policy of leaving ... decisions to the

unchecked discretion of ... supervisors" cannot, in itself, raise an inference of

---

[12] It is well-settled that an "apples to oranges" comparison does not satisfy basic disparate impact pleading requirements.  See, e.g., Donnelly v. R.I. Bd. Of Governors for Higher Educ., 929 F. Supp. 583, 591 (D.R.I. 1996), aff'd, 110 F.3d 2 (1st Cir. 1997) (citation omitted); see also Wards Cove, 490 U.S. at 651-53 (holding that plaintiffs failed to state prima facie disparate impact claim based on alleged statistical disparities where statistics did not compare similarly-situated employees); Moore v. Hughes Helicopters, Inc., a Div. of Summa Corp., 708 F.2d 475, 482 (9th Cir. 1983) (statistical pools should "always be measured against the actual pool of applicants or eligible employees").

discrimination under a disparate impact theory.  Watson, 487 U.S. at 990; see also, e.g., Durante v. Qualcomm, Inc., 144 Fed. Appx. 603, 606 (9th Cir. 2005).

The Counties do not "identify a specific aspect of subjective decision-making" that allegedly has a "causal connection to the alleged class-based imbalance . . . ." Anderson v. Douglas & Lomason Co., 26 F.3d 1277, 1284 (5th Cir. 1994); see, e.g., Fulcher v. City of Wichita, 445 F. Supp. 2d 1271, 1276 (D. Kan. 2006) (dismissing disparate impact claim premised in part on allegations of subjective decision making for failure to specify particular practice or policy). And they have not alleged plausible causation because they failed to allege a common direction or common method of exercising discretion.  Other courts analyzing FHA disparate impact cases in the context of discretionary mortgage pricing have followed Dukes' logic, holding that alleging a discretionary pricing policy coupled with statistics is not sufficient to demonstrate that employees exercised discretion in a similar or discriminatory manner.  See, e.g., Rodriguez v. Nat'l City Bank, 277 F.R.D. 148, 155 (E.D. Pa. 2011); In re Countrywide Fin. Mortgage Lending Practices Litig., No. 08-MD-1974, 2011 WL 4862174, at *4 (W.D. Ky. Oct. 13, 2011); In re Wells Fargo Residential Mortgage Lending Discrimination Litig., No. 08-MD-01930 MMC, 2011 WL 3903117, at *3 (N.D. Cal. Sept. 06, 2011).

Even if the Counties had alleged statistics showing a disparate impact in HSBC's loan pricing or foreclosure rates—and they have not—the Supreme Court has made clear that mere allegations of a policy of discretion and statistics showing a disparate impact are insufficient to allege discrimination.  See Dukes, 131 S.Ct. at 2554-55.  Here, the Complaint specifies no policy and contains no allegations that there was a common direction or bias to apply pricing discretion in a discriminatory manner.

### 3.   The Counties Fail to Allege a Causal Connection Between Purported Lending Policies and Practices and the Alleged Disparate Impact.

To satisfy the final element of a disparate impact claim, the Counties must allege that the challenged policies and practices actually caused the perceived disparity.  Merely showing a bottom line disparity is not enough:  "Respondents will . . . have to demonstrate that the disparity they complain of is the result of one or more of the [ ] practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on [ ] opportunities for whites and nonwhites."  Wards Cove, 490 U.S. at 657.  See also Turner v. City of Auburn, 361 Fed. Appx. 62, 65 (11th Cir. 2010); Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998); Donnelly, 929 F. Supp. at 591-92.

Here, the Counties allege, at best and insufficiently, only a "bottom line . . . imbalance," with no discernible connection between HSBC's alleged practices and that imbalance.  Wards Cove, 490 U.S. at 657.  Even worse, the "imbalance" alleged relates to overall vacancy rates in certain neighborhoods within the Counties.  It is not specific to HSBC loans and has nothing to do with loan pricing. They do not allege in any meaningful way that minorities received higher-priced loans and whether, or how, any policies or practices—rather than a housing bubble, the larger economic collapse, poverty, divorce, job loss, personal tragedies, or any of the other factors that precipitate foreclosure—caused such a phenomenon, or caused more foreclosures to be initiated on those loans, or caused foreclosures to result in vacancies, or for vacancies to result in higher municipal expenditures. Instead, they say only that minorities received more subprime loans and "have been disproportionately and disparately impacted by the increased delinquencies, defaults, foreclosures, and home vacancies resulting from such loans."  (Compl., ¶ 13).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough.  Jacobs, 626 F.3d at 1333.  In short, the Counties seek hundreds of millions of dollars damages but present only general

and conclusory allegations of harm too speculative and attenuated to state a

claim.[13]

### B.    The Counties Fail to Allege a Disparate Treatment Claim.

Insofar as the Counties purport to plead an intentional discrimination claim,

the Complaint does not come close to stating the elements of such a claim.  Indeed,

the lending practices purportedly at issue are alleged to be neutral.  The

"algorithms" allegedly used to determine "personal preferences" or "shopping

patterns" (Compl., ¶ 81), and data regarding "the number of children in a given

household and vehicles owned," (id., ¶ 84), are not alleged to relate in any way to

---

[13] Across a range of cases, courts routinely dismiss claims alleging economic injuries too remote from the alleged conduct to establish a sufficient causal link.  See, e.g., Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005) (plaintiff alleging an "economic loss" failed to plead "what the causal connection might be" between the loss and conduct alleged); Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 186 (4th Cir. 2007) (same); Allegheny Gen. Hosp. v. Phillip Morris, Inc., 228 F.3d 429, 445 (3d Cir. 2000) (claims of third-party hospital seeking to unreimburse costs of health care provided to nonpaying patients suffering from tobacco-related disease were too remote of the hospital's injury and many alternate causal factors may have triggered it); City of Philadelphia v. Beretta U.S.A., Corp., 126 F. Supp. 2d 882, 911 (E.D. Pa. 2000), aff'd, 277 F.3d 415 (3d Cir. 2002) (characterizing suit alleging causal connection between gun manufacturing and harm from gun-related incidents as "a theory in search of a case").  It should be noted that the Complaint cites no data to refute the unremarkable truth that mortgage lenders make loan pricing decisions based on credit risk factors.  The Federal Reserve has stated that statistics relating to borrower creditworthiness factors and pricing information are essential to evaluating discriminatory lending allegations.  (See n.11, supra).

race or ethnicity.[14]  Further, it is not at all obvious that a strategy to "upsell" would be targeted at minorities or minority neighborhoods, and the Counties do not so allege.  (Id., ¶ 82).  To the contrary, the Complaint alleges that HSBC implemented these policies in order to generate "more income through higher interest rates and substantial fees."  (Id., ¶ 9).  Similarly, the allegations concerning statements allegedly made by unidentified HSBC employees (see, e.g., id., ¶¶ 81-87, 91-99, 102, 124, 126, 128, 168-82, 286-88), concern policies allegedly designed to make HSBC "more profitable" (id., ¶ 82).  In other words, taking the allegations as true, the policies alleged were neutral and driven by financial incentives.

Finally, the Counties' conclusory allegations that HSBC engaged in discrimination do not state an actionable disparate treatment claim.  In Federer, 2012 WL 5880916, the court considered a similarly bald claim that subprime lending is discriminatory:

> the pleadings addressing discrimination in any way do so only in a broad and general fashion . . . [and] recite statistics stating that women were 32% more likely than men to receive subprime rate loans and 41% more likely to receive higher-cost subprime loans . . . Additionally, the Plaintiff broadly states that the 'Defendants discriminated against Plaintiff based on gender,

---

[14] Similarly, the Counties allege that Hispanic applicants were more likely to receive underwriting exceptions because "Hispanic homeowners typically had six to eight family members living in one household who could potentially assist in making loan payments." (Compl., ¶ 178).  There is no allegation, however, that Hispanics or any other protected class were targeted.

>Defendants induced Plaintiff into obtaining a mortgage loan Defendants knew that given the Plaintiff's financial circumstances, [she] could not repay' . . . This allegation is conclusory and does not state a specific fact concerning the Defendants' conduct after the loan was issued.

Federer, 2012 WL 5880916, at *4; see also Bennett v. Flagstar Bank, 2011 WL 6152940, (S.D. Ga. Dec. 8, 2011) (dismissing claim of "systemic institutionalized racism in sub-prime home Mortgage Lending" for failure "to identify even a scintilla of factual support for such claims").  As in Federer and Bennett, the Counties allege that HSBC "targeted minorities" with high cost loans that were made "irrespective of borrower ability to repay" (Compl., ¶ 47), and that "Defendants' underwriting policies ultimately caused FHA protected minority borrowers in Plaintiffs [sic] communities and neighborhoods to disproportionately receive mortgage loans they could not repay," (id., ¶ 122).  These allegations are conclusory and do not state a disparate treatment claim.[15]

---

[15] Insofar as the Counties purport to allege that servicing itself was discriminatory, they have thrown into the Complaint only conclusory allegations of "discriminatory mortgage loan servicing" (Compl., ¶¶ 281-83), which do not even approach minimum pleading standards discussed above.  They do not allege that HSBC treated minority borrowers differently or that servicing practices had a disparate impact on minority borrowers.  To the contrary, the allegations relating to servicing amount to a claim that HSBC was bad at servicing loans.  (See, e.g., id., ¶ 282 (alleging that HSBC "fail[ed] to respond" to loan delinquencies, and "fail[ed] to have adequate internal controls")).  Alleged poor servicing does not constitute a claim under the FHA.

## IV.   THE FHA DOES NOT PERMIT DISPARATE IMPACT CLAIMS.

Even if the Counties had pled factual allegations that plausibly could support a disparate impact claim under the FHA—and they have not—the Complaint still would warrant dismissal because the Supreme Court's decision in Smith v. City of Jackson, 544 U.S. 228 (2005), makes clear that the FHA does not permit such claims.[16]  Although the Eleventh Circuit has held that the FHA permits disparate impact claims, it has not addressed the impact of City of Jackson on that holding.[17]

City of Jackson held that the text of an anti-discrimination statute—and not a broad reading of its purpose—determines whether it permits disparate impact claims.  The Supreme Court considered whether the Age Discrimination in

---

[16] The Supreme Court had agreed to consider the issue of whether the FHA permits disparate impact claims in Magner v. Gallagher, 132 S. Ct. 548 (2011); however, the case was subsequently dismissed by the parties.  Id., 132 S. Ct. 1306 (2012).  A recent petition for certiorari raising the same issue has been filed in Township of Mount Holly v. Mount Holly Gardens Citizens in Action, Inc., 2012 WL 2151511 (June 11, 2012).  The Supreme Court has not yet ruled on the petition.

[17] See, e.g., United States v. Mitchell, 580 F.2d 789, 791 (5th Cir. 1978).  In addition, the Eleventh Circuit reiterated the viability of disparate impact claims under the FHA in a case adjudicated subsequent to the decision in City of Jackson.  See Hallmark Developers, 466 F.3d at 1286 (citing Jackson v. Okaloosa County, Florida, 21 F.3d 1531, 1543 (11th Cir. 1994)).  However, that case did not address City of Jackson's applicability to the statutory construction of the FHA, and it appears that no party raised the issue.  Instead, the court relied on an Eleventh Circuit case that predates City of Jackson.  In addition, although other courts in other jurisdictions have rejected this argument, these cases do not properly apply City of Jackson to the FHA's statutory text.  See, e.g., Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co., 597 F. Supp. 2d 120 (D.D.C. 2009); Nat'l Ass'n for Advancement of Colored People v. Ameriquest Mortgage Co., 635 F. Supp. 2d 1096 (C.D. Cal. 2009); Hoffman v. Option One Mortgage Corp., 589 F. Supp. 2d 1009 (N.D. Ill. 2008).

Employment Act ("ADEA") permits disparate impact claims.  Noting the similarity

between subsections (a)(2) of the ADEA and Title VII, compare Title VII, §

703(a)(2), 42 U.S.C. § 2000e-2(a)(2), and ADEA, § 4(a)(2), 29 U.S.C. § 623(a)(2),

the Court held that disparate impact claims are permitted by the "effects" language

they contain:

> Neither § 703(a)(2) [of Title VII] nor the comparable language in the ADEA simply prohibits actions that "limit, segregate, or classify" persons; rather the language prohibits such actions that "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's" race or age . . . .  Thus the text focuses on the effects of the action on the employee rather than the motivation for the action of the employer.

City of Jackson, 544 U.S. at 235-36 (emphasis in original).

Specifically, the Court held that the text of ADEA § 4(a)(2), which mirrors

Title VII § 703(a)(2), empowered it to conclude that the ADEA permits disparate

impact claims.  See City of Jackson, 544 U.S. at 235-38.  In addition to explaining

that Title VII § 703(a)(2) and ADEA § 4(a)(2) both permit disparate impact claims,

the Court clarified that subsection (a)(1) of each statute—the subsection that the

FHA mirrors—does not.  The Court noted that there are "key textual differences"

between subsections (a)(1) and (a)(2) of both Title VII § 703 and the ADEA § 4.

City of Jackson, 544 U.S. at 236 n.6.  Whereas subsection (a)(2) permits disparate

impact claims, the Court explained that subsection (a)(1) encompasses disparate

treatment, but "<u>does not encompass disparate-impact liability</u>," and requires a

showing of intent.  <u>Id.</u> at 236-38 & n.6 (emphasis added).  And, although the

Justices disagreed as to whether ADEA Section 4(a)(2) permits disparate impact

claims, the Court was <u>unanimous</u> that Section 4(a)(1) does not.  <u>See id.</u> at 236 n.6;

<u>id.</u> at 243 (Scalia, J., concurring); <u>id.</u> at 249 (O'Connor, J., dissenting).

The language of the FHA's § 805 mirrors Title VII § 703(a)(1) and ADEA §

4(a)(1), which permit disparate treatment claims, but not disparate impact claims.

<u>Compare</u> Title VII, § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1), <u>and</u> ADEA § 4(a)(1),

29 U.S.C. § 623(a)(1), <u>with</u> FHA § 805(a), 42 U.S.C. § 3605(a).  Moreover, the

FHA lacks language focusing on the effects of actions comparable to the language

of Title VII § 703(a)(2) or ADEA § 4(a)(2) that supports disparate impact claims.

The absence of parallel "effects" language is dispositive of Congress's intent in

enacting the FHA.  As the Supreme Court explained, "when Congress uses the

same language in two statutes having similar purposes, particularly when one is

enacted shortly after the other, it is appropriate to presume that Congress intended

that text to have the same meaning in both statutes."  <u>City of Jackson</u>, 544 U.S. at

233 (citation omitted).  Just as the consistent interpretation of similar language in

similar statutes is a basic principle of statutory construction, different language in

similar statutes must be understood to have different import.  "This use of different

language in two statutes so analogous in their form and contact, enacted so close in time, suggests that the statutes differ in their meaning . . . ."  Acree v. Republic of Iraq, 370 F.3d 41, 61 (D.C. Cir. 2004) (Roberts, J., concurring).  Because the FHA lacks an "effects" subsection in contrast to Title VII and the ADEA, and the statutes were enacted a handful of years apart, the omission must be viewed as an intent by Congress not to provide for disparate impact claims under the FHA.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint in its entirety.

Dated: January 25, 2013                Respectfully submitted,


                                       /s/ Therese G. Franzen
                                       Therese G. Franzen (Bar No. 492367)
                                       D. Sharmin Arefin (Bar No. 511388)
                                       FRANZEN AND SALZANO, P.C.
                                       40 Technology Parkway South, Suite 202
                                       Norcross, Georgia 30092-2906
                                       (770) 248-2885 (Telephone)
                                       (770) 248-2883 (Facsimile)
                                       tfranzen@franzen-salzano.com
                                       sarefin@franzen-salzano.com


                                       Andrew L. Sandler (*pro hac vice*)
                                       Valerie L. Hletko (*pro hac vice*)
                                       Ross E. Morrison (*pro hac vice*)
                                       Mark E. Rooney (*pro hac vice*)
                                       BUCKLEYSANDLER LLP
                                       1250 24th St. NW, Suite 700
                                       Washington, D.C.  20037
                                       (202) 349-8000 (Telephone)
                                       (202) 349-8080 (Facsimile)
                                       asandler@buckleysandler.com
                                       vhletko@buckleysandler.com
                                       rmorrison@buckleysandler.com
                                       mrooney@buckleysandler.com

                                       *Attorneys for Defendants*

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1(D)</u>

I hereby certify that the foregoing brief was prepared using Times New Roman 14 point font, in accordance with Local Rule 5.1(C).

<u>/s/ Therese G. Franzen</u>

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| DEKALB COUNTY, FULTON COUNTY, and COBB COUNTY, GEORGIA,<br><br>Plaintiffs,<br><br>v.<br><br>HSBC NORTH AMERICA HOLDINGS INC., ET AL.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL CASE NO.:<br>)  1:12-cv-03640-SCJ<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing Motion to Dismiss and [Proposed] Order using this Court's ECF System, which will automatically send email notification to the following attorneys of record for all parties:

Darren W. Penn                          Hezekiah Sistrunk, Jr.
darren@hpllegal.com                     hez@sistrunklaw.com

David James Worley                      Jane Lamberti Sams
david@hpllegal.com                      jls@sistrunklaw.com

J. Antonio DelCampo                     Shean DeCarlos Williams
tony@hpllegal.com                       sdw@sistrunklaw.com

James M. Evangelista                    Jeffrey Emery Tompkins
jim@hpllegal.com                        j.tompkins@tkstlaw.com

Jeffrey R. Harris                       Thomas G. Sampson
jeff@hpllegal.com                       t.sampson@tkstlaw.com

  Respectfully submitted this 25th day of January, 2013.

                          **FRANZÉN AND SALZANO, P.C.**

                          /s/ Therese G. Franzén
                          Therese G. Franzén
                          Georgia Bar No. 492367

40 Technology Parkway South, Suite 202
Norcross, Georgia 30092-2906
(770) 248-2885 (Telephone)
(770) 248-2883 (Facsimile)
tfranzen@franzen-salzano.com
*Counsel for Defendants*