## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **DEKALB COUNTY, FULTON COUNTY, and COBB COUNTY, GEORGIA,** | : : : : | **CIVIL ACTION NO.** **1:12-CV-03640-SCJ** |
| **Plaintiffs,** | : : | |
| **v.** | : : | |
| **HSBC NORTH AMERICA HOLDINGS, INC., HSBC INVESTMENTS NORTH AMERICA INC., HSBC FINANCE CORPORATION, HSBC MORTGAGE CORPORATION, HSBC MORTGAGE SERVICES INC., HSBC MORTGAGE SERVICES WAREHOUSE LENDING INC., HSBC USA INC., HSBC BANK USA, NATIONAL ASSOCIATION, DECISION ONE MORTGAGE COMPANY, LLC, HSBC MARKETS (USA) INC., HSBC SECURITIES and HSBC CORPS 1-50,** | : : : : : : : : : : : : : : : : : | |
| **Defendants.** | | |

## ORDER

This matter appears before the Court on the Defendants' Motion to Dismiss

Plaintiffs' Complaint.  Doc. No. 16.

## I.  Factual Background

Plaintiffs DeKalb County, Fulton County, and Cobb County, Georgia, bring this action against the above-named Defendants (collectively, "HSBC")[1] pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA").  Doc. No. 1, p. 1, ¶ 1.  In their Complaint, Plaintiffs state that they "seek injunctive relief to remedy, and monetary damages for, Defendants' predatory and discriminatory residential mortgage lending and servicing activities [to include reverse redlining][2] that have resulted in - and will continue to cause -unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies in Plaintiffs' communities and neighborhoods, particularly those communities with high percentages of FHA protected minority residents."  Id. at ¶ 2.

On January 25, 2013, Defendants filed a Motion to Dismiss Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.  Doc. No. 16. Defendants specifically argue that (1) Plaintiffs lack standing and the Court does not

---

[1]  Defendants state that a number of the named defendants are not proper parties to this action, either because they are misidentified or because they did not originate residential mortgage loans in the Counties.  Doc. No. 16-1, p. 17 n. 4.  Defendants further state that the parties have conferred and are willing to work together to come to an agreement on proper parties in the event that the case goes forward.  Id.

[2]  Defined as "'the practice of extending credit on unfair terms' because of the plaintiff's race and geographic area."  Steed v. EverHome Mortg. Co., 477 F. App'x 722, 726 (11th Cir. 2012).

have subject matter jurisdiction over the Complaint; (2) Plaintiffs' FHA claims are barred by the statute of limitations; (3) the Complaint fails to state a claim upon which relief can be granted; and (4) the FHA does not permit disparate impact claims.

## II.  Legal Standard

The Fair Housing Act (FHA), 42 U.S.C. § 3604, provides in relevant part that it shall be unlawful to:

> make unavailable . . . a dwelling to any person because of race [or] color. . . to discriminate against any person in the terms, conditions, or privileges of sale . . . of a dwelling, or in the provision of services or facilities in connection therewith, because of race [or] color . . . or to make . . . or publish . . . any . . . statement . . . with respect to the sale . . . of a dwelling that indicates any preference, limitation, or discrimination based on race [or] color . . . .

42 U.S.C. § 3604(a)-(c).

Section 3605 of the FHA provides that:

> [i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605.[3]

---

[3] "[T]he term 'residential real estate-related transaction' means any of the following: (1) [t]he making or purchasing of loans or providing other financial assistance . . . (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate; and (2) [t]he selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605(b).

AO 72A
(Rev.8/82)

As to the matter of standing, challenges to subject-matter jurisdiction under Federal Rule of Civil Procedure "12(b)(1) motions to dismiss for lack of subject matter jurisdiction can be asserted on either facial or factual grounds. <u>Carmichael v. Kellogg, Brown & Root Serv., Inc.,</u> 572 F.3d 1271, 1279 (11th Cir. 2009). Defendants state that they have brought a **<u>facial</u>** attack in the case *sub judice*. Doc. No. 18, p. 26 (emphasis added). "Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint." <u>Carmichael</u>, 572 F.3d at 1279. "In a facial attack, . . . the court examines whether the complaint has sufficiently alleged subject matter jurisdiction. <u>Sinaltrainal v. Coca–Cola Co.</u>, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds by* <u>Mohamad v. Palestinian Auth.</u>, –––U.S. –––, 132 S. Ct. 1702 (2012). "For purposes of ruling on a motion to dismiss for want of standing, . . . the trial . . . court[] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." <u>Warth v. Seldin</u>, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206 (1975).

As to the matter of the statute of limitations, the Eleventh Circuit has held that "[a] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred" because "[a] statute of limitations bar is an affirmative defense, and . . . plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." <u>Lindley v. City of</u>

Birmingham, Ala., 515 F. App'x 813, 815 (11th Cir. 2013), *citing* LaGrasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).   In other words, "[a]t the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." Id., *citing* Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1288 n.13 (11th Cir. 2005).

As to the matter of stating a claim, the Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed if the facts as pled do not state a claim for relief that is plausible on its face.   Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2007) (explaining "only a complaint that states a plausible claim for relief survives a motion to dismiss"); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561–62, 570 (2007) (retiring the prior "unless it appears beyond doubt that the plaintiff can prove no set of facts" standard).  In Iqbal, the Supreme Court reiterated that although Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 129 S. Ct. at 1949.

In Twombly, the Supreme Court emphasized a complaint "requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555.  Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (internal citations and emphasis omitted).[4]

### III. Analysis

#### A. Standing

As stated above, in their Motion to Dismiss, Defendants argue that Plaintiffs lack standing and the Court does not have subject matter jurisdiction over the Complaint.

"[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005) (internal citations omitted).  The Supreme Court has

---

[4] The Court notes that the parties have made a number of argument as to whether it is proper to take judicial notice (at the present motion to dismiss stage of the case) of certain materials (*i.e.*, various newspaper articles) cited in the background section of the Defendants' motion. See Doc. No. 17, pp. 3-4; Doc. No. 18, p. 10. Plaintiffs object to the Court taking judicial notice of the matters asserted in the articles for purposes of the present motion on the ground that the Court would be making findings of fact on disputed matters directly at issue in the Complaint. Doc. No. 17, p. 5, n. 3.  The Court declines to take judicial notice of the newspaper articles as proof of facts at this stage of the litigation.  See Parrish v. Ala. Dept. of Corrs., 156 F.3d 1128, 1130 (11th Cir. 1998)  (holding that district court erred when it took judicial notice of newspaper article as proof of fact asserted in article).

AO 72A
(Rev.8/82)

called standing "perhaps the most important of [the jurisdictional] doctrines" in that it is a requirement that "has a core component derived directly from" Article III of the Constitution.[5] <u>Allen v. Wright</u>, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324 (1984); <u>see Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale</u>, 922 F.2d 756, 759 (11th Cir.1991) ("Before rendering a decision . . . every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings.").

There are three elements to Article III standing.  <u>Telesca v. Village of Kings Creek Condo. Ass'n</u>, Inc., 390 F. App'x 877, 880-81, (11th Cir. 2010), *citing* <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992) (alterations omitted) (internal citations and quotations omitted).

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

---

[5]  "'Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" <u>Hollingsworth v. Perry</u>, ---U.S. ----, 133 S. Ct. 2652, 2661 (2013).

Id.  "The party invoking federal jurisdiction bears the burden of establishing these elements."  Lujan, 504 U.S. at 561, 112 S. Ct. at 2136.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  Id.

The United States Supreme Court has held that "the sole requirement for standing to sue under [the Fair Housing Act] is the Art[icle] III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions [plaintiff] has suffered 'a distinct and palpable injury."  Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S. Ct. 1114, 1121 (1982).  The Supreme Court went on to state: "[a]s long as [plaintiffs] have alleged distinct and palpable injuries that are 'fairly traceable' to [defendant's] actions, the Art. III requirement of injury in fact is satisfied."  Id. at 376, 102 S. Ct. at 1122-23.

"Typically, . . .the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."  Allen, 468 U.S. at 752, 104 S. Ct. at 3325.

### 1. Injury in fact

As stated above, in order to satisfy the injury in fact component of standing, the Plaintiffs must demonstrate that they have suffered an injury in fact-an invasion of a

legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. See Lujan, 504 U.S. at 560-61; Bochese, 405 F.3d at 984 ("[T]o satisfy the injury prong of Article III standing, a plaintiff must 'present 'specific, concrete facts' showing that the challenged conduct will result in a 'demonstrable, particularized injury' to the plaintiff.' ") (internal citations omitted).

In their motion, Defendants argue that Plaintiffs have failed to allege a concrete harm that is fairly traceable to the Defendants' conduct.  Doc. No. 16-1, p. 28. Defendants state that Plaintiffs have not made a non-speculative factual allegation that they have actually suffered injury in connection with any property allegedly foreclosed upon by Defendants in that Plaintiffs do not  provide the address of a property where there might have suffered injury; identify a single borrower alleged to be the victim of discrimination; or identify records of property tax assessments, police or fire responses, or any expenses incurred in securing or rehabilitating a property. Id.[6]

The Defendants essentially argue that the harm is not "particularized" in the

---

[6]   The Court takes note of Plaintiffs' argument (and citation of authority) that the Defendants' arguments improperly conflate the injury in fact and fairly traceable components of the standing analysis. Doc. No. 17, p. 17, n. 15.  The Court further notes that the Eleventh Circuit has indicated that the standing concepts may at times blend into one another.  See Cone Corp. v. Florida Dept. of Transp., 92 F. 2d 1190, 1204 (11th Cir. 1991) (noting that each of the standing concepts may blend into the others, "the most important is the injury requirement."). Without more, the Court does not find that the Defendants' method of analysis is entirely in error.

absence of a showing as to the properties involved.  Doc. No. 18, p. 21.

In response, Plaintiffs argue that they have made numerous, particularized factual allegations of harm resulting from Defendants' broad equity stripping scheme, including the following paragraphs of the Complaint:

> • direct economic harm, such as out-of-pocket costs, losses in property lien recording fee revenue, a reduction in Plaintiffs' tax base resulting from an underlying decline in property values;
>
> • indirect, non-economic, injuries to the fabric of Plaintiffs' communities and constituents; and
>
> • a frustration of the purposes and missions of Plaintiffs' Housing Authorities, such as the reallocation of their human and financial resources to address the home foreclosures and vacancies caused by HSBC.

Doc. No. 1, ¶¶292-312; Doc. No. 17, p. 16.

Plaintiffs also reference the section in the Complaint in which they allege estimated, average, total damages from each foreclosure alleged to be caused by Defendants to range between $19,000 to $34,000, based on academic studies of the financial impact of foreclosures on communities.  Doc. No. 17, p. 16, citing Doc. No. 1, ¶¶318-319. Plaintiffs further allege that they face future harm from foreclosures resulting from Defendants' predatory and discriminatory lending and loan servicing practices. Doc. No. 1, ¶¶312-316.  Plaintiffs state that they have expressly limited their damages to those that are directly traceable to Defendants and for which Defendants are responsible.  Doc. No. 17, p. 16, citing Doc. No. 1, ¶¶ 304-306, 310, 319-321.

AO 72A
(Rev.8/82)

Plaintiffs argue full compliance with Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 S. Ct. 1601 (1978) in which the United States Supreme Court found that a municipal corporation had standing to pursue its FHA claim against real estate brokers for illegal racial steering.  Doc. No. 17, p. 18.  The Court agrees that Gladstone provides guidance as to the types of injuries that show injury in fact as to a municipal corporation (*i.e.*, depriving the village of its racial balance and stability, reduction in property values and tax base) and that Plaintiffs have alleged similar types of injuries.

Based on Gladstone, the Court finds that Plaintiffs' have satisfied their burden as to this component of the standing analysis.[7]

### 2.  Whether the injury is fairly traceable to the actions of HSBC

The "fairly traceable" component of standing "examines the causal connection between the assertedly unlawful conduct and the alleged injury . . . ." Allen, 468 U.S. at 753 n. 19, 104 S. Ct. at 3325.  "[T]he injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259, 1265 (11th Cir. 2011), citing Lujan, 504 U.S. at 560, 112 S. Ct. at 2136; see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 161 (4th Cir. 2000) ("'traceability' 'does not mean that plaintiffs must show to a scientific

---

[7]  The Court has thoroughly considered Defendants' arguments to the contrary and declines to uphold them.

11

certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs.'").

    As noted above, Defendants argue that Plaintiffs have failed to demonstrate the "causal connection between the injury and the alleged constitutional violation" necessary to invoke standing.  Doc. No. 16-1, p. 35.  Defendants state that the Complaint relates only generally to alleged policies and practices, and does not address the fundamental traceability gap between HSBC making a loan and causing damages to the Counties by identifying specific foreclosed properties that caused specific cognizable damages.  Doc. No. 16-1, p. 11.  Defendants argue that the three types of injury asserted by Plaintiffs (i.e., lost property tax revenue, crime, and rehabilitation costs) rely on lengthy, speculative, and attenuated casual chains that Defendants' actions caused the borrower to default, as opposed to some other factor such as illness, divorce, job loss, incarceration or death.  Id. at p. 30.  Defendants also note that each district court that has confronted the theories of causation advanced here — without the identification of specific, allegedly injury causing properties — has rejected them.  The Defendants cite Mayor and City of Baltimore v. Wells Fargo Bank, N.A., 677 F. Supp. 2d 847 (D. Md. 2010) and City of Birmingham v. CitiGroup, Inc., No. 09-BE-467-S, 2009 WL 8652915 (N.D. Ala. Aug. 19, 2009) in support of their

arguments.[8]

In <u>Birmingham</u>, the district court considered the city's allegations of reverse redlining and found that the alleged injuries to the city (of decreased property values, lost tax revenue, extra costs for crime and fire prevention) met the first standing component of injuries in fact;[9] however, failed to satisfy the second standing component in that the injuries were "too tenuously connected, and . . . not fairly traceable, to the [d]efendants' alleged misconduct." 2009 WL 8652915 at * 5.  The court held, *inter alia*, that "a series of speculative inferences must be drawn to connect the injuries asserted with the alleged wrongful conduct by the [d]efendants" in that the borrowers could have defaulted on their mortgages for a number of reasons, to not include reverse redlining."  <u>Id.</u> at *4.

In <u>Baltimore</u>, the district court was very concerned as to the plausibility of the causal connection between the defendant's alleged reverse redlining procedures and the "generalized type of damages" claimed by the City (*e.g.,* decline in value of homes, decreased property tax revenues, increased criminal and gang activity, and increased

---

[8]  The Defendants also cite <u>City of Cleveland v. Ameriquest Mortg. Sec., Inc.,</u> 621 F. Supp. 2d 513 (N.D. Ohio 2009) in support of their arguments.  However, the Court notes that the <u>Cleveland</u> case was based upon a public nuisance theory and is not directly analogous to the present FHA claim.

[9]  The Court cited <u>Gladstone</u> in support of its finding.  2009 WL 8652915 at *3.

AO 72A
(Rev.8/82)

police and fire protection resulting from building vacancies).  677 F. Supp. 2d at 850.[10]

After consideration, the district court dismissed the City's amended complaint as to the generalized claim, but allowed the city to pursue "a more limited claim" for "specific damages allegedly suffered by the City in regard to specific houses that became vacant allegedly caused by [the bank's] lending activities or a claim for damages allegedly caused to a specific neighborhood in which [the bank] made enough allegedly improper loans that its activities bear a plausible causal relationship to the destruction of the neighborhood."  Id.  The City addressed the Court's concerns by amending its complaint and identifying 190 vacant properties that defendant had foreclosed upon and for which the City provided municipal services post-foreclosure.  2011 WL 1557759 at n. 2.  On review of a third amended complaint, the district court allowed said complaint to go forward, distinguishing Birmingham on the ground that those "plaintiffs sought sweeping damages but presented only general and conclusory allegations of harm."  Id. at * 5.

In response, Plaintiffs argue that Defendants' extensive reliance on Baltimore and Birmingham is misplaced and misdirects the Court as to the law.  Doc. No. 17, p. 22.  Plaintiffs state that their Complaint addresses all of the short-comings noted in the Birmingham case, by plausibly establishing causation at this initial stage of pleading

---

[10]  There were a series of orders and amended complaints in the Baltimore case.  The Third Amended Complaint was eventually allowed to proceed.  2011 WL 1557759.

without any need to identify specific property addresses that were relied on to sustain the complaint in Baltimore.  Doc. No. 17, p. 26.

Plaintiffs argue that the binding Supreme Court decisions in Havens, Arlington Heights and Gladstone, among other precedent, and the express language of the FHA itself, clearly do not require such unreasonably specific allegations at the pleading stage to establish standing or causation under the FHA.  Doc. No. 17, p. 24.[11]  In

---

[11]   In Havens, the United States Supreme Court reviewed the question of organizational standing under the FHA in the context of allegations of racial steering.  The Court concluded that "[i]f as broadly alleged, [the apartment complex's] steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for . . . homeseekers, there can be no question that the organization has suffered injury in fact."  455 U.S.  at 379, 102 S. Ct. at 1124.

In Arlington Heights, the United States Supreme Court considered an organization's standing to assert its right to be free from arbitrary or irrational zoning actions.  429 U.S. at 263, 97 S. Ct. at 562.  The Court held that "[i]t has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing" Id. at 262-63.  The Court went on to hold that the specific project that the organization intended to build provided that "essential dimension of specificity" that informs judicial decisionmaking so that the organization met the constitutional requirement for standing.  Id. at 263.

In Gladstone, the Supreme Court stated:
> The adverse consequences attendant upon a "changing" neighborhood can be profound.  If petitioners' steering practices significantly reduce the total number of buyers in the Bellwood housing market, prices may be deflected downward. This phenomenon would be exacerbated if perceptible increases in the minority population directly attributable to racial steering precipitate an exodus of white residents. A significant reduction in property values directly injures a  municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services. Other harms flowing from the realities of a racially segregated community are not unlikely. As we have said before, "[t]here can be no question about the importance" to a community of "promoting stable, racially integrated housing." If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that

summary, Plaintiffs argue that (1) there is no binding precedent requiring specific property address allegations in order to demonstrate traceability and plead a "plausible" FHA claim in the context of litigation involving broad discrimination schemes; (2) creating such a requirement would conflict with the FHA's "broad and inclusive" language that must be given generous   construction; (3) Plaintiffs' allegations in the Complaint (of active concealment, governmental and industry findings; and empirical data)[12] go far beyond those in <u>Birmingham</u>, <u>Baltimore</u>, and

---

conduct.  441 U.S. at 110-111, 99 S. Ct. at 1613 (some citations omitted).

[12]  Plaintiffs reference the following paragraphs of the Complaint: 14, 148, 189, 191, 196-199, 200-204, 205-219, 232-242, 243-254, 255-259, 260-271, 285, 290, 297, 298, 298, 304, 306, 310, 319-320.  Doc. No. 17, p. 31.

More specifically, the active concealment allegations concern Defendants' corporate structure, use of MERS, and internal loan origination reporting. Doc. No. 17, p. 30. The Court recognizes Defendants' arguments concerning the validity of MERS.  It is not necessary to resolve said arguments at this stage of the litigation.

An example of the governmental and industry findings alleged in the Complaint is as follows:
The foreclosure crisis throughout the United States, and within Plaintiffs' neighborhoods and communities leading up to the current period, result from the predatory lending activities of the mortgage industry, Report to Congress on the Root Causes of the Foreclosure Crisis, Report of Department of Housing and Urban Development (January 2010) (hereafter, the "Root Causes Report"), including the predatory and discriminatory lending activities of Defendants that are alleged here. Thus, the foreclosure crisis was not caused by either borrower behavior or general economic conditions, but was due to the inherent risk of foreclosure in the mortgage loan products themselves, e.g. the high cost, subprime, ALT-A and other conforming loan products with predatory features (e.g., prepayment penalties and adjustable interest rates) discriminatorily sold to minority borrowers at issue here. See Congressional Testimony of Keith S. Ernst, Center for Responsible Lending, before the Joint Economic Committee of Congress, "Current Trends in Foreclosure and What More Can be Done to

16

Prevent Them" (July 28, 2009) ("Ernst Testimony") (available at http://www.jec.senate.gov/public/?a=Files.Serve&File_id=36d87b93-a0a6-47b4-96ad-1475c70dc9ce).

Doc. No. 1, p. 103, ¶243.

The following excerpted paragraphs are examples of the Complaint's empirical data allegations:

260.  Prior to the predatory and discriminatory lending practices of Defendants and other industry participants alleged herein, Plaintiffs had no "high foreclosure risk" (HFR) areas as defined and designated by the U.S. Department of Housing & Urban Development (HUD) and historical annual foreclosure rates were averaging below approximately 1% in the Atlanta [Metropolitan Statistical Area]. HUD designated HFR areas reflect neighborhood characteristics that are estimated by HUD to have a high level of risk for foreclosure – e.g., those neighborhoods with a relatively high concentration of high cost loans and highly leveraged loans (high mortgage loan to income ratios), among other factors.

261.  Subsequent to and during the predatory and discriminatory lending and servicing practices of Defendants and other industry participants alleged herein, Plaintiffs experienced a massive increase in the number of high cost and highly leveraged loans made within Plaintiffs' neighborhoods and communities with high populations of FHA protected minority borrowers leading to numerous HUD designated HFR areas. Indeed, the level and severity of the risk of foreclosures across the nation and in Plaintiffs' communities and neighborhoods become so great that HUD changed its HFR ranking system from a scale of 1-10 (10 being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas).

 . . . .

264.  In DeKalb County, the initial foreclosure rates from 2004 through 2006 in census tracks with demographics of less than 40% FHA protected minority homeowners increased from the historical 1% to approximately 6%.  However, the initial foreclosure rates in census tracks with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was over 9%, 12% and 18%, respectively, reflecting nearly a 300% increase in foreclosure rates between census tracks with demographics of less than 40% FHA protected minority homeowners and 80%-100% FHA protected minority homeowners.

17

265. Similarly, in Fulton County, the initial foreclosure rates from 2004 through 2006 in census tracks with demographics of less than 40% FHA protected minority homeowners had jumped from the historical 1% to approximately 7%. However, the initial foreclosure rates in census tracks with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was approximately 11%, 13% and 18%, respectively, reflecting nearly a 275% increase in foreclosure rates between census tracks with demographics of less than 40% minority homeowners and 80%-100% minority homeowners.

266. In Cobb County, the initial foreclosure rates from 2004 through 2006 in census tracks with demographics of less than 40% FHA protected minority homeowners had jumped from the historical 1% to approximately 8%. However, the initial foreclosure rates in census tracks with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was 11%, 11% and 13%, respectively, reflecting nearly a 62% increase in foreclosure rates between census tracks with demographics of less than 40% minority homeowners and 80%-100% minority homeowners.

. . . .

268. Of the 1,958 reported total loans Defendants made in DeKalb County between 2004 and 2007 to FHA protected minority borrowers, at least 1,684 of those loans (approximately 86%) ended up in the highest two foreclosure risk areas (designated 19 and 20 by HUD) in DeKalb County. Similarly, of the 1,484 reported total loans Defendants made in Fulton County between 2004 and 2007 to FHA protected minority borrowers, at least 1,200 of those loans (approximately 81%) were in the highest two foreclosure risk areas in Fulton County. Of the 931 reported total loans Defendants made in Cobb County between 2004 and 2007 to FHA protected minority borrowers, at least 587 of those loans (over 63%) were in the highest two foreclosure risk areas in Cobb County.

269. Of the 2,433 loans Defendants made in DeKalb County between 2004 and 2007 (and reported the minority status), 1,684 of those loans (approximately 70%) were to FHA protected minority borrowers and ended up in the highest foreclosure risk census tracks compared to just 97 loans (under 4%) made to Caucasian borrowers that ended up in the highest foreclosure risk census tracks. Of the 2,513 loans Defendants made in Fulton County between 2004 and 2007 (and reported the minority status), 1,200 of those loans (approximately 48%) were to FHA protected minority borrowers and ended up in the highest foreclosure risk census tracks compared to just 537 loans (approximately 21%) made to Caucasian borrowers that ended up in the highest foreclosure risk census tracks.

<u>Memphis</u>[13] regarding the causal link between HSBC's predatory and discriminatory conduct at issue, the resulting vacancies and foreclosures, and the injuries caused to Plaintiffs, while also narrowing damages to only those actually caused by HSBC. Doc. No. 17, pp. 28-29.[14]

The Court notes that it has been held that in a standing analysis, it is instructive to compare the case at issue with previously decided, factually similar cases. <u>Birmingham</u>, 2009 WL 8652915 at *3; <u>see also</u> <u>Allen</u>, 468 U.S. at 752, 104 S. Ct. at 3325 ("In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases. . . . Determining standing in a particular case may be facilitated by clarifying principles or even clear rules developed in prior cases."). However, the standing inquiry still

_____

Doc. No. 1.

    [13] In <u>City of Memphis v. Wells Fargo Bank, N.A.</u>, No. 09-2857, 2011 WL 1706756 (W.D. Tenn. May 4, 2011), the district court found that the defendant bank's arguments concerning lack of an injury fairly traceable to defendant's conduct failed. The court based its decision on the city having supported their allegations of harm (*i.e.*, cost of increased government services and loss of property tax revenue) with the identification of fifty properties representing a number of addresses affected by defendant's alleged lending practices. <u>Id.</u> at * 9. The court stated that "[b]y focusing on these addresses and others like them where allegedly predatory [bank] loans actually resulted in foreclosures and vacancies, . . . [p]laintiffs . . . narrowed the potential damages . . . [and] plausibly allege[d] that [said] limited damages are fairly traceable to [d]efendant's illegal conduct." <u>Id.</u>

    [14] Plaintiffs reference FHA class actions as a corollary. However, Defendants respond (and the Court agrees) that the presumptions of a Rule 23 class action are not applicable to this case in the absence of allegations that the Counties were discriminated against or represent victims of discrimination. Doc. No. 18, p. 24, n. 11.

requires "careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Allen, 468 U.S. at 752, 104 S. Ct. at 3325.

After comparing this case with the factually similar cases of Baltimore, Birmingham, and Memphis, as well as after conducting a careful judicial examination of the Complaint's allegations, the Court finds that Plaintiffs' Complaint (containing governmental and industry findings, as well as empirical data) goes beyond the general, speculative, and conclusory allegations that were of concern in the Baltimore and Birmingham cases.   The Court further notes that while the complaint in the Memphis case did reference specific properties, the holding in Memphis did not determinatively establish that reference to specific properties was a requirement to standing.

The Court finds that the Plaintiffs' Complaint satisfies the second (i.e., fairly traceable) component of standing in that the government and industry findings, as well as the empirical data contained in the Complaint raise the pleadings above the speculative level.   Cf. Maya v. Centex Corp., 658 F. 3d 1060, 1073 (9th Cir. 2011) (indicating that expert testimony could be used in amended complaint to establish standing and "to explain the causal connection between defendants' actions (i.e., lending practices) and plaintiffs' injuries (i.e., reduction in home value), even in the

context of market forces.").

The Court further recognizes that at the conclusion of discovery, specific property information will be readily available.[15]  While, as stated above, the Court finds that the Plaintiffs have satisfied their burden of showing that they have standing under the present allegations of the Complaint, *in the interest of caution*, the Court **ORDERS** that within thirty (30) days of the completion of discovery, the Plaintiffs shall amend their Complaint to add the properties that they allege were affected by discriminatory loans and from which they suffered injury.  See Warth, 422 U.S. at 501, 95 S. Ct. at  2206-07 ("it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."); and Havens, 455 U.S. at 378; 102 S. Ct. at 1124 (affording the parties (on remand) an opportunity to make more definite averments as to standing).

### 3.  Organizational Harm as an Independent Basis for Standing

Plaintiffs also argue that their allegations of organizational harm provide an independent basis for standing in that "[i]t has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing" under the FHA.

---

[15]  The Court recognizes that Plaintiffs argue present "difficulty" at the pleading stage (without the opportunity for discovery) of being able to identify "even a sample of the properties affected by a discriminatory loan."  Doc. No. 17, p. 30 n. 29; p. 31.

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 262-63 (1977).

Plaintiffs state that the have alleged concrete "injury in fact" allegations that HSBC's activities caused non-monetary, organizational harm by draining Plaintiffs' limited resources and caused other injuries that the FHA is designed to remedy:

> • Plaintiffs' housing authorities were frustrated in their purposes and missions "to foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for its residents at large" and had to "reallocate its human and financial resources away from its missions and purposes in order to address the foreclosure and home vacancy crisis caused in part by the discriminatory and predatory subprime mortgage lending practices, including those of" HSBC (Complaint, Doc. No. 1, ¶311);
>
> • Plaintiffs' have been required to "shift dwindling resources to address problems created by . . . vacancies and foreclosures" including that "Plaintiffs' housing, code enforcement and law departments" have incurred "substantial personnel time" in order to "inspect, investigate and respond to violations" and take "legal action to investigate and prosecute housing code violations" and Plaintiffs' law departments' task of identifying responsible parties has been "made all the more difficult" because mortgage lien transfers and assignments were not properly recorded (Complaint, ¶¶300-302); and
>
> • Plaintiffs' "hardest hit neighborhoods and communities" have been harmed by "deterioration and blight." See, e.g., Complaint, ¶¶24, 292, 295, 311, 321.

In response, Defendants argue that Plaintiffs' organizational standing arguments are unavailing because it does not relieve the Plaintiffs of the obligation to demonstrate that any injury is fairly traceable to HSBC. Doc. No. 18, p. 9, citing Doe

v. Pryor, 344 F.3d 1282, 1285 (11th Cir. 2003) (quoting Lujan v. Defenders of Wildlife,

504 U.S. 555, 560 (1992) (emphasis in original)); see also Nat'l Alliance for Mentally Ill,

St. Johns Inc. v. Bd of Cnty Com'rs of St. Johns Cnty,  376 F.3d 1292, 1294 -95 (11th Cir.

2004) ("There are at least three distinct forms of standing: taxpayer standing,

individual standing, and organizational standing. To establish standing under any one

of these, a party must 'demonstrate that he has suffered 'injury in fact,' that the injury

is 'fairly traceable' to the actions of the defendant, and that the injury will likely be

redressed by a favorable decision.'") (internal citations omitted).

The Court upholds Plaintiffs' argument and agrees that they have

organizational standing.  The Court incorporates its ruling in Section III(A)(2) of this

Order, *supra*, and further finds that the allegations of the Complaint satisfy the fairly

traceable component of organizational standing.

  **4.  whether there is an independent basis for subject matter jurisdiction**
Plaintiffs argue that because of HSBC's 12(b)(1) factual attack on Plaintiffs'

causation and traceability allegations, the merits of Plaintiffs' single FHA cause of

action are intertwined with the basis for the Court's standing and federal subject

matter jurisdiction. Doc. No. 17, p. 32.  Consequently, "the proper course of action for

the district court . . . is to find that jurisdiction exists and deal with the objection as a

direct attack on the merits of the plaintiff's case . . . "  Doc. No. 17, p. 32.

23

The Court will adopt the analysis and procedure of the <u>Memphis</u> court to this regard.  In <u>Memphis</u>, the court did not consider factual attacks, but found that the Defendants' arguments that "[p]laintiffs have not pled an injury fairly traceable to [d]efendants' conduct goes to the merits of [p]laintiffs' FHA claims, that is, whether there is a causal connection between [d]efendants' allegedly predatory lending and housing vacancies in Memphis-Shelby County."  2011 WL 1706756 at *10.  The court concluded that "[u]nder the circumstances, . . . the proper course is to assume jurisdiction over this case and proceed to consider whether [p]laintiffs have stated a plausible claim for relief."  <u>Id.</u>

Accordingly, it appearing that the Defendants' arguments that Plaintiffs have not pled an injury that is fairly traceable to their alleged conduct goes to the merits of this FHA action, the Court will assume jurisdiction (to the extent that the above-stated analysis on the injury in fact and fairly traceable components of standing is later deemed to not be determinative) and move forward with the remainder of the motion to dismiss.[16]

## B.  Statute of Limitations

As stated above, in their Motion to Dismiss, Defendants argue that Plaintiffs'

---

[16]  The Court declines to uphold Defendants' argument attempting to distinguish <u>Memphis</u> on the ground that Defendants are only bringing a facial attack – as the court in <u>Memphis</u> appeared to disregard the factual attack in reaching its conclusion.

FHA claim is barred by the statute of limitations.

The FHA provides that "[a]n aggrieved person may commence a civil action … not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." See 42 U.S.C. § 3613(a)(1)(A).  Here, the housing practices at issue are: predatory and discriminatory residential mortgage lending and servicing activities (to include reverse redlining).  Doc. No. 1, p. 2, ¶ 2; ¶ 333.  See Garcia v. Brockway, 526 F.3d 456, 462 (9th Cir. 2008) (indicating that "[t]he Supreme Court has 'stressed the need to identify with care the specific [discriminatory] practice that is at issue.'"), citing Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S. Ct. 2162, 2167 (2007).

The Eleventh Circuit has held that "[t]he FHA's statute of limitations begins to run as soon as facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." Telesca, 390 F. App'x at 882 (internal citations omitted).  It has also been held that the statute begins to run under the FHA "on the date the Plaintiff obtains a discriminatory loan." Federer v. Midland Mortg. Co., No. 1:12-CV-2492-TWT, 2012 WL 5880916, at *3 (N.D. Ga. Nov. 21, 2012), citing Estate of Davis v. Wells Fargo Bank, 633 F.3d 529, 532 (7th Cir. 2011).

A review of the record shows that Plaintiffs filed their Complaint on October 18, 2012, alleging a single claim under the FHA. Doc. No. 1, p. 139. As noted above, the

statute of limitations under the FHA is two years, which means that the Plaintiffs were required to allege that HSBC made discriminatory loans and engaged in discriminatory servicing activities within the two years prior to the filing of the Complaint (*i.e.*, loans made on or after October 18, 2010 and servicing activities on or after October 18, 2010).  Doc. No. 16-1, p. 19.  The Plaintiffs' allegations relating to discriminatory subprime mortgage lending begin in 2003 and end in 2007.  There are no allegations of loans made on or after October 18, 2010 in the Complaint.  The statute of limitations allegations in the Complaint relating to discriminatory servicing activities are that the "Defendants continue to service [predatory and discriminatory] loans and continue to receive periodic payments on outstanding predatory and discriminatory loans at issue here and such loans continue to become delinquent and defaulted on, leading to property vacancies and foreclosures."  Doc. No. 1, p. 119, ¶ 272; see also ¶¶ 272-291.

After review, the Court finds that Defendants have carried their initial burden of making a showing that the statute of limitations defense is applicable. Blue Cross and Blue Shield of Ala. v. Weitz, 913 F.2d 1544, 1552 (11th Cir. 1990) ("Because raising of the statute of limitations is an affirmative defense . . . defendant has the initial burden of making a showing that the statute of limitations defense is applicable . . . .").  Once a defendant carries its burden, the burden shifts to the plaintiff to demonstrate

that an exception or tolling provision applies.  <u>Blue Cross</u>, 913 F.2d at 1552 n. 13.

In their brief in opposition to the Defendants' motion to dismiss, Plaintiffs argue the continuing violations doctrine.  Doc. No. 17, p. 8.  Plaintiffs state that the "continuing and renewed discriminatory effect of each payment on each loan (and refinance) made under discriminatory pricing policies should not be ignored for statute of limitation purposes and also argue that "the last component of [Defendants'] equity stripping scheme [alleged in the Complaint] is the foreclosure itself."  Doc. No. 17, p. 9.  More specifically, Plaintiffs argue that the two-year statute of limitations "will not even begin to run until the last predatory and discriminatory mortgage loan originated or purchased by HSBC in Plaintiff[s'] communities (including any refinances of such loans) is foreclosed upon and HSBC ceases servicing it."  <u>Id.</u> at pp. 10 – 11.[17]  In response, the Defendants argue that such a notion turns the equitable principles underpinning the statute of limitations on their head in that such an approach would essentially create a 30-year (or life of the mortgage) statute of limitations under the FHA.  Doc. No. 18, p. 12, 13.

---

[17]  The Court notes a possible contradiction in the allegations of the Complaint as to assertions that the discriminatory servicing is still ongoing in that there are also allegations in the Complaint that in April 2011, Defendants entered into a Consent Order with the Federal Reserve "in which Defendants agreed to implement a variety of changes to their mortgage servicing practices . . . . " Doc. No. 1, p. 90, ¶ 214.  The Complaint further alleges that the Consent Order was also "to ensure that Defendants' mortgage servicing operations were operated in a safe and sound manner and in compliance with the terms of the mortgage loan documentation and related agreements with borrowers." <u>Id.</u> at  ¶ 289.

AO 72A
(Rev.8/82)

In order to resolve the statute of limitations issue, the Court must consider the continuing violations doctrine.

### 1.  Continuing violations doctrine

Under the continuing violations doctrine, "[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years][18] of the last asserted occurrence of that practice." Havens, 455 U.S. at 380–81, 102 S. Ct. at 1125.[19]  "The courts that have found a continuing violation of the FHA have done so in cases involving multiple plaintiffs alleging multiple, specific, and ongoing acts of discrimination, on specific dates, as opposed to general assertions that the defendants engaged in discriminatory practices." Federer, 2012 WL 5880916, at * 3, citing Grimes v. Fremont Gen. Corp., 785 F. Supp.2d 269, 292 (S.D. N.Y. 2011); see also Hargraves v. Capital City Mortg. Corp., 140 F. Supp.2d 7, 18 (D.D.C. 2000) ("The theory applies where defendants commit "repeated, but distinct, discriminatory acts, some inside and some outside the

---

[18]  At the time of the Havens decision, the applicable statute of limitations was 180 days.  The FHA now provides for a two year statute of limitation.  See 1988 Fair Housing Amendments Act, Pub. L. 100-430, 102 Stat. 1619 (1988).

[19]  The Court Havens in also indicated that a wooden application of the FHA, which ignores the continuing nature of the alleged violation, undermines the broad remedial intent of Congress embodied in the Act.  Havens, 455 U.S. at 380.

limitations period."), citing <u>Guerra v. Cuomo</u>, 176 F.3d 547, 551 (D.C. Cir. 1999).

The continuing violation doctrine is based on "the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." <u>Hipp v. Liberty Nat. Life Ins. Co.</u>, 252 F.3d 1208, 1222 (11th Cir. 2001) (quotation omitted); <u>Hawkins v. Hamlet, Ltd.</u>, 296 F. App'x 918, 920 (11th Cir. 2008). "Where [the continuing violations doctrine] applies, the doctrine delays 'the commencement of the statute of limitations period. . . until the last discriminatory act in furtherance of' the alleged discriminatory policy." <u>Grimes</u>, 785 F. Supp.2d at 292.

Plaintiffs have the burden of demonstrating that the continuing violations doctrine applies. <u>Blue Cross</u>, 913 F.2d at 1552 n.13.

The Eleventh Circuit has noted that "[t]he critical distinction in the continuing violation analysis . . . is whether the plaintiff[ ] complain[s] of the present consequence of a one time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." <u>Lovett v. Ray</u>, 327 F.3d 1181, 1183 (11th Cir. 2003) *citing* <u>Knight v. Columbus, Ga.</u>, 19 F.3d 579, 580-81 (11th Cir. 1994). <u>See also Garcia</u>, 526 F.3d at 462 ("Put differently, '[a] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation.'"). This question lies at the heart of the parties' arguments in that Plaintiffs

argue that in performing its analysis, the Court should consider each payment made under the alleged predatory loan, servicing acts, and the ultimate foreclosure (as the last component of the equity stripping scheme) in computing the statute of limitations. In contrast, Defendants argue that servicing and foreclosures do not extend the statute of limitations under the continuing violation doctrine; that Plaintiffs' must identify a specific act or occurrence alleged to violate the law within the limitations period; and "[a]dopting the approach the [Plaintiffs'] advocate would create a 30-year [or life of the loan] statute of limitations under the FHA."  Doc. No. 18, p. 13.

A review of the case law shows that there is a split of authority among the district courts that have considered similar arguments. See e.g.,[20] Hargraves, 140 F. Supp. 2d at 7 (concluding that the allegations that defendants' lending practices that included "churning" loans through multiple foreclosures on the same property, higher than average rates of foreclosure, and fraudulent fees and penalties "were sufficient to demonstrate a pattern of repeated violations" under a continuing violations analysis; also stating in the context of the defendant's "continuing effects" argument that "the character of defendants' activities would need to be examined at trial before a determination can be made as to whether those activities were independently

---

[20] The Court only cites example cases here.  The Court recognizes that both parties have cited numerous other cases (with similar holdings) in support of their respective positions.  See Doc. Nos. 16-1, pp. 22-23; 17, p. 9; 18, p. 14.

discriminatory"); <u>Federer v. Midland Mortg. Co.</u>, No. 1:12-CV-2492-TWT, 2012 WL 5880916, at *3 (N.D. Ga. Nov. 21, 2012) (holding that the statute of limitations would be rendered meaningless if any loan made with a discriminatory animus were subject to a continuing violation doctrine provided that subsequent assignees and servicers invoke their rights under the loan and further finding that plaintiff had "not alleged any discriminatory act made after the loan issued that could invoke the continuing violations doctrine"); <u>see also</u> <u>Taylor v. Accredited Home Lenders, Inc.</u>, 580 F. Supp. 2d 1062, 1066 (S.D. Cal. 2008) (holding that "each mortgage statement that seeks inflated payments for the loan based upon discriminatory terms is a violation visited upon [p]laintiff.").  There is no Eleventh Circuit case on point.

The Court finds that <u>Federer</u> is not determinative of the present issue in that the analysis addressed "subsequent assignees and servicers" who invoked their rights under an alleged discriminatory loan.  2012 WL 5880916.  The present case involves allegedly discriminatory loans issued and retained for servicing by Defendants – and for which Plaintiffs allege discriminatory servicing in the context of an illegal scheme. Doc. No. 1, ¶¶ 272-273.

In the absence of direct authority from the Eleventh Circuit, and it appearing that <u>Federer</u> is distinguishable, the Court will adopt the approach of the <u>Hargraves</u> court, in which, as stated above, the court permits the character of the Defendants'

activities to be examined again at summary judgment – or at trial.

Next, the Defendants argue that Plaintiffs cannot rely on the continuing violations doctrine here because the Counties were aware of the bases for their purported FHA claim long before expiration of the limitations period.  Doc. No. 16-1, p. 20.  Defendants further argue that "[t]here can be no reasonable dispute that the Counties were aware of their alleged claims for many years before they filed the Complaint."  Doc. No. 16-1, p. 25.  Defendants essentially argue that the Plaintiffs "slept on their rights" and are out of time.  Doc. No. 16-1, p. 26 (internal citations omitted).

The continuing violation doctrine "is premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." Hipp, 252 F.3d at 1222 (citation omitted).  The Eleventh Circuit has stated that it has "limited the application of the continuing violation doctrine to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred." Center for Biological Diversity v. Hamilton, 453 F.3d 1331, 1335 (11th Cir. 2006) (internal citations omitted).  Accordingly, "[i]f an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine . . . ." Id.,

AO 72A
(Rev.8/82)

citing <u>Hipp</u>, 252 F.3d at 1222.[21]

Plaintiffs state that they should be afforded an opportunity to make an appropriate evidentiary submission as to the date of their discovery of the basis of their claims.  Doc. No. 17, p. 11, n. 9.  The Court agrees and finds that the statute of limitations issue should be decided after evidentiary submission (and under a summary judgment analysis).[22]

### C.  Failure to state a claim

As stated above, in their Motion to Dismiss, Defendants argue that the Complaint fails to state a claim upon which relief can be granted.

As stated above, in their Motion to Dismiss, Defendants argue that the Complaint fails to state a claim upon which relief can be granted.

---

[21] <u>See</u> <u>Barkley v. Olympia Mortg. Co.</u>, No. 04CV875, 2007 WL 2437810, 17 (E.D. N.Y. Aug. 22, 2007) ("In predatory lending cases, courts typically deem plaintiffs to be aware of their claims as of the date on which they meet with counsel.").

[22] The Court recognizes that Plaintiffs have also asserted the doctrine of equitable tolling, which is an extraordinary remedy that "allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations to begin running on the plaintiff's claims." <u>Arce v. Garcia</u>, 434 F.3d 1254, 1261 (11th Cir. 2006). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418, 125 S. Ct. 1807 (2005).  The Court finds that, like the continuing violation analysis, a proper resolution of the due diligence component of the doctrine of equitable tolling will require evidentiary submissions, inclusive of information as to the timing of the Plaintiffs' knowledge of the alleged discrimination.  In the absence of said evidence, the Court cannot determine the equitable tolling matter at this stage of the litigation.

33

To state a specific and plausible reverse redlining claim, the Plaintiffs must allege "that the defendants' lending practices and loan terms were unfair and predatory, and that the defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race." <u>Steed v. EverHome Mortg. Co.</u>, 308 F. App'x 364, 368 (11th Cir. 2009) (internal quotations and citation omitted).[23] "[P]redatory lending practices include exorbitant interest rates, equity stripping, acquiring property through default, repeated foreclosures, and loan servicing procedures that involve excessive fees . . . . [W]hether the practices alleged occurred, and whether the practices were unfair and predatory, is a jury question." <u>Id.</u> at 369.

### 1. allegations that Defendants' lending practices and loan terms were unfair and predatory

As stated above, to state a plausible reverse redlining claim, the Plaintiffs must allege that the Defendants' lending practices and loan terms were unfair and predatory. After review, the Court finds that the allegations of the Complaint meet this requirement.

### 2. allegations of intentional targeting on the basis of race

As a reverse redlining case may be established based on either intentional targeting or disparate impact – and the Court having found (in the next section of this Order) Plaintiffs' disparate impact allegations to be sufficient, in the interest of judicial

---

[23] <u>See</u> 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

34

economy, the Court declines to engage in a full analysis of Defendants' arguments regarding intentional targeting.

### 3.  allegations of disparate impact

As stated by Defendants, to "plausibly" plead disparate impact, the Complaint must set forth (i) a specific and clearly delineated practice or policy adopted by the defendant; (ii) a disparate impact on a protected group; and (iii) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact. Doc. No. 16-1, p. 37; citing Wards Cove Packaging Co. v. Atonio, 490 U.S. at 657-58; Smith v. City of Jackson, 544 U.S. at 241; EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274 (11th Cir. 2000); Paige v. California, 291 F.3d 1141, 1144-45 (9th Cir. 2002); see also Hallmark Developers, Inc. v. Fulton Cnty, GA, 466 F.3d 1276, 1286 (11th Cir. 2006) (holding, post-City of Jackson, that a disparate impact claim under the FHA "[t]ypically . . . is demonstrated by statistics"; "no single test controls in measuring disparate impact," and "the appropriate inquiry is into the impact on the total group to which a policy . . . applies.").

#### (i) a specific and clearly delineated practice or policy and a disparate impact on a protected group

As stated above, to plausibly plead disparate impact, the Complaint must set forth a specific and clearly delineated practice or policy adopted by the defendant that had a disparate impact on a protected group.

Plaintiffs state that they have extensively alleged specific details of several interrelated, discriminatory, HSBC corporate policies that are part and parcel of HSBC's intentional equity stripping scheme, to include: steering credit worthy borrowers to more costly loans,[24] reverse-redlining,[25] Discretionary Pricing Policy,[26] Underwriting Policy,[27] Appraisal & Overrides Policies,[28] and Servicing Policies.[29] Doc. No. 17, p. 35.  Plaintiffs also allege that Defendants uniformly implemented and enforced their steering, discretionary pricing and underwriting policies through a variety of mechanisms including direct financial incentives, uniform pricing rate sheets, and management override policies.  Doc. No. 17, p. 35, citing Complaint, ¶¶123-135.  Plaintiffs further state that they have alleged specific empirical data reflecting the disparate impact of Defendants' policies on minorities within Plaintiffs' communities.  Doc. No. 17, citing Complaint, ¶¶ 136-141; 142-146; 260-267; and 268-270.  An excerpt of said statistical evidence is as follows:

Of the 2,433 loans Defendants made in DeKalb County between 2004 and 2007

---

[24]  Complaint, ¶¶5-6,60-61,100,134,184, 193,246-250, 328.

[25]  Id. at ¶¶47,136-146,148,333.

[26]  Id. at ¶¶102-116.

[27]  Id. at ¶¶117-122.

[28]  Id. at ¶¶123-130.

[29]  Id.

AO 72A
(Rev.8/82)

(and reported the minority status), 1,684 of those loans (approximately 70%) were to FHA protected minority borrowers and ended up in the highest foreclosure risk census tracks compared to just 97 loans (under 4%) made to Caucasian borrowers that ended up in the highest foreclosure risk census tracks. Of the 2,513 loans Defendants made in Fulton County between 2004 and 2007 (and reported the minority status), 1,200 of those loans (approximately 48%) were to FHA protected minority borrowers and ended up in the highest foreclosure risk census tracks compared to just 537 loans (approximately 21%) made to Caucasian borrowers that ended up in the highest foreclosure risk census tracks.

Doc. No. 1, p. 118, ¶ 269.

In their motion to dismiss, Defendants argue that the Complaint "is completely devoid of allegations of a specific and clearly delineated policy or practice that had a disparate impact on a protected class." Doc. No. 16-1, p. 37. The Court does not agree. The Court finds that Plaintiffs have set forth specific and clearly delineated policies and practices for which they claim had a disparate impact on minorities – the Court finds that use of the word "minorities," combined with other allegations of the Complaint, provides a plausible allegation of a protected class under the FHA, which prohibits discrimination on the basis of race, color, or national origin. See 42 U.S.C. §§ 3604, 3605. The Court also finds that Plaintiffs have offered statistics to demonstrate disparate impact.[30]

Defendants also argue that Plaintiffs offer no relevant (*i.e.*, "apples to apples")

---

[30]   The Court will leave Defendants' remaining arguments challenging the Plaintiffs' statistical support to a summary judgment analysis.

comparison of "minority and white borrowers" for purposes of supporting a disparate impact theory.  Doc. No. 18, p. 30.  To this regard, the Court will look to the approach of the Hargraves court (which the Eleventh Circuit agreed with in an unpublished opinion).  Steed, 308 F. App'x at 368.[31]  In Hargraves, the court found that statistical evidence that defendant mortgage company made a greater percentage of loans in majority black census tracts than other subprime lenders and made a disproportionately large number of loans in neighborhoods that were over ninety percent black showed disparate impact.  140 F. Supp. at 21.  The Eleventh Circuit also noted that Hargraves held that "plaintiff need not show that the defendant made loans on preferable terms to non-African Americans."  308 F. App'x at 369.  In accordance with Hargraves, the Court finds, at a minimum, that Plaintiffs' statistics and allegations that Defendants focused its lending activity on minorities by making "a substantially greater percentage of their total mortgage loans (i.e., high cost, subprime, and ALT-A-conforming loans) to minority borrowers than to Caucasian borrowers far beyond what the racial makeup of Plaintiffs' communities and neighborhoods would indicate," as well as the data showing the "relative proportion of HSBC's minority loans in the highest foreclosure rate census tracks relative to the number of non-

---

[31]  The Court recognizes Defendants' citation of Schwarz v. City of Treasure Island, 544 F.3d 1201, 1217-18 (11th Cir. 2008) in support of its comparison argument; however, Schwarz was not a reverse redlining case and at this stage in the litigation, the Court deems it appropriate to first consider reverse redlining cases.

minority loans in the same census tracks" are sufficient to satisfy Plaintiffs' disparate impact pleading requirements.  <u>See</u> Doc. No. 17, pp. 35-36, citing Complaint, Doc. No. 1 ¶¶ 136-141; 142-146; 260-267; and 268-270).

Defendants further argue that policies referenced by Plaintiffs are not sufficient to satisfy Plaintiffs' pleading burden in that the identified policies are "general policies common to all lenders" and "mere allegations of a policy of discretion and statistics showing a disparate impact are insufficient to allege discrimination." Doc. No. 18, pp. 30, 41.  Defendants cite <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 990, 108 S. Ct. 2777 (1988) for the holding that a "policy of leaving . . . decisions to the unchecked discretion of . . . supervisors" cannot, in itself, raise and inference of discrimination.  Doc. No. 16-1, p. 40.  However, the Supreme Court has also recognized that "'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of . . . liability under a disparate-impact theory—since 'an . . . undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2554 (2011), citing <u>Watson</u>, 487 U.S. at 990–91, 108 S. Ct. 2777; <u>see also</u> <u>Ramirez v. GreenPoint Mortg. Funding, Inc.</u>, 633 F. Supp.2d 922, 928 (N.D. Cal. 2008) ("Although challenging subjective practices does not relieve a plaintiff from identifying a specific policy or practice that allegedly results in a

39

disparate impact, Plaintiffs have adequately identified a specific policy in the Discretionary Pricing Policy. In doing so, they have singled out the subjective portion of a lending policy that allegedly relies on both subjective and objective criteria, and they need do no more to meet the 'specific policy or practice' requirement for stating a disparate impact claim.").

After review, the Court declines to uphold Defendants' present challenge to Plaintiffs' allegations of policy.  After review, the Court is unable to conclude that a discretionary policy can never be the basis of a disparate impact claim.  The Court finds that Defendants' citations of authority to the contrary are based upon Rule 23, class action/commonality determinations — which are not at issue here.

> **(ii) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact**

As stated above, to plausibly plead disparate impact, the Complaint must set forth facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact.

Defendants state that Plaintiffs "at best" argue only a "bottom line. . . imbalance" between minorities and Caucasians with no discernible connection between Defendants' alleged practices and that imbalance.  Doc. No. 16-1, p. 42. Defendant argue that Plaintiffs "do not allege in any meaningful way that minorities

received higher-priced loans and whether, or how, any policies or practices—rather than a housing bubble, the larger economic collapse, poverty, divorce, job loss, personal tragedies, or any of the other factors that precipitate foreclosure—caused such a phenomenon, or caused more foreclosures to be initiated on those loans, or caused foreclosures to result in vacancies, or for vacancies to result in higher municipal expenditures." Doc. No. 16-1, p. 43.

In response, Plaintiffs argue that Defendants' discriminatory policies have had "segregative and discriminatory effects, establishing the causation element." Doc. No. 17, pp. 36-37. Plaintiffs further argue that "[i]ncreased urban blight and decay, caused by the explosion of foreclosures and vacancies, is widely recognized as leading to 'white flight,' thereby in turn further segregating effected communities and neighborhoods." Id. at p. 37, citing Laufman v. Oakley Bldg. & Loan Co., 408 F. Supp. 489, 497 (S.D. Ohio 1976). Plaintiffs' also argue that Defendants' predatory and discriminatory lending and loan servicing make housing more restrictive or unavailable for minorities in Plaintiffs' communities. Id.

Defendants argue that Plaintiffs do not identify how a specific policy actually created an illegal, discriminatory impact on minorities in that Plaintiffs' arguments is circularly, i.e., "because HSBC allegedly discriminated, its policies are discriminatory." Doc. No. 18, p. 31.

41

As stated by the <u>Miller</u> court in considering similar causation arguments, "ultimately, the question of causation – to what extent the discrepancy is explainable by objective data or race – is premature" at this stage of the case.  571 F. Supp. 2d at 259.  The Court does, however, conclude that the Plaintiffs' Complaint gives rise to a fair inference of causation, "the question of proof will become an issue at later stages in the proceedings."  <u>Id.</u>

### 4.  Whether the FHA permits disparate impact claims

As stated above, in their Motion to Dismiss, Defendants argue that the FHA does not permit disparate impact claims.  Defendants argue that the FHA does not permit disparate impact claims as a matter of law, an issue as to which the Supreme Court has granted certiorari.  Doc. No. 16-1, p. 13.[32]  Defendants cite <u>Smith v. City of Jackson</u>, 544 U.S. 228 (2005) and argue that because the FHA lacks an "effects" subsection in contrast to Title VII and the ADEA, and the statutes were enacted a handful of years apart, the omission must be viewed as an intent by Congress not to provide for disparate impact claims under the FHA.  Doc. No. 16-1, p. 49.

Plaintiffs argue that Defendants' argument is contrary to the case law in which other courts have rejected this same argument.  Doc. No. 17, p. 35, n. 32, citing <u>Guerra</u>

---

[32]  <u>Township of Mount Holly, New Jersey v. Mt. Holly Gardens Citizens in Action, Inc.</u>, 658 F.3d 375 (2011), *cert granted* June 17, 2013, 133 S. Ct. 2824.

v. GMAC LLC, No. 08-CV-1297, 2009 WL 449153, *2-5 (E.D. Pa. Feb. 20, 2009) (denying mortgage lender's motion to dismiss class action alleging violations of the FHA for lender's discretionary pricing policy, and rejecting the contention that City of Jackson precludes disparate impact claims under the FHA – citing a collection of cases from across the United States that "squarely" and "unanimously" reject similar arguments, as the one here).

For purposes of this Order, the Court will adopt the holding in Guerra and allow the disparate impact claim to proceed.  The Court will reconsider the matter after the Supreme Court issues its ruling in Mount Holly.

### CONCLUSION

The Defendants' Motion to Dismiss Plaintiffs' Complaint [Doc. No. 16] is hereby **DENIED**.

**IT IS SO ORDERED,** this 24th day of September, 2013.

s/Steve C. Jones
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)