IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEKALB COUNTY, GEORGIA,                  :
FULTON COUNTY, GEORGIA, and              :
COBB COUNTY, GEORGIA,                    :
                                         :      CIVIL ACTION NO.
    Plaintiffs,                          :      1:12-cv-3640-AT
                                         :
    v.                                   :
                                         :
HSBC NORTH AMERICA HOLDINGS,             :
INC.,  et al.,                           :
                                         :
    Defendants.                          :

## **ORDER**

Three of the five core counties ("the Counties") in the Atlanta metropolitan area filed this suit in October of 2012 under the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. ("FHA"). They alleged that Defendants systematically discriminated against minority mortgage borrowers during the height of the housing bubble by making those borrowers mortgage loans with predatory terms that were materially worse than those obtained by non-minority borrowers, in an effort to drain the equity from their homes.  (*See generally* Compl., Doc. 1.)

The Counties further alleged that HSBC continued this scheme for years after the housing bubble popped by engaging in discriminatory "[m]ortgage [s]ervicing [and] [f]oreclosure [p]ractices" that continued well after origination and persisted into the depths of the foreclosure crisis.  (*See* Compl. at ¶ 272,

Subsection H.)  Plaintiffs allege that Defendants were "actually incentivized to cause borrower delinquencies, defaults, home vacancies, or foreclosures because they make more net income in those circumstances." (Compl. ¶ 278.) As a result, according to Plaintiffs, Defendants' "lending *and* servicing activities . . . resulted in . . . unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures, and[] home vacancies" in the Counties.  (Compl. ¶ 2 (emphasis added).)  In other words, Plaintiffs allege that Defendants and their corporate partners in the mortgage industry lit the fire of the foreclosure crisis by originating predatory loans, and then poured gasoline on it through their discriminatory servicing practices.

Defendants have vigorously defended their position in this litigation, in part through their assertion of affirmative defenses.  Importantly for the purposes of this Order, Defendants filed a motion to dismiss this suit on the basis that Plaintiffs have inadequately pled their claims and that those claims were barred by the statute of limitations.  Judge Jones rejected those arguments in September of 2013, holding that Plaintiffs had met the pleading requirements of Fed. R. Civ. P. 8 and that Defendants' statute of limitations argument was premature because "the character of Defendants' activities [should] be examined" after discovery.  (Order, Doc. 23 at 31-32.)  Specifically, Judge Jones adopted the approach taken in *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 21 (D.D.C. 2000), where the district court held that it could not rule on a statute of limitations defense before it understood the nature of the violations at issue,

because it could not determine if later lending practices where "independently discriminatory" without knowing the full scope of the alleged discriminatory scheme.  (Order, Doc. 23 at 30-31.)  And Judge Jones found that Plaintiffs had stated a claim for disparate impact under FHA because they had alleged that "Defendants focused [their] lending activity on minorities" and because they alleged "specific empirical data reflecting the disparate impact of Defendants' policies on minorities."  (Order, Doc. 23 at 37-38.)

Judge Ross, after receiving the case, took much the same path charted by Judge Jones on the continuing violations issue.[1]  (Order, Doc. 110 at 9) (holding that "Plaintiffs' claims are subject to the continuing violations doctrine," and rejecting Defendants' motion for summary judgment on the statute of limitations issue because Plaintiffs' allegations that "hundreds of loans[] which were made to minority borrowers between 2003-2008[] were still being serviced by an HSBC entity within the statutory period.")  However, roughly four months later Judge Ross limited Plaintiffs' discovery on servicing issues only to Defendants' servicing policies and procedures, and did not permit loan-level servicing discovery in her March 4, 2016 Scheduling Order (Doc. 120).

On May 11, 2016, this case was transferred to the undersigned judge after the Judge Ross recused herself.  [Docs. 131, 132.]  At the time, the parties were operating under the March 4, 2016 scheduling order, and had several pending discovery disputes.  First, the Counties had filed a Motion for Clarification on

---

[1] After a brief detour.  (Order of March 3, 2015 , Doc. 75).

March 9, 2016 seeking, in essence, reconsideration of Judge Ross's scheduling order.  Plaintiffs argued that the Court had incorrectly limited the scope of discovery after having ruled that Plaintiffs could proceed under both their loan origination and mortgage servicing claims.  (Doc. 121; Order, Doc. 110 at 16-17.) The primary dispute between the parties was whether or not the Counties were entitled to loan-level data beyond that of loans originated between October 18, 2010 and October 18, 2014, the agreed-upon limitations period.  Plaintiffs contest they are entitled to loan data going back to 2003, so that they can understand and prove the entire extent of Defendants' alleged discriminatory scheme. Defendants contended (understandably, given the parameters of Judge Ross's scheduling order) that they only had to provide origination data, not servicing data, for loans made within the limitations period.   This fundamental disagreement about the nature and contours of the case appears to have led to other breakdowns in the discovery process.

After the case was transferred, the Court, in an effort to bring itself up to speed on this four-year old litigation, received statements from the parties concerning the discovery that had been conducted to date and the pending discovery disputes.  The Court then held a scheduling hearing on June 9, 2016. At the hearing, the Court heard argument from both parties about the proper breadth of this case and the appropriate scope of discovery moving forward.  The parties discussed a variety of important issues, including the nature of the claims alleged (more specifically, whether the Counties had alleged a "stand alone"

4

servicing and foreclosure discrimination claim), the statute of limitations problem facing the Counties, the application of the continuing violation doctrine to that statute of limitations issue, the Counties' knowledge of the alleged discrimination, and so on. The Court also invited the parties to submit key citations to the record and a list of important cases that they felt the Court should review. The Court administratively closed the case while it considered the parties' positions and authorities, with the aim of reopening this matter and setting a clear schedule for discovery going forward. That time is now here.

The Court has since reviewed much of the abundant case law provided by the parties, all of the relevant orders issued by the Court's predecessors, and the parties' briefing at varying stages of the case. For the following reasons, the Court **GRANTS IN PART** Plaintiffs' Motion for Clarification [Doc. 121] as provided herein. The Court agrees with Plaintiffs – at least to some extent – that given the claims recognized by both Judge Jones and Judge Ross's substantive orders, a modification of the March 4, 2016 scheduling order is appropriate, whether the Court proceeds under the standards of a motion for reconsideration or simply as a motion for clarification.

Both Judge Jones and Judge Ross viewed this case as presenting origination, servicing, and related foreclosure claims. (*E.g.*, Order, Doc. 23 at 41 ("Plaintiffs[] also argue that Defendants' predatory and discriminatory lending and loan servicing make housing more restrictive or unavailable for minorities in Plaintiffs' communities") (Jones, J.); *see id.* at 31 ([t]he present case involves

5

allegedly discriminatory loans issued and retained for servicing by Defendants –

and for which Plaintiffs allege discriminatory servicing in the context of an illegal

scheme"); *see also* Order, Doc. 110 at 4 ("Judge Jones further decided that the

specific nature of Defendants' activities with respect to the loans, i.e., whether

there was discrimination solely in the origination of the loans or whether

discrimination was committed as a separate act throughout the servicing of the

loans, was to be decided at summary judgment or trial, and these facts were

necessary in order to resolve the statute of limitations issue.").) (Ross, J.)  Judge

Jones specifically found that "Plaintiffs allege discriminatory servicing in the

context of an illegal scheme."  (Order, Doc. 23 at 31.)

The Court understands Defendants' concerns and arguments about the

generality of Plaintiffs' allegations.    However,  the  Court  agrees  with  its

predecessors and is satisfied that Plaintiffs have alleged stand alone servicing

violations, even if the precise nature of those violations is not developed in great

detail despite the Complaint's extensiveness.[2]

For example, the Counties allege that Defendants:

---

[2] Judge Ross, in particular, expressed concerns about the specificity of the Complaint.  (Order, Doc. 110 at 16 ("Plaintiffs assert that three of the Defendants who have responded to discovery requests admit that hundreds of loans, which were made to minority borrowers between 2003-2008, were still being serviced by an HSBC entity within the statutory period . . . [but] the parties have provided no further facts or made any arguments explaining the character of Defendants' activities.").)   But, as Judge Ross ultimately acknowledged in her November 2015 Order, Judge Jones resolved most of those questions in 2013, and so revisiting them at this time would be inappropriate.  (Order, Doc. 110 at 4.)  ("Judge Jones found in the September 25 Order that Plaintiffs had alleged that Defendants had issued *and serviced* loans discriminatorily. . .").

- Improperly charged minority borrowers "inflated mortgage servicing and foreclosure related fees and costs" which "led to disproportionate rates of . . . defaults" on loans made to minority borrowers.  (Compl. ¶ 283-284.)

- Failed to follow "any guidelines" for home loan modifications.[3]  (Compl. ¶ 288.)

- Filed false statements in federal bankruptcy courts regarding "the amount of principal and interest due, and the fees and expenses chargeable to the borrower."  (Compl. ¶ 282.)

And Plaintiff has been consistent (and more specific) about the nature of the servicing violations in their briefs and oral arguments.  (*E.g.*, Transcript of February 29, 2016 Status Conference, Doc. 126-1 at 6:20-22; 9:5-8 ("[p]art of that loan servicing, Your Honor, includes refusals to make loan modifications, which is another act of discriminatory lending;" arguing that defendant "decid[es] to foreclose when it is convenient for the bank . . . after . . . running up fees on the borrowers when they go into default;" *see also* Plaintiffs' Reply in Support of Motion for Clarification, Doc. 127 at 3, 5-6 (arguing that discriminatory servicing includes improperly denying loan modifications, "impos[ing] 'subjective . . . servicing costs' . . .[and] 'maximiz[ing] loan servicing fees . . . through the foreclosure process [by] . . .add[ing] upcharges to borrowers.").)

The Court also agrees with Plaintiffs that under the current case law these allegedly discriminatory servicing and foreclosure practices or actions, if true,

---

[3] The Court expresses no opinion here on whether or not HSBC was legally required to follow any guidelines regarding loan modifications during the time period relevant to this Complaint.

could be FHA violations.  And if these new violations of the FHA occurred within the limitations period for this case, then Defendants may be liable for those violations even if they were inflicted on borrowers whose loans were originated many years ago (i.e., 2003 and forward).  This is because such a violation is a "new" act of discrimination, though conceptually a part of a larger and ongoing pattern of discrimination.[4]  *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1284 (11th Cir. 2015), *cert. granted sub nom. Bank of Am. Corp. v. City of Miami, Fla.*, No. 15-1111, 2016 WL 853246 (U.S. June 28, 2016) (the continuing violations doctrine "allows a plaintiff to sue on otherwise time-barred claims as long as one act of discrimination has occurred . . . during the statutory period.") (citations and internal quotation marks omitted); *see also Hargraves*, 140 F. Supp. 2d at 21 (denying summary judgment on FHA claim where Plaintiffs alleged that lender subjected minorities to "repeated foreclosures, and loan servicing procedures in which excessive fees are charged"); *Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 965 (N.D. Ill. 2015) (denying motion to dismiss based on statute of limitations defense when county alleged that defendant "continue[d] to service the loans in a discriminatory manner"); *Cty, of Cook v. Bank of America Corp.*, Case No. 14-C-2280, 2015 WL 1303313, at *6 (N.D. Ill. March 19, 2015) (finding that a statute of limitations defense should

---

[4] What the Court does not view as "new" act is the mere collection of payments on an allegedly discriminatory loan.  Nor is the Court convinced – though it does not reach the issue at this time – that the act of foreclosure is, by itself, a discriminatory new act if that foreclosure was solely the result of the loan being rotten at its inception, with no presence of an intervening discriminatory policy, practice, or action.

only be resolved on summary judgment because "it is plausible that the discriminatory nature of home loans signed by minority borrowers in Cook County became apparent only during the servicing period of each loan as high costs and fees started to add up.")

The Eleventh Circuit was careful to note in *City of Miami* that the type of allegedly predatory lending practice does not need to remain uniform in order to allege a continuing violation.  800 F.3d at 1285 ("[t]he predatory qualities of the loans have taken slightly different forms over time (e.g., higher interest rates, undisclosed back-end premiums, higher fees, etc.) . . . [t]he fact that the burdensome terms have not remained perfectly uniform does not make the allegedly unlawful practice any less 'continuing.'")  And so the Court finds that Plaintiffs' allegations and arguments concerning continuing servicing violations – whether in the form of racially discriminatory denial of loan modifications, discriminatory imposition or application of servicing fees, or discriminatory foreclosure practices – are sufficient to permit Plaintiffs to access loan-level servicing data within the limitations period.  As Judge Jones observed, the Court needs to see if Plaintiffs can produce any evidence of discriminatory acts and the "character" of the those practices before reaching any determination on the statute of limitations issues.

Accordingly, the Court views loans originated in or after 2003,[5] made on homes located in the Counties, and directly serviced[6] by Defendants between 2010 and 2014 to be a proper target for discovery.[7] The Court **REOPENS** the case, as well as discovery. The parties should be prepared to discuss a proposed timeline for discovery under the scope described here. Defendants **SHALL** provide their servicing files and data for such loans to Plaintiffs during the reopened discovery period. This applies to loans for both minority and non-minority borrowers, so that Plaintiffs may review comparator evidence.

In recognition of the fact that Plaintiffs' Complaint does not identify specific examples (of properties or loans) which exemplify how the alleged discriminatory acts were committed, the Court finds it appropriate to require Plaintiffs to put forward some evidence that they have uncovered a violation within a reasonable amount of time after receiving servicing data and files from Defendants. Therefore, Plaintiffs **SHALL** file on the docket an amendment to their initial disclosures within forty-five (45) days of receiving Defendants' loan-servicing data and files.[8] In response to Item 1 of those required disclosures, each County shall identify at least one property/mortgage – and preferably more – that the County alleges was subject to a racially discriminatory practice

---

[5] This is the date when Defendants allegedly entered the subprime market, according to Plaintiffs' Complaint. (Compl. ¶ 15.)

[6] If Plaintiffs allege that Defendants' servicing included or resulted in a discriminatory foreclosure, such alleged actions would be embraced within this category. The Court does not view this as encompassing loans where Defendants sold the loan and had no part in its servicing or foreclosure.

[7] Loans originated prior to October 18, 2010 which were *not* serviced by Defendants during the limitations period are not a proper target for discovery at this time.

[8] The Court is open to discussing this timeline at the June 30, 2016 status conference.

(mortgage origination, servicing, or foreclosure). The disclosures should identify the property address and loan and the <u>specific discriminatory practice(s)</u> that the County alleges the borrower was subjected to and the time frame at issue. Plaintiffs are further directed to more specifically identify their disparate impact theories in response to Item 2 of these amended disclosures.

The Court has scheduled a second status conference on June 30, 2016 to discuss scheduling and other issues associated with this decision. The parties should expect to again discuss the issue of a special master, and a proposed period for the fact discovery period and expert discovery period. The Court understands that, depending on what Plaintiffs obtain during fact discovery, they may be entitled to additional loan-level information. Or they may not. *See City of Los Angeles v. Wells Fargo & Co.,* No. 213-CV-09007-ODW, 2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015) (granting summary judgment for lender when city only located a handful of potentially predatory loans during discovery).

The Court believes this Order (and the more concrete schedule that will shortly follow) should address most of the outstanding discovery disputes. Plaintiffs acknowledged in their portion of the Joint Discovery Dispute Statement submitted on May 26, 2016 that "[m]any of Plaintiffs' concerns regarding the scope of the 30(b)(6) topics will be resolved if the new scheduling order permits full merits discovery." Plaintiffs are obtaining a partial version of that, though not the whole loaf. But with the broader discovery provided, the Court is satisfied

it can help the parties to begin to tackle the pending 30(b)(6) and other case management issues.[9]

With respect to the outstanding interrogatories, the Court **DIRECTS** Plaintiffs to provide ongoing supplementation in response to Defendants' Interrogatories concerning injury in fact and the County's knowledge.   As Plaintiffs stated at the June 9, 2016 Status Conference, "If [Defendants] want to ask whatever questions they want to ask, as long as they are not seeking privileged information, go right ahead.   But let's do that in the course of the merits discovery that is intertwined with the statute of limitations issue."   (Doc. 144 at p. 81:15-19.)   Plaintiffs should provide their first updates within forty-five (45) days of receiving the first wave of Defendants' servicing data, and shall supplement their responses every forty-five (45) days thereafter.

Finally, the Court intends to discuss at the June 30, 2016 status conference the efficiency and viability (or lack thereof) of filing motions for summary judgment prior to the close of the reopened discovery period.   The Court is concerned that Defendants' plans to file summary judgment motions on some issues – like the County's knowledge and diligence – might be prematurely timed.

**IT IS SO ORDERED** this 29th day of June, 2016.

**Amy Totenberg**
**United States District Judge**

---

[9]   The Court will address some of these 30(b)(6) issues at the June 29th conference.